# 22-98

---

## UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

LEVON ALEKSANIAN, INDIVIDUALLY, ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, AND AS CLASS REPRESENTATIVES, SONAM LAMA, INDIVIDUALLY, ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, AND AS CLASS REPRESENTATIVES, HARJIT KHATRA, INDIVIDUALLY, ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, AND AS CLASS REPRESENTATIVES,

*Plaintiffs-Appellants,*

-against-

UBER TECHNOLOGIES INC., JOINTLY AND SEVERALLY, UBER LOGISTIK, LLC, JOINTLY AND SEVERALLY, UBER USA LLC,

*Defendants-Appellees.*

---

*On appeal from Order and Judgment of the U.S. District Court for the Southern District of New York Case No 1:19-cv-10308*

---

## OPENING BRIEF FOR PLAINTIFFS-APPELLANTS & SPECIAL APPENDIX

---

**JULIEN & MIRER, PLLC**
1 Whitehall Street, 16th Floor
New York, New York 10004
(212) 231-2235
jmirer@julienmirer.com
*Attorneys for Plaintiffs-Appellants*

**ZUBIN SOLEIMANY, ESQ.**
NEW YORK TAXI WORKERS ALLIANCE
31-10 37th Avenue, Suite 300
Long Island City, New York 11101
(718) 706-9892
zsoleimany@nytwa.org
*Attorney for Plaintiffs-Appellants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................iv

INTRODUCTION.................................................................................................1

JURISDICTIONAL STATEMENT .......................................................................3

STATEMENT OF ISSUES FOR REVIEW ..........................................................3

STATEMENT OF THE CASE ..............................................................................3

    Procedural History .........................................................................................3

    Factual Background ........................................................................................4

STANDARD OF REVIEW ...................................................................................8

SUMMARY OF ARGUMENT .............................................................................8

ARGUMENT .....................................................................................................11

    I.    APPELLANTS ARE EXEMPT FROM ARBITRATION UNDER THE
        SCOPE OF SECTION 1 OF THE FAA BECAUSE THEY ARE PART
        OF A CLASS OF TRANSPORTATION WORKERS ENGAGED IN IN-
        TERSTATE COMMERCE, AS ARTICULATED IN *CIRCUIT CITY*......11

        A.    Rideshare Drivers Are Transportation Workers "Engaged In Interstate
               Commerce": In Their Work, They Regularly Cross State Lines Pursu-
               ant to Industry Business Models and Policies........................................13

               1.    The Text of the FAA's Residual Exemption Applies to
                      Transportation Workers Engaged In Interstate Com-
                      merce, Without Any Further Qualification Such as A
                      Specific Quantum of Interstate Work ..............................16

               2.    Rideshare Drivers Perform Millions Of Trips Across
                      State Lines With Sufficient Regularity To Support A
                      Finding That They Engage In Interstate Commerce........18

i

3. Rideshare Drivers Are Engaged In Interstate Commerce As They Reasonably Expect to Drive Across State Lines Pursuant to Their Employer's Terms of Service, Advertising, Coverage Area and Policies, And Interstate Travel Is Thus Integral To The Job ............................................ 20

4. Courts Have Further Looked To Revenue From Interstate Work As A Measure Of Engagement In Interstate Commerce To Understand The Significance Of Such Work .. 25

5. Nationwide, Uber and Rideshare Drivers Provide More Interstate Trips Than National Bus Lines, Which Are Undeniably Engaged In Interstate Commerce ...................... 27

B. The District Court's Opinion Effectively Repeals the Residual Exemption's Application To Workers Engaged in "Interstate Commerce" In Favor Of An Unwritten And Undefined Requirement For Engagement In "Non-Local" Commerce ................................................................. 28

1. The *Capriole* Line of Cases' Atextual Requirement For Long-Distance Travel Imposes An Incorrect And Ahistorical Understanding Of Transportation Work Onto Its Understanding Of The Residual Exemption ........................................................................ 35

2. At The Time Of The FAA's Passage, Congress Understood Entities To Be Engaged In Interstate Commerce Without Regard To Predominance Of Interstate Activities Or The Length Of Interstate Travel ........................... 37

C. Additionally, Rideshare Drivers Are Engaged In The Flow Of Interstate Commerce Through Intrastate Transportation To Interstate Travel Hubs ...................................................................................... 43

II. ABSENT THE APPLICABILITY OF THE FAA TO UBER DRIVERS, THE CONTRACT'S CHOICE-OF-FAA PROVISION CONTROLS, AND CANNOT BE CONTRAVENED BY ANOTHER STATE LAW NOT CONTRACTED FOR .............................................................................. 50

A. The Parties Choice of Law Controls Under General Contract Principles; The Parties Must Arbitrate Pursuant To The FAA Or Nor At All 50

1.	No Other Law Can Be Applied To The Arbitration Provision To Contravene An Extant Choice-Of-FAA Provision ...........................................................................54

2.	Severance Of The Choice-Of-FAA Provision Would Be A Condition	Precedent To The Court's Application Of Any Other Choice Of Law To	The Arbitration Provision ...........................................................................56

3.	There Would Be No Grounds To Disregard The Choice-Of-Law Provision Merely Because The FAA Doesn't Apply To Workers Engaged In Interstate Commerce Such As Plaintiffs ............................................................58

4.	Courts Are Empowered Only To Enforce Arbitration Agreements As Written; Doing Otherwise Subverts The Purpose Of A Choice-Of-Law Provision, And, In This Case Would Undermine National Policy On Arbitration, And Create Inconsistent And Absurd Results .................59

B.	Plaintiffs' Claims Cannot Be Compelled To Arbitration Even If New York Law Were To Be Applied, Which It Should Not .........................62

1.	The Arbitration Provision In The Uber Contract Is Null And Void Under NY CPLR § 7515..............63

2.	Under New York Law, Courts Assess The Enforceability of Arbitration Agreements on a Case-By-Case Basis; In this Case, Public Policy Would Bar Enforcement of the Arbitration Agreement And Its Class Waiver ...........................................65

CONCLUSION ...........................................................................70

CERTIFICATE OF COMPLIANCE ..........................................................71

# TABLE OF AUTHORITIES

## CASES

*Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emples. v. Pa. Greyhound Lines*, 192 F.2d 310 (3d Cir. 1951) ...............................................................28

*Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388 (1960) ....................................23

*AT&T Mobility v. Concepcion*, 563 U.S. 333 (2011)....................................51

*Bacolitsas v. 86th & 3rd Owner, LLC*, 702 F.3d 673 (2d Cir. 2012)..........................50

*Badgett v. Rent-Way, Inc.*, 350 F. Supp. 2d 642 (E.D. Pa. 2004) ...............................22

*Bailey v. Fish & Neave*, 8 N.Y.3d 523 (2007) ............................................................55

*Booking v. Gen. Star Mgmt. Co.*, 254 F.3d 414 (2d Cir. 2000) ...................................50

*BP p.l.c. v. Mayor of Baltimore*, 141 S. Ct. 1532 (2021)......................................23, 34

*Brady v. Williams Capital Group, L.P.*, 14 N.Y.3d 459  (2010) ...............65, 66, 67, 69

*Brown & Brown v. Johnson*, 25 N.Y. 3d 364 (2015)....................................................58

*Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440 (2006) ...............................61

*Burgos v. Northeast Logistics*,  2017 WL 10187756 (E.D.NY. Mar. 30, 2017)....15, 17

*Burke v. PricewaterhouseCoopers LLP Long Term Disability Plan*, 572 F.3d 76 (2d Cir. 2009) ...........................................................................................................54

*Capriole v. Uber Techs.*, 7 F.4th 854 (9th Cir. 2021)..........................................*passim*

*Central States, Southeast and Southwest Area Pension Fund v. Central Cartage Co.*, 84 F.3d. 988 (7th Cir. 1996)...........................................................................................14

*Circuit City v. Adams*, 532 U.S. 105 (2001) ........................................................*passim*

*Cunningham v. Lyft*, 17 F.4th 244 (1st Cir. 2021) ..................................................34, 44

*Dauphin v. Chestnut Ridge Transp.*, 2009 U.S. Dist. LEXIS 74483 (S.D.N.Y. Aug. 20, 2009) ........................................................................................................................22

*Davarci v. Uber Techs.*, 2021 U.S. Dist. LEXIS 157948, 2021 WL 3721374 (S.D.N.Y. Aug. 20, 2021) ....................................................................................*passim*

*Denius v. Dunlap*, 330 F.3d 919, (7th Cir. 2003).........................................................36

*Deutsche Bank Natl. Trust Co. v. Barclays Bank PLC*, 34 N.Y.3d 327 (2019)...........60

*Diaz v. Michigan Logistics Inc.*, 167 F. Supp.3d 375 (E.D.N.Y. 2016) ...............57, 58

*Doe v. Trump Corp.*, 6 F.4th 400 (2d Cir. 2021) ...........................................................8

*Dreiling v. Am. Express Co.*, 458 F.3d 942 (9th Cir. 2006).........................................49

*Employers Liability Cases*, 207 U.S. 463 (1908)....................................................38, 39

*Golightly v. Uber Techs.*, 2021 U.S. Dist. LEXIS 151100, 2021 WL 3539146 (S.D.N.Y. Aug. 11, 2021) ...........................................................................................15

*Gonzalez v. Lyft*, 2020 WL 7183573, 2020 U.S. Dist. LEXIS 231790 (D. N.J. Oct. 13, 2020), *adopted*, 2021 WL 303024, 2021 U.S. Dist. LEXIS 17188 (D. N.J. Jan. 29, 2021) ....................................................................................................................17

*Gulf Oil Corp v. Copp Paving Co..,* 419 U.S. 186 (1974) .................................... 43-44

*Haider v. Lyft*, 2021 U.S. Dist. LEXIS 62690, 2021 WL 1226442 (S.D.N.Y. Mar. 31, 2021) .......................................................................................................................*passim*

*Hill v. Rent-A-Center, Inc.*, 398 F.3d 1286 (11th Cir. 2005) ......................................32

*Howard v. Ill. C. R. Co,* 148 F. 997 (C.C. W.D. Tenn. 1907) ...............................39, 40

*Islam v. Lyft*, 524 F. Supp. 3d 338 (S.D.N.Y. 2021)..............................................*passim*

*Jacobus v. Colgate*, 217 N.Y. 235 (1916).....................................................................65

*Katel Ltd. Liab. Co. v. AT&T Corp.*, 607 F.3d 60 (2d Cir. 2010)................................60

*Kennedy v. Equity Transp. Co.*, 2015 U.S. Dist. LEXIS 143565, 2015 WL 6392755 (N.D.N.Y. Oct. 22, 2015).......................................................................................21, 23

*Lamps Plus v. Varela*, 139 S. Ct. 1407 (2019)........................................................51, 63

*Law Debenture Trust Co. v. Maverick Tube Corp.*, 595 F.3d 458 (2d Cir. 2010). 54-55

*International Brotherhood of Teamsters Local Union No. 50 v. Kienstra Precast, LLC*, 702 F.3d 954 (7th Cir. 2012).........................................................................*passim*

*Kramer v. Time Warner, Inc.*, 937 F.2d 767 (2d Cir. 1991) ........................................36

*Marbury v. Madison*, 5 U.S. 137 (1803) ....................................................................65

*Marshall v. Victoria Transp. Co.* 603 F.2d 1122 (5th Cir. 1979) .......................... 46-47

*Maross Constr. v Central N.Y. Regional Transp. Auth.*, 66 NY2d 341 (1985) ...........69

*Matter of Nationwide Gen. Ins. Co. v Investors Ins. Co. of Am.*, 37 NY2d 91 (1975) 69

*Matter of Smith Barney Shearson v Sacharow*, 91 NY2d 39 (1997)...........................68

*Meyer v. Uber Techs.*, 868 F.3d 66 (2d Cir. 2017) .........................................................8

*Morris v. McComb*, 332 U.S. 422 (1947) ..................................................21, 22, 23, 25

*Moses H. Cone Mem'l Hospital v. Mercury Constr. Corp.*, 460 U.S. 1 (1983)...........52

*Motorola Credit Corp. v. Uzan*, 388 F.3d 39 (2d Cir. 2004) .....................52, 58, 60, 61

*New Prime v. Oliviera*, 139 S.Ct. 532 (2019) ...................................….13, 35, 37, 53, 59

*Newton v. LVMH Moët Hennessy*, 2020 N.Y. Misc. LEXIS 3288, 2020 NY Slip Op 32290(U) (Sup. Ct. N.Y. Co. July 10, 2020) ................................................................63

*Newton v. LVMH Moët Hennessy*, 192 A.D.3d 540 (1st Dep't 2021) .........................63

*O'Connor v. Uber Technologies*, 82 F.Supp.3d 1133 (N.D. Cal 2015)......................24

*Osvatics v. Lyft, Inc.*, 535 F. Supp. 3d 1 (D.D.C. 2021) ..............................................32

*Palcko v. Airborne Express Inc.*, 372 F.2d 588 (3rd Cir. 2004) ..................................12

*Phillips v. Walling*, 324 U.S. 490 (1945) ....................................................................22

*Ragucci v. Prof'l Constr. Servs.*, 803 N.Y.S.2d 139 (2nd Dept.) ...............................67

*Rittmann v. Amazon.com Inc.,* 383 F. Supp. 3d 1196 (W.D. Wash. 2019)............55, 57

*Rittmann v. Amazon.com Inc.,* 971 F.3d 904 (9th Cir. 2020)...............................*passim*

*Rogers v. Lyft*, 452 F. Supp. 3d 904 (N.D. Cal.2020) ......................................29, 30, 41

*Ross v. Am. Express Co.*, 35 F. Supp. 3d 407 (S.D.N.Y. 2014)..................................36

*Salvano v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 85 N.Y.2d 173 (1995) ........52

*Sienkaniec v. Uber Techs.*, 401 F. Supp 3d 870 (D. Minn, 2019) .............................25

*Singh v. Uber Techs.*, 2021 U.S. Dist. LEXIS 225732, 2021 WL 5494439 (D. N.J. Nov. 23, 2021).................................................................................................31, 34

*Smith v. Allstate Power Vac Inc.*, 482 F. Supp. 3d 40 (E.D.N.Y. 2020)..........12, 15, 18

*Southern R. Co. v. United States*, 222 U.S. 20 (1911) .................................................42

*Susquehanna Valley Cent. Sch. Dist. v. Susquehanna Valley Teachers' Assoc.*, 37 N.Y.2d 614 (1975) .............................................................................................67

*Terwiliger v. Terwiliger*, 206 F.3d 240 (2d Cir. 2000) ................................................51

*United States v. Capital Transit Co,* 338 U.S. 286 (1949)........................ 33-34, 37, 48

*U.S. v. Colorado & N.W.R. Co.*, 157 F. 321 (8th Cir. 1907) .................................42, 43

*United States v. Yellow Cab. Co.*, 332 U.S 218 (1947).........................................*passim*

*Valdes v. Swift Transp.Co.,* 292 F. Supp. 2d 524 (S.D.N.Y 2003) .............................57

*Wabash R. Co. v. United States*, 168 F.1 (7th Cir. 1909) ...........................................41

*Waithaka v. Amazon.com, Inc.*, 404 F. Supp. 3d 335 (D. Mass. 2019)............38, 39, 44

*Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798 (7th Cir. 2020)............14, 17, 20, 31

*Walling v. Jackson Paper Co.*, 317 U.S. 564 (1943) ...................................................44

*Walters v. Am. Coach Lines of Miami, Inc.*, 569 F. Supp.2d 1270 (S.D. Fla. 2008) ...25

*Williams v. Tri-State Biodiesel, L.L.C.*, 2015 U.S. Dist. LEXIS 7926 (S.D.N.Y. Jan. 23, 2015) ...............................................................................................................21

*Woods v. Empire Health Choice, Inc.*, 574 F.3d 92 (2d Cir. 2009) .......................11, 29

*67 Wall Street Co. v. Franklin Nat'l Bank*, 37 N.Y.2d 245 (1985)..............................55

**STATUTES**

CPLR § 7515.........................................................................................63, 64, 65, 68

Fair Labor Standards Act ..............................................................................9, 21, 22, 46

Federal Arbitration Act, 9 U.S.C. § 1 ...................................................................*passim*

Federal Employers Liability Act............................................................................38, 39

N.Y. Gen. Bus. Law § 399-c ......................................................................................67

New York Labor Law ......................................................................................4, 62, 66

28 U.S.C. § 1291 ............................................................................................................3

1935 Motor Carrier Act, 49 Stat. 543 .........................................................................42

**OTHER AUTHORITIES**

10 NY JUR, CONTRACTS, § 223....................................................................................55

4 WILLISTON, CONTRACTS § 621 ................................................................................55

**MISC.**

William J. Cunningham, Committee on Recent Economic Changes of the President's Conference on Unemployment, RECENT ECONOMIC CHANGES IN THE UNITED STATES (1929), available at https://www.nber.org/system/files/chapters/c4957/c4957.pdf..................................................................................................35

Department of Commerce, U.S. Bureau of the Census, WATER TRANSPORTATION 1926 (1929), available at https://books.google.com/books?id=JUgnAQAAI-AAJ&printsec=frontcover&source=gbs_ge_summary_r&cad=0#v=onepage&q&f=false (Date accessed: Apr. 29, 2022) ........................................................36

*Bridges and Tunnel History*, Port Authority of New York and New Jersey, available at https://www.panynj.gov/port-authority/en/about/History/bridges-and-tunnels-history-about.html (Date Accessed: Apr. 27, 2022) ..........................................................36


*Uber Technologies Form S-1 Registration Statement* (2019), available at https://www.sec.gov/Archives/e
gar/data/1543151/000119312519103850/d647752ds1.htm
(Date Accessed: April 28, 2022) ...................................................................................49

---

SPECIAL APPENDIX

Opinion & Order [Carter, J.] (Dec. 29, 2021) ........................................................SpA.1


CPLR 7515 ...............................................................................................................SpA.4

## **INTRODUCTION**

Whether rideshare drivers for companies such as Uber and Lyft are, as a matter of law, exempt from the Federal Arbitration Act, 9 U.S.C. § 1, *et seq*. (FAA) has been the subject of much litigation around the country in recent years. Appellant Uber drivers in this case allege that, as part of a class of transportation workers engaged in interstate commerce, they are exempt from having to arbitrate their disputes with Uber under the FAA, the exclusive law chosen by Uber to govern the arbitration provision in its contract with drivers. The dispute with Uber in this case concerns an astronomical wage theft which occurred between 2013 and 2017, when Uber deducted approximately 11% from each fare paid to New York City Uber drivers, in violation of Uber's contracts with its drivers. These deductions represented New York City and State sales tax as well as the contribution to the workers' compensation fund known as the "Black Car Fund" (BCF). These deductions not only violated Appellants' contracts with Uber, which provided that Uber would only deduct its Commission from the fare, they also violated New York State tax law, as they illegally transferred the customers' duty to pay such taxes to the driver. There are over 90,000 Uber drivers affected by this theft.

Uber nonetheless moved to compel arbitration, and the District Court granted the motion but dismissed the case as neither party requested a stay. This appeal presents an issue of first impression in this Circuit on the issue of whether rideshare

drivers fall within the FAA's transportation worker exemption. Appellants allege that the District Court erroneously aligned itself with cases which analogize the global rideshare companies Uber and Lyft to "local cab companies," whose drivers are not engaged in interstate commerce. This ruling ignored facts in the record showing that Uber drivers regularly perform interstate trips, at rates in line with other transportation workers who have been recognized to be engaged in interstate commerce under the FAA. Indeed, Uber drivers annually make more trips across state lines than either Amtrak or Greyhound.

The many clear errors Appellants identified to the District Court made in their motion for reconsideration were not corrected when the Court reiterated its decision on December 29, 2021, from which this appeal was taken.

Uber had also argued that if the drivers were exempt from the FAA, they still had to arbitrate their cases under State law. The District Court did not address this issue because of its ruling that Appellants were not exempt from the FAA. Plaintiffs provide arguments why, upon being found to be exempt from the FAA, in line with the terms of Uber's contract, the Court may not order the Appellants to arbitrate under state law.

## JURISDICTIONAL STATEMENT

Jurisdiction arises under 28 U.S.C. § 1291 as an appeal from a final order. The final order was issued on December 29, 2021 when the Court denied Appellants' Rule 59(e) Motion to Amend Judgment of March 8, 2021 which dismissed the case.

## STATEMENT OF ISSUES FOR REVIEW

The main issue on appeal is whether Appellants are transportation workers who are engaged in interstate commerce and thus not required to arbitrate their claims against Uber because they fit within the residual exemption of section 1 of the FAA. Secondarily, if the FAA does not apply to their contracts, the second issue on appeal is whether Appellants are nonetheless required to submit their claims to arbitration under State law.

## STATEMENT OF THE CASE

*Procedural History*

Appellants' Complaint, filed November 6, 2019, alleged that Uber breached its contract with its New York City drivers, by charging drivers the cost of sales tax and a surcharge for drivers' workers' compensation fund. J.A. 1. In response to the Complaint, Uber moved to compel arbitration. J.A. 33-35. While the motion to compel arbitration was pending, Appellants filed a motion for limited discovery related to the question of whether Uber drivers are engaged in interstate commerce for purposes of the FAA's residual exemption. J.A. 593. While these motions were

pending, the New York Court of Appeals issued its first ruling finding app-based workers to be employees under the New York Labor Law (NYLL); on March 2, 2021, Appellants filed a letter request for a pre-motion conference to amend the Complaint, seeking to add NYLL claims based on the initially-pleaded breach of contract claims. J.A. 603-606.

On March 8, 2021, Judge Andrew L. Carter granted Uber's motion to compel arbitration, holding that rideshare drivers are not part of a class of workers engaged in interstate commerce, and thus are not exempt from application of the FAA. J.A. 734-751. *Aleksanian v. Uber Techs.*, 524 F. Supp. 3d 251 (S.D.N.Y. 2021). Judge Carter also denied Appellants' motion for discovery. *Id*. Appellants sought reconsideration in a timely-filed motion to amend the judgment. J.A. 753. On December 29, 2021, Judge Carter denied this motion. J.A. 754-756. *Aleksanian v. Uber Techs.*, 2021 US Dist. LEXIS 248227, 2021 WL 6137095 (S.D.N.Y. Dec. 29, 2021). As Uber did not seek a stay of litigation, Judge Carter's order dismissed the case, making the order final. Appellants filed a timely notice of appeal on January 18, 2022. J.A. 757.

### *Factual Background*

From the time Uber entered the New York City market in 2011 until May of 2017, Uber illegally deducted from every trip worked by New York City Uber drivers approximately 11% of every fare; this was on top of the percentage

4

commission drivers agreed, by contract, would be deducted by Uber. J.A. 1-3, 12-14. This roughly 11% amount, represented on Uber's driver pay statements as two deductions for sales tax and the Black Car Fund surcharge (a contribution to drivers' workers' compensation), was the customer's obligation, which Uber deducted from drivers' pay, in violation of its own contract and state tax law. J.A. 14. Thus far, Uber has avoided responsibility for its daily theft from tens of thousands of drivers. Yet, Appellants argue they are entitled to proceed with this action, on behalf of themselves and a class of New York City-based drivers, based on their status as transportation workers engaged in interstate commerce and thus exempt from the FAA, *et seq*.

Appellants and rideshare drivers generally, both in New York City and nationwide, are engaged in interstate commerce as a regular and inseparable part of their employment with Uber. For example, 4.36% of the trips Appellant Aleksanian performed for Uber crossed state lines. J.A. 5. Para. 27; J.A. 44-45. These interstate trips accounted for 10.12% of the total sales revenue of Uber trips he provided. *Id*. Similarly, during the relevant period, 3.09% of all New York City Uber trips crossed state lines; nationwide statistics are not materially different, showing that 2.72% of all Uber trips crossed state lines. J.A. 38, Para. 8; J.A. 37, Para 4. Additionally, Appellants and rideshare drivers generally regularly transport a substantial proportion of their passengers in the flow of interstate commerce, transporting them

5

to hubs of interstate travel, including airports, rail and bus stations, and ferry terminals. Uber acknowledges that 10.1% of its nationwide trips begin or end at airports alone, and that it derives 15% of its revenue from such trips. J.A. 38, Para. 7; J.A. 373.

Pursuant to Uber's policies, Appellants (J.A. 4-6) and rideshare drivers nationwide, routinely transport passengers across state lines, in line with rideshare company business models that are structured to provide transportation not only, *e.g.*, within New York City or State, but across state lines as well. *See generally* J.A. 9-11. For example, in New York, Uber contemplates the regular performance of interstate transportation work by its drivers, including the imposition of a "$20 surcharge on all trips between NYC and New Jersey," holding itself out as providing this broad interstate service, on its consumer-facing website. J.A. 10, Para. 77. Other Uber policies require New York City-based drivers to routinely transport passengers between New York and New Jersey and/or Connecticut due to the fact that Uber policies state that trips originating in New York City may last as long as four hours. J.A. 10-11, Paras. 79-87. Regarding the class of rideshare drivers as a whole, Lyft imposes a 100-mile limit, likewise facilitating regular performance of interstate trips. *Islam v. Lyft*, 524 F. Supp. 3d 338, 352 (S.D.N.Y. 2021). In other U.S. markets, Uber places no limit on trip length. *Davarci v. Uber Techs.*, 2021 U.S. Dist. LEXIS 157948, at *21, n. 20, 2021 WL 3721374 (S.D.N.Y. Aug. 20, 2021).

Pursuant to such policies, New York-based passengers, for example, may choose any destination within four hours (or 100 miles) of their pick-up location, irrespective of the state of the destination and thus, for example, in New York, Uber drivers may be dispatched to locations in New Jersey or Connecticut. As drivers are not aware of the drop-off location until the passenger has entered the vehicle, J.A.10, Para. 83, should the driver refuse to drive for such trips, the refusals would count as "cancellations," and during the relevant time period, Uber's deactivation policy stated that drivers' accounts could be permanently deactivated for excessive cancellation rates. *See also Islam*, *supra*, at 347. Accordingly, no driver had the option to exclude interstate trips without risking further exposure to deactivation. J.A. 10-11, Paras 85-87. Thus, acceptance of interstate trips was a term and condition of drivers' access to Uber dispatches. *Id*. All such facts establish that the class of rideshare drivers is required to accept interstate trips as a term and condition of their jobs. *Id*. *See also Islam*, *supra,* at 352. Indeed, the interstate nature of Plaintiffs' and the putative class' work was touted by Uber. *See* J.A. 10, 344.

Fact-findings in other cases regarding the class of rideshare workers indicate that such policies with respect to the assignment of such trips apply to the class of workers nationally. *See*, *Islam, supra,* at 351-352; *Haider v. Lyft*, 2021 U.S. Dist. LEXIS 62690 at *9-10, 2021 WL 1226442 (S.D.N.Y. Mar. 31, 2021); *Davarci v.*

*Uber Techs., Inc.,* 2021 U.S. Dist. LEXIS 157948, at \*21, 2021 WL 3721374 (S.D.N.Y. Aug. 20, 2021).

## STANDARD OF REVIEW

Determinations of the arbitrability of a claim are reviewed *de novo. Doe v. Trump Corp.*, 6 F.4th 400, 409 (2d Cir. 2021), citing *Meyer v. Uber Techs.*, 868 F.3d 66, 72 (2d Cir. 2017).

## SUMMARY OF ARGUMENT

Appellants summarize below the arguments presented in this brief.

Section 1 of the FAA provides that "nothing" in the FAA "shall apply" to "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. In *Circuit City*, the Supreme Court narrowed the meaning of "class of workers" to only mean transportation workers. *Circuit City Stores v. Adams*, 532 U.S. 105, 109 (2001).

 Appellants and rideshare drivers generally are transportation workers engaged in interstate commerce, as that term was understood contemporaneous to the passage of the FAA, consistent with proper Circuit court interpretation of the Section 1 exemption, and consistent with this Court's understanding of threshold requirements to be engaged in interstate commerce in analogous federal law.

The District Court's error in finding that drivers who perform 1 in every 30 trips across state lines, and who may generate 15% of their net income from such trips, is completely unmoored from the text of the FAA, which places no thresholds

8

on the level of engagement in interstate commerce required to satisfy the standard. Indeed, federal appellate courts have found workers engaging in state-line crossing at similar rates to Uber drivers sufficiently engaged in interstate commerce to fall within the Section 1 exemption, even when construing such exemption narrowly, rather than construing it fairly as current Supreme Court precedent requires. When considering the same requirement for engagement in interstate commerce with respect to the Motor Carrier Exemption of the FLSA, the Supreme Court and Second Circuit have held similarly with respect to driver crossing state lines, even when such exemption was construed narrowly.

Such an approach aligns with the Supreme Court's understanding in the years preceding the FAA's passage that the term "engaged in interstate commerce," would apply broadly to those workers crossing state lines.

Nonetheless, the District Court compelled arbitration without reference to the facts of drivers' engagement in trips across state lines or in the flow of interstate commerce, adding by interpretation additional modifiers to Section 1's terms that would forbid "local" work, however plainly interstate, from being seen as part of interstate commerce. Such a finding lacks any support in the text of the statute, contemporary understandings from Supreme Court case law of what "engaged in interstate commerce" meant when not explicitly modified or limited, and highly analogous case law interpreting the same term in other statutes.

Instead, guided by the text of the FAA, and relevant case law, drivers are properly understood as engaged in interstate commerce and exempt from application of the FAA. Rideshare drivers' regular transportation across state lines occurs routinely, as an inseparable and required part of their job duties, at a rate that would lead to weekly interstate trips, a pattern that plainly indicates engagement, per the statute's plain language. Statutes contemporaneous to the FAA and the cases interpreting them undoubtedly viewed such interstate travel by transportation workers as engagement in interstate commerce; the Supreme Court has viewed such sources as properly guiding interpretation of the FAA's the residual exemption

Further, Appellants request that this court exercise its discretion to decide the state law question of whether any state law may apply to the arbitration provision against the contract extant choice of FAA provision, where the parties briefed the matter below but the District Court did not decide it. Where Uber chose the FAA, solely and exclusively to govern its arbitration provision, no other source of law may be substituted for this choice, as there are no grounds to conduct a choice-of-law analysis, when the contract chose the FAA, but the FAA does not provide Uber with the means to compel arbitration. General contract principles prohibit the disregard for the choice-of-FAA provision that Uber had sought below.

Even if New York law were to apply, there would still be no basis for compelling arbitration. Recent statutory restrictions on prohibited types of

arbitration clauses, such as Uber's, would prohibit enforcement of its arbitration agreement and, further, with the FAA no longer applicable, New York State policy would bar the enforcement of an arbitration agreement and class waiver that, under the facts of this case, would render individualized adjudication of 90,000 state labor law claims simply impossible.

## **ARGUMENT**

**I.  APPELLANTS ARE EXEMPT FROM ARBITRATION UNDER THE SCOPE OF SECTION 1 OF THE FAA BECAUSE THEY ARE PART OF A CLASS OF TRANSPORTATION WORKERS ENGAGED IN INTERSTATE COMMERCE, AS ARTICULATED IN *CIRCUIT CITY***

The residual clause exempts from arbitration under the FAA, "contracts of employment of seamen, railroad employees, *or any other class of workers* (emphasis added) engaged in foreign or interstate commerce." 9 U.S.C. § 1.

In *Circuit City*, the scope of the residual exemption, previously subject to varying interpretations regarding which contracts of employment were to be exempted from the FAA's coverage, was limited by the Supreme Court to encompass only "class[es]" of *transportation* workers engaged in interstate commerce. *Circuit City, supra,* at 109. To fall within the residual category then, a class of workers must be transportation workers engaged in interstate commerce. In interpreting a statute, a court's analysis must begin with the text of the statute. *See Woods v. Empire Health Choice, Inc.*, 574 F.3d 92, 98 (2d Cir. 2009). Accordingly, the task before a court in determining whether the residual exemption applies is a

straightforward process in line with the text of the residual exemption: 1.) is the class of workers in question a class of transportation workers, and, if so; 2.) is the class of workers engaged in interstate commerce? Transportation workers for purposes of the FAA have been defined as "those other classes of workers who are actually engaged in the movement of interstate or foreign commerce." *Smith v. Allstate Power Vac Inc.*, 482 F. Supp. 3d 40, 46 (E.D.N.Y. 2020), *quoting Palcko v. Airborne Express*, 372 F.3d 588, 593 (3d Cir. 2004). Here, clearly, drivers are transportation workers. The only question then is whether they as a class are engaged in interstate commerce.

As argued herein, plaintiffs and rideshare drivers across the nation, and in New York, are part of a class of rideshare drivers who 1) engage in interstate commerce by actually crossing state lines in a manner that courts have recognized as sufficient to bring them within the ambit of engagement in interstate commerce; and 2) engage in non-state line crossing activity within the flow of interstate commerce by trips to airports and other interstate transportation hubs. Each of these activities is sufficient to bring the class within the FAA exemption. *See*, *Islam*, *supra*, and *Haider*, *supra* (both finding Lyft drivers nationwide to be transportation workers engaged in interstate commerce and exempt under Section 1 of the FAA).

### A. Rideshare Drivers Are Transportation Workers "Engaged In Interstate Commerce": In Their Work, They Regularly Cross State Lines Pursuant to Industry Business Models and Policies

Courts have understood the term engagement in interstate commerce under the residual exemption to apply to transportation workers who cross state lines in the course of their work, or are engaged in the flow of interstate commerce. *See*, *e.g.*, *New Prime Inc. v. Oliveira*, 139 S. Ct. 532 (2019) (uncontested that driver for an interstate trucking company was engaged in interstate commerce). In *International Brotherhood of Teamsters Local Union No. 50 v. Kienstra Precast, LLC*, the Seventh Circuit held that truck drivers who hauled concrete locally within the East St. Louis area, from Illinois, across the Mississippi River to Missouri a "few dozen" times out of "1500 to 1750 deliveries each year" were engaged in interstate commerce under the FAA. 702 F.3d 954, 958 (7th Cir. 2012). This number represents somewhere in the range of 2.06%-4%[1] of all deliveries, firmly within the range of Uber trips, nationally, that cross state lines. *See* J.A. 37, Para. 4 (Describing 2.72% of Uber trips nationwide ending in different states). In *Kienstra*, the Court held explicitly that "there is no basis in the text of §1 for drawing a line between workers who do a lot of interstate transportation work and those who cross state lines only rarely; both sorts of worker are engaged in foreign or interstate commerce." 702 F.3d, at 958 (citation omitted). *See also Islam*, at 351, *quoting Kienstra*; *Haider*, at

---

[1] Deriving the percentage based on a "few" dozen, taken to mean three to five dozen.

*10, *quoting Kienstra*. Further, these trips, taken within the same metropolitan area, across the Illinois-Missouri border were, of course, treated as interstate, in line with Section 1's plain terms, regardless of the relatively short length of transit across state lines. The Seventh Circuit did not dismiss the interstate nature of these trips as "happenstance" merely because the drivers worked "directly across the Mississippi River from St. Louis, Missouri, and its environs." *Kienstra*, at 956.

The *Kienstra* decision followed long-standing precedent in the Seventh Circuit that transportation workers will be considered engaged in interstate commerce under the FAA where they are "primarily engaged in local trucking and occasionally transport[] cartage across state lines." *Central States, Southeast and Southwest Area Pension Fund v. Central Cartage Co.*, 84 F.3d. 988, 993 (7th Cir. 1996). Amidst the emergence of the so-called "gig economy," *Kienstra* remains good law. In a recent case involving GrubHub delivery workers, who did not cross state lines, the Seventh Circuit cited *Kienstra* with approval, noting its treatment of transportation workers who make some trips across state lines. *Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798, 802 (7th Cir. 2020) (Barrett, J.).

The majority of Courts within the Second Circuit to have touched on the question of whether or not there is a sufficient level of interstate work required to be done to fall within the FAA's residual exemption have followed the Seventh Circuit's approach, recognizing no specific amount of interstate travel is necessary

for transportation workers to be engaged in interstate commerce. *See Burgos v. Northeast Logistics*, 2017 WL 10187756 (E.D.NY. Mar. 30, 2017), *Smith v. Allstate Power Vac Inc.*, 482 F. Supp. 3d 40, at 46-47 (E.D.N.Y. 2020), *Islam v. Lyft*, *supra*, *Haider v. Lyft*, *supra*, all finding drivers to fall within the exemption where they performed some work across state lines.[2] In line with *Kienstra*, these courts refused to impose further qualifications on the plain text of the FAA. One day after the District Court decided this case, Judge Abrams held that Lyft and Uber drivers nationwide are engaged in interstate commerce by virtue of their performing "sufficient numbers of interstate rides, with sufficient regularity" noting that, for a driver, "interstate trips are a regular component of his or her day-to-day work." *Islam*, at 353, 352. In *Haider*, Judge Nathan followed *Islam*, writing:

> Looking only at Lyft drivers in the New York City area, this is not a close case. Lyft markets its service as one allowing interstate travel. Its fare schedule contemplates interstate travel. And its drivers cross state lines on more days than not. Lyft does not dispute Islam's evidence that interstate trips took a disproportionate amount of his work time and accounted for twenty percent of his earnings. Interstate travel is a central component of Lyft's business in the tri-state area. The Court has little trouble concluding that its drivers here are members of a class of workers engaged in interstate commerce, and thus that they fall within the FAA's exemption for contracts of employment of transportation workers.
>
> The Court reaches the same conclusion when considering rideshare drivers as a class without regard to geography. To begin with, the sheer

---

[2] *Compare Davarci*, *supra*, and *Aleksanian*, finding drivers to fall outside the exemption. *See also Golightly v. Uber Techs.*, 2021 U.S. Dist. LEXIS 151100, 2021 WL 3539146 (S.D.N.Y. Aug. 11, 2021) (Granting discovery on the issue of whether drivers are engaged in interstate commerce).

number of interstate trips rideshare drivers make places them "within the flow of interstate commerce." *Circuit City*, 532 U.S. at 118. Based on Lyft's own data, its full-time drivers take passengers across state lines about twice each week on average. Undisputed record evidence reflects that these trips are longer, more time-consuming, and more lucrative than intrastate trips. These trips make up a significant part of Lyft's business—based on Lyft's data, millions of interstate fares each year. "From the perspective of an individual driver, these interstate trips are a regular component of his or her day-to-day work." *Islam*, 2021 U.S. Dist. LEXIS 43839, 2021 WL 871417, at *8 [...]Weekly interstate trips are enough.

*Haider*, at *8-10.

1. **The Text of the FAA's Residual Exemption Applies to Transportation Workers Engaged In Interstate Commerce, Without Any Further Qualification Such as A Specific Quantum of Interstate Work**

Notably, data that Uber provided in this case describe an even higher incidence of trips crossing state lines, with 3.09% of trips originating in New York City crossing state lines; Uber's nationwide data shows no significant difference for its drivers nationally, with 2.72% of trips nationwide crossing state lines. J.A. 37-38.

Consistent with the text of the FAA, the Seventh Circuit view, and the majority view within this Circuit, these courts refused to move the goalposts on sufficient "engagement" in interstate commerce where the text of the statute is clear. These courts would not amend the FAA, by interpretation, by adding modifiers that do not exist in the statute. There is no "basis to read into Section One the words *'predominantly* engaged in' or '*primarily* engaged in' interstate commerce." *Islam*,

16

at 351 (emphasis original). Similarly, in *Gonzalez v. Lyft*, Magistrate Judge Dickson

held that

> "The [FAA] does not say 'engaged exclusively", "engaged primarily",
> "engaged routinely", or even 'engaged in a lot of' interstate commerce.
> Congress could have inserted any number of modifiers intended to express a
> baseline amount of activity. It did not."

2020 WL 7183573, 2020 U.S. Dist. LEXIS 231790 at *15 (D. N.J. Oct. 13, 2020),

*adopted*, 2021 WL 303024, 2021 U.S. Dist. LEXIS 17188 (D. N.J. Jan. 29, 2021).

Rejecting these unfounded notions of predominance, Judge Abrams analogized that

> [b]y way of illustration, any federal district judge would answer in the
> affirmative if asked whether or not she was "engaged in" conducting
> criminal trials, notwithstanding that most federal judges' dockets
> consist primarily of civil actions and the majority of criminal
> prosecutions are resolved by a guilty plea. Overseeing criminal trials is
> unquestionably a "central part of [a federal district judge's] job
> description," *Wallace*, 970 F.3d at 801, even if it is not something that
> she does every day or even every month.

*Islam*, at 351.

These rideshare decisions followed earlier decisions from within the Circuit

that also hewed to the statute's plain meaning, and the Seventh Circuit view. In

*Burgos v. Northeast Logistics*, the Court found that "plaintiffs sufficiently allege[d]

that they were engaged in interstate transportation" where they did "drive across

state lines in their employment as delivery drivers." 2017 WL 10187756 (E.D.NY.

17

Mar. 30, 2017).[3] In *Smith v. Allstate Power Vac.*, the Court found a driver who occasionally crossed state lines to be engaged in interstate commerce, citing with approval the Seventh Circuit's position in *Kienstra* that the FAA makes no distinction between workers who often or rarely cross state lines. 482 F. Supp. 3d 40, 46-47 (E.D.N.Y. 2020).

### 2. Rideshare Drivers Perform Millions Of Trips Across State Lines With Sufficient Regularity To Support A Finding That They Engage In Interstate Commerce

Because Uber drivers are transportation workers, and they perform interstate work at a rate at least equal to that of the drivers in *Kienstra*, they are transportation workers engaged in interstate commerce. Here, as in *Islam* and *Haider*, Plaintiffs and rideshare drivers generally, regularly perform a significant percentage of their trips across state lines. In 2017 Uber drivers completed nearly 106,400,000 trips in New York City alone. J.A. 264 (Describing nearly 160 million rideshare trips); J.A. 298 (Describing Uber's 66.5% market share). Accepting Uber's data that 3.09% of these were interstate trips (J.A. 38), at least 3,287,760 of those trips were interstate in 2017 in New York City alone.

---

[3] In *Burgos*, the record support for this proposition was plaintiffs' declarations averring that they had performed interstate trips. *See*, 15-cv-06850 (E.D.N.Y.)(CBA)(CP), at Dkt. Nos. 45-49. *E.g.*, plaintiff Burgos' declaration noted that while working for Northeast Logistics he "frequently traveled outside of New York State to perform deliveries." Dkt. No. 45. Other plaintiffs could not recall specific dates when they traveled outside New York State, but noted that they were "required to be available" to do so. *Id*, at Dkt. 46, 47.

The same can be said for Uber drivers nationwide. Nationwide statistics are not materially different: looking to Uber's nationwide statistics, 2.72% of its trips crossed state lines, a proportion consistent with that in *Kienstra*. J.A. 37. While Uber did not provide, and Appellants did not obtain discovery regarding total number of trips from 2013-17, Uber's SEC filings indicated that, in 2019, Uber provided 35,845,568 interstate trips nationally.[4]

Yet, in the face of overwhelming statistical evidence that both New York City Uber drivers and Uber drivers nationwide cross state lines at rates sufficient to find engagement in interstate commerce, the District Court nonetheless found that Plaintiffs were not part of a class of transportation workers in interstate commerce. The District Court took issue with the scope of Plaintiffs' proposed New York City class, but then failed to analyze the available nationwide data, showing 2.72% of trips crossing state lines, to determine whether such class of workers is engaged in interstate commerce. J.A. 747.

---

[4] **Type**

| | |
|---|---|
| Global trips (2019)* | 6,904,000,000 |
| U.S. Share (2019) (22%)** | 1,518,880,000 |
| U.S. Interstate trips (2019) 2.36%*** | 35,845,568 |

*J.A. 402
**J.A. 369
*** J.A. 37, at Para. 4.

The District Court's decision is entirely silent on this most probative question. Indeed, the nationwide data available belies the Court's statement that "just because Uber is set up to handle the occasional interstate trip does not mean that 'interstate movement of goods is a central part of the job description of the class of workers to which [Plaintiffs] belong.' *See Wallace*, 970 F.3d at 800, 803." J.A. 749. There is nothing "occasional" about 36 million interstate trips a year, which occur with "weekly" frequency. *Haider*, at *10. Indeed, "interstate travel is a regular part of its business." *Haider*, at *4. To be clear, the precise data set—nationwide interstate trips annually—that formed the ultimate basis of the decisions in *Kienstra, Islam*, and *Haider* were not considered by the District Court here, despite the fact that such data was included in the motion papers. That such facts could have been dispositive, if considered, should be abundantly clear.

### 3. Rideshare Drivers Are Engaged In Interstate Commerce As They Reasonably Expect to Drive Across State Lines Pursuant to Their Employer's Terms of Service, Advertising, Coverage Area and Policies, And Interstate Travel Is Thus Integral To The Job

In addition to applying the *Kienstra* standard, Judges Abrams and Nathan integrated into their analysis of "engagement in commerce" under the FAA's residual exemption this Circuit's approach to determining whether workers are engaged in interstate commerce for the purposes of the Fair Labor Standard Act's

(FLSA's) motor carrier exemption. Under the exemption, drivers are considered to be engaged in interstate commerce when "the employee could reasonably have expected to drive in interstate commerce." *Kennedy v. Equity Transp. Co.*, 2015 U.S. Dist. LEXIS 143565, at *15, 2015 WL 6392755 (N.D.N.Y. Oct. 22, 2015), *aff'd* 663 Fed. Appx 38 (2d Cir. 2016), *cert denied* 137 S. Ct. 2117 (2017), *quoting Williams v. Tri-State Biodiesel, L.L.C.*, 2015 U.S. Dist. LEXIS 7926 (S.D.N.Y. Jan. 23, 2015). As stated in *Islam*, "[o]ne way in which interstate travel can be a natural, integral, and inseparable part of an employee's position [for purposes of the FLSA's motor carrier exemption] is when any employee may be required to perform interstate travel, regardless of the actual time spent by employees individually on interstate travel[.]" *Islam*, at 352, *quoting Kennedy, supra*, at *14-15.

The Second Circuit's approach, as described in *Kennedy*, follows Supreme Court precedent that is directly on point to the instant question. Construing the requirement that motor carriers must, *inter alia*, be engaged in interstate commerce in order to be exempt from the FLSA, courts have found trucking companies to be engaged in interstate commerce when only 1 or 2% of their trips involve crossing state lines. Most crucially, the Supreme Court in *Morris v. McComb* found drivers for a trucking company to be within this exemption and "engaged in interstate commerce" when 3.65% of the trips they performed were interstate trips. 332 U.S.

422, 433 (1947). The Court noted that these trips occurred in "the normal operation of the business," were distributed indiscriminately among drivers, mingled among its predominantly intrastate work, and occurred throughout the year; accordingly the Court found that such interstate trips "were thus a natural, integral and apparently inseparable part of the common carrier service" at issue. *Id*. *See also*, *Badgett v. Rent-Way, Inc.*, 350 F. Supp. 2d 642, 655-656 (E.D. Pa. 2004) (Collecting cases, and noting circumstances in which even 1% of trips crossing state lines was sufficient for purposes of the motor carrier exemption).

The Supreme Court in *Circuit City* held that courts must interpret the term "engaged in commerce" in an "objective and consistent" manner across statutes. 532 U.S. at 117. Accordingly, the Supreme Court's holding in *Morris*, and its progeny, are directly on point in interpreting the term "engaged in interstate commerce" for FAA purposes.

Courts in the Second Circuit have continued to follow this standard. *See*, *e.g.*, *Dauphin v. Chestnut Ridge Transp.*, 2009 U.S. Dist. LEXIS 74483 (S.D.N.Y. Aug. 20, 2009) (Considering the standard in *McComb* to determine whether plaintiff bus drivers were subject to the motor carrier exemption).

It is crucially important to note that these motor carrier cases were decided when exemptions to the FLSA were afforded a narrow construction. *See*, *Phillips v.*

*Walling*, 324 U.S. 490 (1945); *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960). In May 2021, following prior decisions that restricted the use of narrow reading of statutory exemptions in limited contexts, the Supreme Court held broadly that courts have "no license to give statutory exemptions anything but a fair reading." *BP p.l.c. v. Mayor of Baltimore*, 141 S. Ct. 1532, 1538 (2021). Considering that statutory exemptions are now, as a general matter, to be afforded a fair construction, such decisions are even more persuasive where they found engagement in interstate commerce under a more stringent construction than that required to be applied today.

In the case of rideshare drivers, interstate trips are a "natural, integral, and inseparable part" of their work. Based on the terms and conditions of their employment in the Uber Terms of Service, as in *Morris* and *Kennedy*, *supra*, rideshare drivers on the whole can reasonably expect to drive in interstate commerce. This fact is made clear by Uber's terms of service with its drivers. Appellants describe in the Complaint how Uber has structured its business to make interstate trips an inseparable part of its regular business. J.A. 9-11.

As described *supra*, Uber and the rideshare industry's policies generally incorporate interstate transportation as a regular part of their services, both in offering such trips to customers, and requiring performance of such work by drivers as they do with any other trip. As drivers are not aware of the drop-off location until

the passenger has entered the vehicle (J.A. 11), dispatch of such trips to drivers is not segregated from any other work drivers receive. So while Uber provides discrete service classes among which passengers and drivers can choose or qualify, such as Uber X, Uber XL, and Uber Black, there is no "Uber Local" or "Uber Interstate." Interstate work is a regular and inseparable part of the class' work.

With respect to rideshare drivers nationally, the same outcome is warranted, given the general similarity between the terms and conditions of employment among New York City drivers, and drivers nationally. Indeed Plaintiffs establish they are representative of a nationwide rideshare class as a whole as Uber's policies apply broadly across Uber's markets nationwide. *See*, *e.g.*, *O'Connor v. Uber Techs.*, 82 F. Supp. 3d 1133, at 1149 (N.D. Cal. 2015) (In a case involving California-based drivers, describing Uber's requirements that "drivers accept all [ride] requests" and noting that too many rejections could lead to termination). As noted in *Islam*,

> rideshare drivers can effectively be required…to ferry passengers across state lines. Lyft passengers may choose any destination within 100 miles of their pick-up location, irrespective of the state of the destination. Drivers cannot see the passenger's chosen location until they accept the trip. At that point, the driver may cancel the trip, but not without risking a penalty, such that "no driver [has] the option to exclude performing interstate trips, without risking further exposure to deactivation.

*Islam*, at 352 (Citation and quotation marks omitted). Similarly, as Judge Nathan noted in *Haider* regarding drivers nationally, "Lyft's fare schedules, advertisements, and guidelines for drivers reflect that interstate travel is a regular part of its

business." 2021 U.S. Dist. LEXIS 62690, at *4.  *See also Sienkaniec v. Uber Techs.*, 401 F. Supp. 3d 870, 872 (D. Minn. 2019) (Noting that all "Uber drivers perform the same job for the same company pursuant to the same agreement.")

As rideshare drivers' work in crossing state lines occurs pursuant to company industry policy, disregard of which could lead to termination or other discipline, there is nothing "happenstance" about drivers' interstate trips.

### 4. Courts Have Further Looked To Revenue From Interstate Work As A Measure Of Engagement In Interstate Commerce To Understand The Significance Of Such Work

Other courts, following *Morris v. McComb*, *supra*, have also looked to the percentage of a company's revenue that is derived from interstate work to determine the extent to which the workers are engaged in interstate commerce. *See*, *e.g.*, *Walters v. Am. Coach Lines of Miami, Inc.*, 569 F. Supp.2d 1270, 1284 (S.D. Fla. 2008) (Private coach drivers found to be sufficiently engaged in interstate commerce where 4% of their employer's revenue was derived from interstate work, a "significant component".)

In this case,  Plaintiff Aleksanian received more than 10% of his income from interstate trips, and for Plaintiff Lama, he received almost 20% of his income for the eight-week period in early 2016 from interstate trips. J.A. 5, Para. 27; J.A. 6, Para. 36. Based on these facts, as well as the distance of the interstate trips and the increased earnings they yield to the drivers, it is reasonable to project that Uber

drivers would see revenue from interstate trips that is roughly three times the amount of an average trip. *See Islam*, at 352; *Haider*, at *4 (Describing the length of interstate rides and the greater revenue derived from them). It is important to note that, as trip revenue is tied to distance and time of trips, increased revenue also reflects the larger amount of their overall working time that drivers spend providing interstate trips. *See Haider*, at *3. Uber's data bore these trends out among drivers nationwide. J.A. 37-38 (Describing the average length of Uber's interstate trips as 14.6 miles, compared to an average length of 6.3 miles for all trips); *see also id*, Paras 9-10 (Describing interstate trips that began in New York as being more than three times the distance of in-state New York trips).

The amount of revenue derived from interstate trips is significant to understanding both the nature of the business and its involvement in interstate commerce. Available data regarding revenue from interstate trips proves its significance of such trips to drivers' overall earnings. Although broader revenue data was not provided in discovery, Appellant Aleksanian, for example, received roughly 10% of his trip earnings from interstate trips during his tenure with Uber. Given that drivers have been made to pay for their expenses, a 10% loss in gross pay, could translate to 20% loss in take-home pay. For example, if a driver who takes in $70,000 in fare revenue, and after typical vehicle expenses (e.g., car payments, commercial insurance, fuel, maintenance), is left with net pay of $35,000, a 10% loss of gross

revenue ($7,000), would mean a 20% loss of net income, leaving this driver with only $27,000. For a family of four, this is the difference between paying the rent, and falling below the federal poverty level. Plainly, such interstate trips are integral to the class of workers.

Such trips are integral to the class of workers, just as they are integral to Uber's bottom line. Given that Uber's interstate trips are more than twice as long as its intrastate trips (see J.A. 37, describing a ratio of 13.5 miles : 6.1 miles, or 2.21 times longer), it is fair to assume that Uber derives more than 6% of its nationwide revenue from the 2.72% of its nationwide trips that cross state lines. From Uber's perspective, payments for interstate trips are certainly not a revenue stream that they would be willing to give up.

### 5. Nationwide, Uber and Rideshare Drivers Provide More Interstate Trips Than National Bus Lines, Which Are Undeniably Engaged In Interstate Commerce

In addition to the amount and regular percentage of interstate trips rideshare drivers make and the percentage of driver revenues derived from such trips, in absolute numbers, nationwide, *the rideshare industry provides more interstate trips than national bus and rail providers combined.* On these facts, rideshare services have more engagement in interstate commerce than Greyhound and Amtrak. Further, in absolute numbers, nationwide, *Uber drivers alone provide more interstate trips than national bus lines.*

In 2019, Uber provided 35,845,568 interstate trips nationally. *See* Page 19, *supra*. Combined with Lyft's substantial national market share, this number would grow even larger. These trips, which are not limited to one passenger per trip, involve the transportation of more than twice the number of passengers Greyhound Bus carried in 2019 in all trips both interstate and intrastate. J.A. 517 (Describing 16 million Greyhound trips in 2019). In 2019, the number of passengers on all Amtrak trips was less than the number of all Uber interstate trips nationally, and this number is even larger as Uber trips often involved more than one passenger. J.A. 523 (Describing 32.5 million Amtrak trips in 2019). This fact is further indicative of the interstate nature of rideshare drivers' work. In other words, Uber provided more interstate rides in 2019 than Amtrak or Greyhound. *See Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emples. v. Pa. Greyhound Lines,* 192 F.2d 310 (3d Cir. 1951) (Holding Greyhound drivers to be exempt under the FAA). In light of these facts, it would be an absurd result to find—whatever the standard applied—that rideshare drivers who, as a national class, transport more passengers across state lines than national bus lines or Amtrak, are not engaged in interstate commerce whereas bus drivers and Amtrak workers are.

**B. The District Court's Opinion Effectively Repeals the Residual Exemption's Application To Workers Engaged in "Interstate Commerce" In Favor Of An Unwritten And Undefined Requirement For Engagement In "Non-Local" Commerce**

The District Court's decision and other courts' decisions finding no engagement in interstate commerce, even where drivers crossed state lines, all suffer from the same flaw. Fundamentally, these decisions proceed only by implying modifiers such as "long -distance" or "non-local" before the phrase "interstate commerce" that do not exist in the text of Section 1 of the FAA. The result is that these decisions assume that subjectively "local" interstate commerce is somehow not interstate commerce for the purposes of Section 1.

Here, the District Court, rather than engaging with an analysis of drivers' interstate activities under the precedents above, "substitute[d] a vague notion of [Uber's] business model for the evidence before it[,]" *Haider*, at *11, focusing on the alleged local nature of drivers' work. Specifically, resting on a passage from another district court decision, the District Court held:

> [T]he company is in the general **business** of giving people rides, not the particular business of offering interstate transportation to passengers. Interstate trips that occur by **happenstance of geograph**y do not alter the intrastate function performed by the class of workers. *Rogers*, at 452 F. Supp. 3d at 916 (citing *Hill*, 398 F.3d at 1290).

J.A. 746. The errors of this decision are clear. In interpreting a statute, a court's analysis must begin with the text of the statute. *See Woods v. Empire Health*, *supra*. In holding that rideshare drivers are not engaged in interstate commerce, the Court's reference to Uber being in the business of "giving people rides" and its reference to state line crossing by "happenstance of geography" betray the fact that the District

Court has inserted tacit modifiers of vague and undefined notions of "non-local" or "long-distance" interstate commerce into the text of Section 1 as an additional element of the residual exemption to be satisfied.

The *Rogers* passage cited referred to "drivers who live near state borders" regularly crossing state lines, but discounted wholesale the relevance of such plainly interstate transportation work to the Section 1 inquiry, implying that what the residual exemption requires is not satisfied by merely crossing state lines as a transportation worker, regardless of the incidence of such work, but requires other vague qualities, such as "non-local" or long-distance transport, simply not required by the statute. *Rogers v. Lyft*, 452 F. Supp. 3d 904 (N.D. Cal. 2020).

Such a view was expressed more fully in *Capriole v. Uber Techs.*, where the Ninth Circuit repeated this error, writing that Uber drivers, even when crossing state lines are "merely convey[ing] interstate . . . passengers between their homes and [their destination] in the normal course of their independent local service." *Capriole v. Uber Techs.*, 7 F.4th 854, 865 (9th Cir. 2021), *quoting United State v. Yellow Cab*, 332 U.S. 218, 233 (1947). Fleshing out this position, the Ninth Circuit held that interstate commerce, for the purpose of the residual exemption, means only long-distance interstate commerce, to the exclusion of more local interstate commerce, explicitly discounting the significance of drivers' interstate trips and the statute's plain language: "even Uber trips that 'started and ended in different states' are

inherently local in nature." *Id*. at 864. In essence, the *Capriole* court further limited the residual exemption only to ***long-distance*** interstate transportation workers, based on its unfounded and unexplained assumption that railroads and maritime transportation were primarily and essentially long-distance enterprises, stating in relevant part: "for the other enumerated categories of workers in Section 1, seamen and railroad workers, the interstate movement of goods and passengers ***over long distances*** and across national or state lines is an indelible and 'central part of the job description.'" *Id.* at 865, *citing Wallace*, 970 F.3d, at 803 (emphasis added).

Other district court cases have followed this line of reasoning. Similarly, the District Court in *Davarci* contrasted rideshare drivers with "seamen and railroad workers" whose work the court defined as necessarily defined by the "interstate movement of people and things ***over long distances***." *Davarci*, *supra*, at *31 (emphasis added). *See also Singh v. Uber Techs.*, 2021 U.S. Dist. LEXIS 225732, at *37, 2021 WL 5494439 (D. N.J. Nov. 23, 2021), citing *Wallace*, 970 F.3d, at 803 (Framing the residual exemption in terms of "the interstate movement of people and things over long distances and across state lines.")[5]

The District Court for the District of Columbia likewise sought to limit the application of the residual exemption to those whose jobs concern the "interstate

---

[5] Puzzlingly, *Singh* cites *Wallace* for this proposition, even though nothing in *Wallace* even remotely touches on the question of any distinction between long or short-distance interstate travel. As noted *supra*, to the contrary, *Wallace* cited *Kienstra* with approval, which found drivers engaged in interstate commerce where they made short interstate trips in the East St. Louis area.

movement of goods and passengers over long distances." *Osvatics v. Lyft, Inc.*, 535 F. Supp. 3d 1, 18 (D.D.C. 2021) (Jackson, J.). The Court in *Osvatics* continued that "Lyft drivers' interstate rides, no matter how numerous, are merely 'incidental' to their local transportation function" *Id*, at 21, citing *Hill v. Rent-a-Center*, 398 F.3d 1286, at 1289 (11th Cir. 2005). (Notably *Hill* was concerned with whether an account manager for a furniture rental store, who made occasional deliveries across state lines, that "were incidental to [his] employment as an account manager," could properly be considered a "transportation worker" in line with *Circuit City*. Such a case is plainly distinguishable from the case of rideshare drivers who are transportation workers whose sole job duty is to move passengers wherever they wish to go.)

Fundamentally, there is no basis in the text of the FAA for this line of cases' attempts to imply modifiers before Section 1's use of the phrase "engaged in commerce." Plainly, *Capriole* and the courts that follow it, have privileged a textually unsupported notion of local vs. non-local commerce over the statutory requirement to be "engaged in interstate commerce," which Congress decided should define the scope of the residual exemption.

Another recent district court decision repeats this error, taking this line of reasoning to its ultimate conclusion: "Once the Court concludes that interstate trips are merely incidental to Uber drivers' local transportation function, ***there is no raw***

*number of interstate trips* that can transform them into workers who are engaged in interstate commerce." *Davarci*, *supra*, at *27. This decision illustrates the dangers of substituting vague notions of the nature of the business and "the incidental," "local" or "non-long distance" nature of plainly interstate travel for the text of the statute. Such an analysis simply ignores the text of the FAA and Section 1's requirement of interstate–not long-distance–commerce.

Yet, the fact that *Capriole* and other like cases premised their rationale for denying the significance of rideshare drivers' regular trips across state lines on *Yellow Cab* is particularly puzzling, considering that "[t]he *Yellow Cab* decision was premised on the fact that the local taxicab service was 'confined to transportation between any two points within the corporate limits of the City [of Chicago]'" *Islam*, at 355, *quoting Yellow Cab*, at 230-31.

To be absolutely certain, nothing in *Yellow Cab* even begins to imply that transportation *that actually crosses state lines* would not be considered engagement in interstate commerce because of the length of the journey. Two years after its decision in *Yellow Cab*, the Supreme Court made this crystal-clear in *United States v. Capital Transit Co.*, where the Court held that streetcars operating within the District of Columbia and often connecting to passenger bus service from downtown Washington D.C. to the Pentagon and other buildings "just across the Potomac in Virginia" to be "engaged in interstate commerce under the Motor Carrier Act." 338

U.S. 286, 288; 292 (1949). Neither *Capriole*, nor any of the other cases seizing on the alleged "local" nature of the rideshare industry, acknowledge the Court's decision in *Capital Transit*.

Should Uber seek to justify the use of unwarranted modifiers as an exercise of a required narrow reading of a statutory exemption, this would miss the mark. As *Capriole*, *Cunningham v. Lyft*, 17 F.4th 244 (1st Cir. 2021), *Davarci*, and *Singh* (D. N.J. 2021) limited engagement in interstate commerce to "transportation workers" consistent with *Circuit City*, they all err in further reading the residual exemption narrowly, as, at the time these decisions were rendered, the Supreme Court had already held that statutory exemptions should, as a rule, be afforded a "fair" reading. *BP p.l.c. v. Mayor of Baltimore*, *supra*. To be sure, even when applying a narrow construction to the exemption, there would be no basis for a further layer of narrowing, by implying modifiers to the text in the manner used in *Capriole*. *See Rittmann v. Amazon.com*, *Inc.* (decided prior to *Mayor of Baltimore*) where the Ninth Circuit noted that the Supreme Court defined the narrow scope of the residual exemption in *Circuit City* as being limited to transportation workers engaged in interstate commerce, and that "[n]othing in *Circuit City* requires that we rely on the pro-arbitration purpose reflected in §2 [of the FAA] to even *further* limit the already narrow definition of the phrase 'engaged in commerce.'" 971 F.3d 904, 914 (9th Cir. 2020) (emphasis original).

1. **The *Capriole* Line of Cases' Atextual Requirement For Long-Distance Travel Imposes An Incorrect And Ahistorical Understanding Of Transportation Work Onto Its Understanding Of The Residual Exemption**

While the District Court and those courts following *Capriole* aimed to further limit *Circuit City*'s scope of the residual exemption to only apply to long-distance transportation in interstate commerce, such interpretations are out of line not only with the statutory text but also the contemporary nature of "interstate commerce" as defined by the residual exemption. Following *New Prime*'s instruction to interpret statutory language using the common contemporary meaning at the time of a statute's passage, 139 S. Ct., at 539, in reading the residual exemption, it is essential to understand the nature of railroad and maritime work in 1925. As it turns out, the Ninth Circuit's assumption that railroad and maritime work is inherently non-local or long-distance is ahistorical and simply untrue.

In 1925, data produced in federal government reports indicated that 49% percent of trips on Class I railroads (those with the highest level of revenue), were taken on commuter railroads, which are an inherently local, and not long-distance, form of travel, remaining within a metropolitan area. William J. Cunningham, Committee on Recent Economic Changes of the President's Conference on Unemployment, Recent Economic Changes in the United States (1929), at 278,

available at https://www.nber.org/system/files/chapters/c4957/c4957.pdf.[6] Such trips would include commuter railroad trips from Manhattan to Long Island, Westchester County, and, importantly, to Connecticut and New Jersey– *exactly the type of interstate trips that Plaintiffs took*. In 1926, almost all passenger trips on boats– 93.1%-- were taken on ferries, an inherently local form of transportation. Department of Commerce, U.S. Bureau of the Census, WATER TRANSPORTATION 1926 (1929), at 124, available at https://books.google.com/books?id=JUgnAQAAIAAJ&printsec=frontcover&source=gbs_ge_summary_r&cad=0#v=onepage&q&f=false (Date accessed: Apr. 29, 2022). *See also, id* (showing, in, 1916, 88.1% of all passenger boat trips taking place on ferries). These types of ferry trips, for example, in New York harbor, which had no road crossings between New York and New Jersey in 1925,[7] are among the kinds of trips that Appellants perform, and are even shorter than the Uber trips from New York to New Jersey. Indeed, such ferry trips, crossing the Hudson River, are shorter than even the average nationwide Uber trip, as would be most ferry trips, which merely cross rivers or short distances within harbors. Thus seamen and railroad

---

[6] "Courts may take judicial notice of data contained in Government reports." *Ross v. Am. Express Co.*, 35 F. Supp. 3d 407, 435, n. 27 (S.D.N.Y. 2014), *citing Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003) and *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

[7] *See Bridges and Tunnel History*, Port Authority of New York and New Jersey, available at https://www.panynj.gov/port-authority/en/about/History/bridges-and-tunnels-history-about.html (Last Accessed: Apr. 27, 2022) (Describing the Holland Tunnel, Built in 1927, as the first Hudson River crossing in New York City).

workers were largely engaged in local or short distance activities at the time of the FAA's passage, and accordingly such engagement by classes of transportation workers today, is consistent with their engagement in interstate commerce.

The statements of courts to the contrary are without any factual basis. For example, the *Capriole* Court offered no evidence for its contention that railroad and maritime travel were, at their essence, long-distance enterprises. This view is, in all likelihood, the product of that Court's modern-day lens, that focuses on the gauzy anachronism of the heyday of long-distance rail and boat travel, with the assumption that since such modes of long-distance transport are largely diminished today, they must have predominated in 1925. Government reports reveal that such assumptions are simply wrong.

> **2.  At The Time Of The FAA's Passage, Congress Understood Entities To Be Engaged In Interstate Commerce Without Regard To Predominance  Of Interstate Activities Or The Length Of Interstate Travel**

In addition to the problems with conducting a contemporary meaning analysis rooted in plain historical error, and ignoring *Capital Transit*, *supra*, *Capriole*'s view that the residual exemption should be limited to long-distance transportation workers is belied by the plain language of the text.

In interpreting the meaning of the residual exemption in *New Prime*, the Supreme Court held that "it's a fundamental canon of statutory construction that words generally should be interpreted as taking their ordinary . . . meaning . . . at the

time Congress enacted the statute." 139 S. Ct., at 539. (Citations omitted). In so doing, the Court looked to, *inter alia*, contemporary dictionaries and contemporary federal statutes. *Id*, at 540, 543. *See also Waithaka v. Amazon.com, Inc.*, 966 F.3d 10, 19 (Noting that in *Circuit City*, the Supreme Court looked to the interpretation of similar phrases in statutes contemporaneous to the FAA.) In *Waithaka*, for example, the First Circuit looked to the 1908 version of the Federal Employers Liability Act (FELA), and cases interpreting it, to understand whether engagement in commerce would necessarily require the crossing of state lines. *Id*, at 18-22.

In this case, the necessity of a plain language reading of Section 1, as done in *Kienstra*, *Islam*, and *Haider* is reinforced and guided by the fact that, just 17 years before Congress enacted the FAA, the Supreme Court had addressed the scope of another federal law, involving railroad companies "engaged in interstate commerce," and key to its ruling, held that the phrase "engaged in interstate commerce" would necessarily apply to companies which in the course of their business cross state lines, without limiting its understanding of this term to long-haul or "non-local" interstate commerce, or those companies that were "primarily" or "predominately" engaged in interstate commerce. *See Employers Liability Cases*, 207 U.S. 463 (1908).

Here, cases interpreting the earlier, 1906 version of the FELA are directly instructive. In 1908, in a decision reflecting the contemporary hostility to economic

regulation, the Supreme Court struck down the 1906 version of the FELA on the grounds that, because the FELA aimed to cover all railroad workers' injuries for any employee working for a railroad "engaged in interstate commerce," the statute unconstitutionally extended the Commerce Power, as it was then understood, to purely intrastate commercial activities. The Supreme Court held that because the FELA applied to any company "engaged in" interstate commerce:

> It is certain that the act extends to every individual or corporation **who may engage in interstate commerce** as a common carrier. Its **all-embracing words** leave no room for any other conclusion. It may include, for example, steam railroads…the express business, vessels of every kind, whether steam or sail, ferries, bridges, wagon lines, carriages, trolley lines, etc. … [T]he statute is addressed to the individuals or corporations **who are engaged in interstate commerce** and is not confined solely to regulating the interstate commerce business which such persons may do– that is, it regulates the persons **because they engage in interstate commerce** and does not alone regulate the business of interstate commerce.

*Id*, at 497 (emphasis added).[8] The Supreme Court's decision affirmed *Howard v. Ill. C. R. Co.*, where the Court held that engagement in interstate commerce under

---

[8] It bears noting here that the mid-twentieth century evolution in the Court's commerce clause jurisprudence has no bearing on the significance of such FELA cases to parsing the definitional meaning of a statutory term, which task does not implicate arcane views of the scope of the Commerce Clause. Indeed, courts "looking to these FELA precedents to understand the original meaning of the phrase [engaged in commerce] in 1925…are not engaging in a method of interpretation" forbidden by the Supreme Court. *Waithaka*, at 21 (contrasting this approach with the Plaintiffs' prohibited approach in *Circuit City*, which sought to apply a gloss of since-rejected notions of the commerce clause's scope to guide the interpretation of the term "engaged in commerce.") As in *Waithaka*, Appellants look to these FELA cases purely for their definitional guidance.

FELA, "whether it is intra or inter state–is to be determined by the point of reception and the point of destination, and not by the number *or length* of railroads over which it is routed." 148 F. 997, 1003 (C.C. W.D. Tenn. 1907) (emphasis added). Indeed, this rejection of length as irrelevant to an understanding of interstate commerce is plainly evident in the Supreme Court's inclusion of "ferries" or "bridges" or "trolley lines" as among the modes of interstate commerce. *Employer Liability Cases*, *supra*, at 497.

*Howard* and its affirmance are crucial to understanding what Congress meant when it chose to frame the residual exemption as applying to classes of workers simply "engaged in interstate commerce." Given the text and the canon of *ejusdem generis*, there is simply no basis to read in a limitation of the Section 1 exemption to only long-haul interstate commerce, especially where the Supreme Court had, not long before the FAA's passage explicitly addressed the unlimited scope of "interstate commerce" in the context of railroads, and found that such term could support no such limitations.

State lines impart clear and unambiguous meanings; undefined notions of "locality" do not. Congress obviously understood the scope of the term "interstate" as tied to travel across state lines, wherever such lines may lie, and had it wished to modify the scope of the residual exemption to longer-distance workers, it could have done so, as the *Employer Liability Cases* makes abundantly clear. "[T]hat

transportation is commerce and that those who do the business of carrying passengers and freight across state lines are engaged in interstate commerce are matters settled beyond question." *Wabash R. Co. v. United States*, 168 F.1, 5 (7th Cir. 1909).

Further, the fact that the scope of the residual exemption must embrace relatively "local" interstate commerce is plain from statute's text, which defines interstate commerce not merely as "commerce among the several States" but, going further, explicitly defines it as including commerce "between ***any state*** and the District of Columbia" 9 U.S.C. § 1 (emphasis added). This definition necessarily includes transportation between the District of Columbia and Virginia or Maryland, neither of which are ever more than eight miles from any point in the District. In this context, that some present-day courts view trips that cross state lines as failing to engage in interstate commerce as they are merely accidental "happenstance of geography," (*Rogers*, *supra* at 916) is particularly puzzling.

In addition, a line of cases concerning the Safety Appliance Acts (SAA), which, similar to the FELA cases, stressed the meaning of the unmodified term "engaged in interstate commerce," further supports honoring the plain meaning of Section 1. The Eighth Circuit, putting forth an explicitly textualist reading, noted that "if the Congress 'should be intended to mean what they have plainly expressed,' they must have meant that no common carrier engaged in [interstate] commerce by

railroad, ***whether its railroad was long or short***, whether it was within one or many states, whether it was engaged much or little in that commerce" could avoid the requirements of the SAA. *U.S. v. Colorado & N.W.R. Co.*, 157 F. 321, 324 (8th Cir. 1907) (emphasis added), *cert denied* 209 U.S. 544 (1908).  *See also Southern R. Co. v. United States*, 222 U.S. 20 (1911) (Upholding the SAA).

Further instructive is the 1935 Motor Carrier Act, 49 Stat. 543, whose structure makes plain that the phrase "engaged in interstate commerce," when not modified by any preceding phrase, cannot be read to carve out subjectively "local" interstate commerce. Written to "apply to the transportation of passengers or property by motor carriers engaged in foreign or interstate commerce," *id*, § 202(b), the Act then specifically notes that it does not apply to "taxicabs, or other motor vehicles performing a bona fide taxicab service" or to "the transportation of passengers or property in interstate or foreign commerce wholly within a municipality or between contiguous municipalities or within a zone adjacent to and commercially a part of any such municipality." *Id* at § 203(b)(2); (b)(8). The structure of the Act and the above-referenced exemptions shed light on the contemporary understanding that taxicab service across state lines, or interstate travel of shorter distances, would otherwise be considered part of interstate commerce per § 202. Indeed, such exemptions would merely be superfluous if the broad term "engaged in interstate commerce" were already understood as excluding

such interstate trips, either because of the nature of the taxicab industry, or because of shorter interstate travel distances.

As the above makes clear, the District Court's interpretation of the FAA's residual exemption as applying only to longer-distance transportation in interstate commerce lacks any basis in the text of the FAA, the term "engaged in interstate commerce" as used in contemporaneous statutes was, uncontroversially, understood to embrace enterprises that cross state lines, without requiring such work be long-distance.

Additionally, the reasoning of such early twentieth century cases,  which accord with *Kienstra,* are just as applicable when considering the amount of interstate commerce required to constitute "engagement." That is, engagement in interstate commerce is satisfied regardless of whether a company "was engaged much or little in [interstate] commerce." *U.S. v. Colorado*, 157 F. at 324.

## C.  Additionally, Rideshare Drivers Are Engaged In The Flow Of Interstate Commerce Through Intrastate Transportation To Interstate Travel Hubs

While rideshare drivers' state-line crossings independently and sufficiently establish their engagement in interstate commerce, drivers' substantial engagement in the channels of interstate commerce via transporting passengers directly in interstate commerce, to airports and other interstate transportation hubs further supports a finding of their engagement in interstate commerce. *See, e.g., Gulf Oil*

*Corp. v Copp Paving Co.,* 419 U.S. 186, 195 (1974) (the phrase "engaged in commerce" "appears to denote only persons or activities within the flow of interstate commerce"). *See also Walling v. Jackson Paper Co.*, 317 U.S. 564, 568 (1943) (holding that goods remain in interstate commerce where there is a practical continuity of movement). Recently, several circuits have found intrastate driving work to support a finding of engagement in the flow of interstate commerce. *See Waithaka*, *supra*; *Rittman*, *supra*. *See also Islam, supra,* 353-355; *Haider, supra,* at *11-13.

Specifically, rideshare drivers spend a significant portion of their time working traveling to interstate transit hubs. *See* J.A. 37 (Stating that 10.1% of all Uber trips, nationally, begin or end at an airport). *See also Haider* at *3 (noting that the Plaintiff Lyft drivers had an even more substantial portion of trips to airports and other hubs of interstate travel). Courts have also noted rideshare companies' special "arrangements" with airlines and airports. *Islam, supra,* at 355.

Recently the Ninth and First Circuits denied that rideshare drivers' trips to airports and other transit hubs would constitute engagement in interstate commerce because drivers were merely carrying local fares to interstate travel hubs, citing to *Yellow Cab*'s holding that, in one case, trips by a local taxicab company to railroad stations, which were "casual and incidental" would not constitute engagement in interstate commerce. *Capriole*, *supra*, at 930-933; *Cunningham v. Lyft*, 17 F.4th 244,

at 250-251 (1st Cir. 2021). Yet, *Yellow Cab* does not weigh against a finding that rideshare drivers engage in the flow of interstate commerce, when transporting, as Uber drivers do, more than 150 million passengers a year to and from airports, annually, as part of a nationwide enterprise. *See* p. 19, n. 4 *supra*, describing 1,518,880,000 annual U.S. trips, and J.A. 38, at Para. 7, noting that 10.1% of all trips beginning or ending at an airport. By its own terms, *Yellow Cab* never went this far, and explicitly noted that there could be circumstances in which taxicab service could be so substantial as to be considered sufficiently interstate to trigger the application of federal antitrust law. Accordingly, *Yellow Cab* does not actually address the questions of whether such facts, as present in the instant case, constitute sufficient engagement in the flow of interstate commerce. While the characterization of being engaged in interstate commerce in *Circuit City* referred to the test as being one of participating in the "flow of interstate commerce[,]" as used in Clayton Act, the Court in *Yellow Cab,* was careful to confine this case to its facts:

> We do not mean to establish any absolute rule that local taxicab service to and from railroad stations is completely beyond the reach of federal power or even beyond the scope of the Sherman Act. … **[W]e are not to be understood in this case as deciding that all conspiracies among local cab drivers are so unrelated to interstate commerce as to fall outside the federal ken.** A conspiracy to burden or eliminate transportation of passengers to and from a railroad station where interstate journeys begin and end might have sufficient effect upon interstate commerce to justify the imposition of the Sherman Act or other federal laws resting on the commerce power of Congress.

*Yellow Cab, supra*, at 232-233. In 1947, when the Court decided *Yellow Cab*, regarding a local, municipally-based taxi cab service, there were no multi-billion dollar rideshare services such as Uber, operating globally, transporting nearly 36 million passengers across state lines or transporting more than 150 million passengers to and from U.S. airports annually. Given the narrow holding of *Yellow Cab*, Appellants believe that should there be similar types of antitrust claims between or among other rideshare companies, there is no doubt that Uber's business, and thus the drivers who work for them, would be found to be engaged in the flow of interstate commerce. It could not be plausibly denied that a restraint or shutdown of service that transports 150 million US passengers to and from airports annually would have a significant impact on interstate air travel.

Given *Yellow Cab*'s disclaimer of any generally applicable rule regarding taxicab companies' engagement in interstate commerce and its explicit invitation to consider facts wherein even "local" hired vehicle service to and from transit hubs could constitute engagement in interstate commerce, it should not be surprising that courts have done so. For example, in *Marshall v. Victoria Transp. Co.*, the Fifth Circuit held that a bus company that operated entirely within Brownsville, Texas, on the U.S.-Mexico border, was engaged in foreign commerce for purposes of the FLSA's motor carrier exemption, where 14.2% of its passengers began or ended their journeys in different countries, even where there was no through-ticketing

arrangement. 603 F.2d 1122, at 1124 (5th Cir. 1979). *Compare* Uber's nationwide rate of 12.82% percent of all trips nationwide ending in different states, or involving travel to or from airports. J.A. 37-38 (Describing 10.1% of trips involving airport travel, and 2.72% of trips crossing state lines). In *Marshall*, the Fifth Circuit explicitly held that *Yellow Cab* did not foreclose its decision, noting that unlike the "casual and incidental" trips to railroad stations, the bus company at issue in *Marshall*, "carries a substantial percentage of international travelers every day." *Id*.

Similarly, the courts in *Islam* and *Haider* have likewise articulated why rideshare drivers' service, distinct from the purely local service described in *Yellow Cab,* can constitute engagement in interstate commerce when connected to travel hubs, noting the sheer impact of these national companies:

> It is fair to conclude that today's national ridesharing enterprises are not in the same league as local taxi companies with respect to the role they play in interstate commerce. Accordingly, the role Lyft and Uber drivers play in ferrying passengers to and from airports and train stations at the very least lends additional support to the Court's conclusion that they are, as a class of workers, "engaged in…interstate commerce."

*Islam*, at 355. Similarly in *Haider*, Judge Nathan held:

> To be sure, *Yellow Cab* did not hold that all local activities of vehicles for hire involve interstate commerce. It distinguished between taxicab companies who contracted with railroads and those who only infrequently drove passengers to train stations. *See id.* at 228–32. Thus, taxicabs operating exclusively within one city do not engage in interstate commerce by making "casual and incidental" trips to train stations. *Id.* at 231. Lyft drivers' trips to air, train, and bus terminals are

hardly incidental. Lyft does not dispute Islam's evidence that twenty-five percent of his trips began or ended at these hubs of interstate travel. Nor does it offer any evidence that this proportion is atypical".

2021 U.S. Dist. LEXIS, *11-12. In allowing for "other arrangement[s]," *Yellow Cab* did not hold that in the passenger transportation context, through-ticketing is an essential element for finding practical continuity of movement in the flow of interstate commerce. *Id.* at 231. *See also Capital Transit, supra* (finding that a purely intrastate company without independently contracted for through-ticketing was engaged in interstate commerce). As the court in *Islam* noted, in contrast to *Yellow Cab* where "'the taxi companies had no contractual or other arrangement with the interstate railroads,' [...] there is at least some evidence in the record of ridesharing companies' arrangements with airports and even airlines." *Islam, supra,* at 355, *quoting Yellow Cab*, at 230-31.

Indeed, under the applicable case law, such trips are not to be disregarded as outside of the flow of commerce; rideshare drivers' trips to and from airports are not casual or merely incidental to their work. Uber holds itself out as specifically offering airport service at tailored rates of fare, and Uber's SEC filings make clear that such business is the result of Uber's contractual arrangements with airports, and Uber's structuring of its business focuses on delivering airport service. Uber's SEC filings note that "[w]e have entered into agreements with most major U.S. airports … to allow the use of our platform within airport boundaries" and that Uber

established a customer rewards program "aimed at increasing usage" of Uber that created "priority pickups at airports." J.A. 373; *Uber Technologies Form S-1 Registration Statement* (2019)[9], at 158, 169, available https://www.sec.gov/Archives/edgar/data/1543151/000119312519103850/d647752 ds1.htm (Date Accessed: April 28, 2022). The result of such arrangements and focus is that Uber derives 10.1% of its trips and 15% of its total bookings from trips to and from the airport. J.A. 37; J.A. 373. These same corporate disclosures state that "*We generate a significant percentage of our Gross Bookings from trips in large metropolitan areas and trips to and from airports. If our operations in large metropolitan areas or ability to provide trips to and from airports are negatively affected, our financial results and future prospects would be adversely impacted.*" J.A. 371.

Based on the limited holding of *Yellow Cab*, as well as the facts presented to and overlooked by this Court, rideshare drivers are also engaged in interstate commerce by virtue of the substantial portion of trips they perform in the flow of interstate commerce.

---

[9] SEC filings are proper subjects of judicial notice. *Dreiling v. Am. Express Co.*, 458 F.3d 942, 946, n.3 (9th Cir. 2006).

## II. ABSENT THE APPLICABILITY OF THE FAA TO UBER DRIVERS, THE CONTRACT'S CHOICE-OF-FAA PROVISION CONTROLS, AND CANNOT BE CONTRAVENED BY ANOTHER STATE LAW NOT CONTRACTED FOR

Although the District Court did not reach the question of whether state law could substitute for the FAA if the FAA is inapplicable to rideshare drivers, this Court should take up this question as it was briefed by the parties below and would serve judicial economy. This Court has "discretion to consider issues that were raised, briefed, and argued in the District Court, but that were not reached there." *Bacolitsas v. 86th & 3rd Owner, LLC*, 702 F.3d 673, 681 (2d Cir. 2012), *quoting Booking v. Gen. Star Mgmt. Co.*, 254 F.3d 414, 418-19 (2d Cir. 2000).

### A. The Parties' Choice Of Law Controls Under General Contract Principles; The Parties Must Arbitrate Pursuant To The FAA Or Nor At All

Plaintiffs cannot be subject to arbitration under state law because Uber's contract chooses the FAA as the exclusive law governing the arbitration provision. Following *Rittmann v. Amazon*, *supra*, and applicable precedent from this Court, where an express choice-of-law becomes inapplicable, arbitration may not be compelled under alternate law not contracted for. Indeed, no choice-of-law analysis can be undertaken when the clear language of the agreement provides for an express choice of law.

Arbitration agreements must be placed "on an equal footing with other contracts" and should be enforced "according to their terms." *AT&T Mobility v. Concepcion*, 563 U.S. 333, 339 (2011) (internal citations omitted). "'[T]he first principle that underscores all of our arbitration decisions' is that '[a]rbitration is strictly a matter of consent.'" *Lamps Plus v. Varela*, 139 S. Ct. 1407, 1415 (2019) (internal citations omitted). Here, the contract only contemplates an agreement to arbitrate governed by the FAA. In this adhesion contract drafted by Uber, express terms provide emphatically for arbitration pursuant to the FAA, to the exclusion of other law. J.A. 88. The contract's general governing law provision states that it does not apply to the arbitration clause, which is "governed by the Federal Arbitration Act," while California law applies to the remainder. J.A. 86, at § 15.1. Uber reiterates its choice of the FAA three more times in §§ 15.1 and 15.3, never raising the possibility of any other law applying to the arbitration provision, and explicitly foreclosing the application of its general choice-of-law to the arbitration provision: "The Choice of law provisions contained in this Section 15.1 do not apply to the arbitration clause."

Uber's inclusion of the choice-of-FAA provision is an affirmative choice of law, subject to the same treatment as other choice-of-law provisions. Parties are free to contract for the applicable choice of law, and generally, "choice of law provisions are valid and enforceable." *Terwiliger v. Terwiliger*, 206 F.3d 240, 245 (2d Cir.

2000). Indeed, because arbitration agreements involving interstate commerce are governed by the FAA whether or not a contract specifically invokes the FAA (see *Moses H. Cone Mem'l Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)), Uber's decision to specifically and repeatedly invoke the FAA as the governing law is not superfluous, but represents a meaningful decision to choose one law to the exclusion of others.

The deliberateness of this choice is underscored by Uber's change to its choice-of-law provision in the subsequent January 2020 Agreement's arbitration provision, which provides for an alternate choice of state law to the arbitration provision*,* "if…the Federal Arbitration Act does not apply to this agreement." J.A. 586, at § 14.1(a). Had Uber intended to provide for state law to apply if the FAA did not, it could have done so in the 2015 contract, yet it chose not to.

That courts must defer to choice-of-law provisions in arbitration agreements is a settled question. Regarding arbitration agreements, "[t]he court's role is limited to interpretation and enforcement of the terms agreed to by the parties; it does not include the rewriting of their contract and the imposition of additional terms." *Salvano v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 85 N.Y.2d 173, 182 (1995). This Court has held that "where the parties have chosen the governing body of law, honoring their choice is necessary to ensure uniform interpretation and enforcement of that agreement." *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 51 (2d Cir. 2004).

"**In short, if defendants wish to invoke the arbitration clauses in the agreements at issue, they must also accept the … choice-of-law clauses in the agreements.**" *Id.* (emphasis added). Here, as the arbitration agreement must be understood according to its specific choice of the FAA, and a court cannot add terms imposing New York law, Uber's motion to compel arbitration rises or falls with the applicability of the FAA.

Absent application of the FAA, Plaintiffs cannot be compelled to arbitrate pursuant to New York law, a choice-of-law that runs counter to either of the contract's two express choice-of-law provisions: the FAA as to the arbitration clause, and California law as to the remainder of the contract. "The parties' private agreement may be crystal clear and require arbitration of every question under the sun, but that does not necessarily mean the [FAA] authorizes a court to stay litigation and send the parties to an arbitral forum." *New Prime*, at 537-38. As the arbitration agreement calls unequivocally to be governed by the FAA alone, and as rideshare drivers "are engaged in interstate commerce and are thus exempt from the FAA's enforcement provisions pursuant to §1" accordingly "the parties did not enter into a valid agreement to arbitrate and … there is no other ground upon which [a court] may enforce the arbitration provision. *Rittmann*, 971 F. 3d at 921.

### 1. No Other Law Can Be Applied To The Arbitration Provision To Contravene An Extant Choice-Of-FAA Provision

Where an express choice-of-law clause selects the FAA, and is putatively applied to workers exempt from the FAA, it is not the case that a choice of law was not made, nor that such choice-of law clause would then be severed, leaving a court to consider on a blank slate whether arbitration must be compelled. Here, the result is merely that Uber, as the drafter, chose the FAA as the governing law, the FAA governs the arbitration agreement and, pursuant to the FAA, a court lacks the power to compel Plaintiffs to arbitration under 9 U.S.C. § 4, because the FAA just does not apply to them. Given this, a court may not rewrite the contract or engage in hypotheticals that assume the contract has no choice-of-law provision. The contract's plain choice of the FAA begins and ends the inquiry into law applicable to the arbitration clause.

To superimpose a choice of New York law onto an arbitration provision which contemplates only the application of the FAA would be a textbook case of prohibited re-writing of a contract. Under New York law, a "court must not rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous." *Burke v. PricewaterhouseCoopers LLP Long Term Disability Plan*, 572 F.3d 76, 81 (2d Cir. 2009) (internal citations omitted). *See also Law Debenture*

*Trust Co. v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010), quoting *Bailey v. Fish & Neave*, 8 N.Y.3d 523, 528 (2007) ("courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.") Here, the choice-of-FAA provision is unambiguous; this choice may not be subverted by writing in the application of New York law.

While Uber's exclusive choice of the FAA to govern the arbitration provision is clear, even if there were some ambiguity regarding the arbitration provision's governing law, such ambiguity would be construed against Uber, as the drafter of this adhesion contract, and no law other than the FAA could be applied to it. *See*, *67 Wall Street Co. v. Franklin Nat'l Bank*, 37 N.Y.2d 245, 249 (1985) ("a contract must be construed most strongly against the party who prepared it"), *citing* 4 WILLISTON, CONTRACTS § 621; 10 NY JUR, CONTRACTS, § 223. *See Rittmann*, *supra*, at 920 (9th Cir. 2020) (Refusing to compel arbitration under any state law "[b]ecause it is not clear that the parties intended to apply Washington law to the arbitration provision in the event the FAA did not apply, we construe ambiguity in the contract against Amazon to avoid that result."). *See also Rittmann v. Amazon.com, Inc.*, 383 F. Supp. 3d 1196, 1203 (W.D. Wash. 2019) (Refusing to enforce an arbitration agreement

where "it is not clear…whether the parties intended the Arbitration Provision to remain enforceable in the event that the FAA was found to be inapplicable.")

As the choice-of-FAA provision remains in the contract, it cannot be disregarded or papered over in the guise of interpretation.

### 2. Severance Of The Choice-Of-FAA Provision Would Be A Condition Precedent To The Court's Application Of Any Other Choice Of Law To The Arbitration Provision.

Uber's position below, that New York law should apply against an extant choice-of-FAA provision could only begin to make sense if the Court ignores the basic fact that a Court cannot apply one law to a contract where the contract calls to be governed by another law. Uber did not argue for severance of the choice-of-FAA provision before the District Court, instead simply glossing over the question of how New York law could ever be imposed over an extant choice-of-FAA provision.

In *Rittmann*, faced with the same question of how to proceed in light of the FAA's inapplicability, the Ninth Circuit was able to discuss Amazon's arguments regarding the possible application of state law to the Amazon's arbitration clause **only because** it decided to entertain, "*arguendo*," Amazon's argument that the choice-of-FAA provision in its contract should have been severed. 971 F.3d at 920. Where the choice-of-FAA provision in Amazon's contract was not severed, the Court held that no state law arguments could even be entertained in the alternative to the contract's choice of the FAA to govern the arbitration provision. *Id*.

This Court has yet to consider how to treat an arbitration agreement explicitly and exclusively governed by the FAA, when the FAA does not apply; Appellants have not encountered any well-reasoned decision that sought to compel arbitration under such facts that could accomplish the feat of compelling arbitration pursuant to an alternate source of law, without first disposing of contractual language applying the FAA. District Court decisions from within this Circuit that compelled arbitration under state law where the FAA did not apply are inapposite. In *Valdes v. Swift*, the Court analyzed a contract that, unlike the Uber contract, contained no choice-of-law provision and the Court explicitly limited its holding to situations "where the arbitration agreement contains no choice of law provision." 292 F. Supp. 2d 524, 528. (S.D.N.Y. 2003). Thus, in such a case, in the event of the FAA's inapplicability, the Court proceeded to conduct a choice-of-law analysis, because no language exclusively selecting the FAA barred such an analysis, and the contract contained no other applicable choice-of-law provision. *Id. See also Rittmann*, 383 F. Supp. 3d, at 1203 (Distinguishing *Valdes*). Where another district court in this Circuit compelled arbitration of a transportation worker's claims against the terms of a choice-of-FAA provision, it did so only by erring on the facts. In *Diaz v. Mich. Logistics Inc.*, 167 F. Supp. 3d 375 (E.D.N.Y. 2016), the Court was clearly in error where it compelled arbitration by getting the facts wrong and misstating the contents of the contract in order to analogize to *Valdes*, stating that it was proper to perform

a choice-of-law analysis "where, *as here*, the action was brought under federal question jurisdiction and the agreements contain no general or otherwise applicable choice of law provision." (Emphasis added). Yet the contract in *Diaz* **did contain** an applicable choice-of-FAA provision that the district court did not acknowledge, did not sever, and disregarded anyhow. *See* 2:15-cv-01415-LDW-ARL (E.D.N.Y.), Dkt. No. 43-1, at § 17.

### 3. There Would Be No Grounds To Disregard The Choice-Of-Law Provision Merely Because The FAA Doesn't Apply To Workers Engaged In Interstate Commerce Such As Plaintiffs.

Applying general contract principles, there would simply be no grounds to sever the choice-of-FAA provision in the Uber contract. The fact that the contracts' choice-of-FAA provision does not provide Uber with the power to compel drivers to arbitration, does not require it to be severed under the contract or any principles of contract law.

Choice-of-law provisions are to be honored. *See Motorola*, *supra*. In the context of determining the validity of choice-of-law provisions applying the law of a foreign state, choice-of-law provisions may only be severed or disregarded if application of the choice of law would violate "some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal." *Brown & Brown v. Johnson*, 25 N.Y. 3d 364, 368 (2015) (internal citations omitted). In no case could the choice of a preemptive federal

statute such as the FAA as governing law be considered so repugnant that it would require severance by the Court. Faced with the same questions in *Rittmann*, the Ninth Circuit noted that it did not see how the choice-of-FAA provision in Amazon's contract was susceptible to a severability analysis "merely because the provision does not work as Amazon had intended." 971 F.3d at 920, n. 10.

Uber's insistence upon applying New York law to the arbitration provision, against the express language of two choice-of-law provisions that Uber itself drafted is a nonsensical refutation of its own choices and lacks a basis in contract law.

> **4. Courts Are Empowered Only To Enforce Arbitration Agreements As Written; Doing Otherwise Subverts The Purpose Of A Choice-Of-Law Provision, And, In This Case Would Undermine National Policy On Arbitration, And Create Inconsistent And Absurd Results**

Fundamental to the Supreme Court's body of law on arbitrability is that courts only possess the power to compel arbitration "accord[ing to] the terms of the parties' agreement" *New Prime*, 139 S. Ct. at 534. In the event that the FAA does not apply because, as here, plaintiffs are transportation workers exempt from the application of the FAA, courts must enforce the agreement as written, even if that means it cannot compel arbitration, pursuant to 9 U.S.C. § 4.

Here, where the contract contains an express choice-of-law for the arbitration provision, and a general choice of law clause selecting California law, there would

be no basis for performing a choice-of-law analysis, on an imagined blank slate, that Uber proposed to the District Court.

Such an approach is consistent with general contract principles; where parties have expressed their intent to apply a certain law, the Court may not override the parties' intent and impose a choice-of-law analysis against the clear language of the contract. *See Motorola Credit Corp., supra*. Rather, determining the parties' intent requires examining "the plain meaning of the language employed" and giving "full meaning and effect to all of its provisions." *See Katel Ltd. Liab. Co. v. AT&T Corp.*, 607 F.3d 60, 64 (2d Cir. 2010) (internal citations omitted).

To assist with contractual interpretation, "[c]hoice-of-law provisions are intended to guarantee a uniform interpretation of contractual language." *Deutsche Bank Natl. Trust Co. v. Barclays Bank PLC*, 34 N.Y.3d 327, 340 (2019). To conduct the type of choice-of-law analysis that Uber proposed to the District Court would run afoul not only of the plain contractual text but subvert the recognized benefit of choice-of-law provisions in providing clarity, and upend the benefits of a uniform interpretation of a contract intended to apply to drivers in different states. Regarding arbitration provisions that could be applied between residents of various jurisdictions, as in this case, the Second Circuit held, in a case involving residents of different nations, "where the parties have chosen the governing body of law, honoring their choice is necessary to ensure uniform interpretation and enforcement

of that agreement and to avoid forum shopping. This is especially true of contracts between transnational parties, where applying the parties' choice of law is the only way to ensure uniform application of arbitration clauses." *Motorola Credit Corp, supra,* at 51. Such concerns are just as pressing here where Uber presents this national contract to drivers in all 50 states.

Following Uber's proposed choice-of-law analysis would lead to inconsistent and absurd results and promote forum-shopping. After disregarding the exclusive choice of the FAA, then using Uber's proposed center-of-gravity choice-of-law inquiry would make drivers subject to state arbitration procedures under a national contract dependent on where they live or, more troublingly, in what forum they bring their case. Nothing in this uniform contract evinces this kind of location-dependent intent. Applying the contractual prohibition on extending California choice-of-law expressed in the contract's general choice of law provision to the arbitration agreement would, for example, mean that, *for example*, California drivers could not be compelled to arbitrate under their state law, whereas drivers in New York could, upon an interpretation of identical terms. Such a variable approach to interpreting a contract that calls uniformly for application of the FAA, and the various outcomes it would produce would be anathema to the "national policy" regarding arbitration embodied by the FAA. *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006).

Moreover, disregarding the exclusive choice of the FAA to apply choice-of-law principles to require the application of the law of the jurisdiction with the greatest interest in the litigation, would lead to bizarre results and merely promote forum-shopping. In this case, this approach would mean that, similar to *Rittmann*, where one California driver's claims were heard alongside those of three Washington-based drivers, using Washington law to interpret the arbitration provision, *e.g.*, an Uber driver seeking to raise New York Labor Law claims, would be permitted to have such claims heard for himself and a class of New York drivers if brought in federal court in California, alongside three California Uber drivers asserting California wage and hour claims, thus rendering California the state with the greatest interest in the litigation. Yet the same New York driver would be compelled to arbitration if only bringing New York claims in a New York-based court. Such divergent outcomes would be required by Uber's approach, and could not square with an approach to contractual interpretation that requires a manifest intent, yet allows for various outcomes depending on forum.

### B. Plaintiffs' Claims Cannot Be Compelled To Arbitration Even If New York Law Were To Be Applied, Which It Should Not

While, for the above-stated reasons, New York law cannot apply to the arbitration provision and, even if it could, Plaintiffs' claims could not be compelled to arbitration under the relevant agreements.

### 1. The Arbitration Provision In The Uber Contract Is Null And Void Under NY CPLR § 7515

Even if the Court were to find that New York law applies to the arbitration provision (which it should not), state law would operate to bar enforcement of the arbitration provision. CPLR 7515 invalidates, prospectively and retrospectively,[10] any arbitration provision that would compel arbitration of sexual harassment or discrimination claims, as the arbitration provisions here do.

Although the Court in *Islam* held that CPLR 7515 functions only to bar the arbitration of certain claims, *Islam, supra*, at 357, n.7, the statute, by its plain language, functions not by prohibiting the compelling of arbitration of discrimination and sexual harassment claims, but by prohibiting new, and voiding existing arbitration provisions that require such claims to be arbitrated. In her dissent in *Lamps Plus v. Varela*, Justice Ginsburg accurately described CPLR 7515 as "rendering unenforceable certain mandatory arbitration clauses ***covering*** sexual harassment claims." 139 S. Ct. 1407, 1422 (J. Ginsburg, dissenting) (emphasis added). CPLR 7515 functions by, first, defining a "prohibited clause" as "***any*** clause or provision in any contract which requires as a condition of the enforcement of the

---

[10] While the New York Supreme Court held that CPLR 7515 applies retroactively, *Newton v. LVMH Moët Hennessy*, 2020 N.Y. Misc. LEXIS 3288, at \*14-17, 2020 NY Slip Op 32290(U) (Sup. Ct. N.Y. Co. July 10, 2020), the Appellate Division, reversed this decision. *Newton v. LVMH Moët Hennessy*, 192 A.D.3d 540 (1st Dep't 2021). As the Appellate Division's decision stayed litigation, the New York Court of Appeals has not yet had the opportunity to pass on this question.

contract or obtaining remedies under the contract that the parties submit to mandatory arbitration to resolve any allegation or claim of discrimination, in violation of laws prohibiting discrimination, including but not limited to, article fifteen of the executive law." CPLR § 7515(a)(2). New York State Courts have not addressed the issue of how CPLR 7515 bars enforcement of a broad arbitration clause that includes sexual harassment and discrimination claims, in the context of an action involving other types of claims.

Uber's arbitration provision, in whole, is a "prohibited clause" under section 7515(a)(2) because it requires arbitration of discrimination claims, pursuant to a universal requirement to arbitrate all types of dispute under the contract, necessarily including discrimination claims. The contract states that, "[t]his Arbitration Provision applies to any dispute arising out of or related to this Agreement." J.A. 86, at §15.3(i). The arbitration provision does not contain any separate clause that specifically contracts for the arbitration of discrimination claims; the contract only contracts for the arbitration of discrimination claims through its broad, general requirement that "any dispute" be arbitrated. Accordingly, the arbitration clause requires that a party would have to submit any discrimination claim to mandatory arbitration. Because this broad arbitration clause, including "any dispute" requires, as part of its broad reach, submission of discrimination claims to arbitration, it is a "prohibited clause" under CPLR 7515 (a)(2). As a "prohibited clause" the arbitration

clause is "null and void." There is only one provision in the contract to compel arbitration, and with this provision rendered null and void, nothing remains in the contract to compel arbitration of Plaintiff's claims. Thus, as the prohibited clause is the broad arbitration clause, there would be no basis to compel arbitration on this contract under New York law.

> **2. Under New York Law, Court Assess The Enforceability of Arbitration Agreements on a Case-By-Case Basis; In this Case, Public Policy Would Bar Enforcement of the Arbitration Agreement And Its Class Waiver**

Even if New York law could apply, and CPLR 7515 did not bar the enforcement of Uber's arbitration provision (which it must), New York public policy prohibits compelling arbitration where, as here, the specific facts of this case, indicate that doing so vitiates rights to a meaningful remedy.

It is fundamental that where there is a right, there is a remedy. *Marbury v. Madison*, 5 U.S. 137 (1803); *Jacobus v Colgate*, 217 N.Y. 235 (1916) (same, as a matter of New York State policy). The New York Court of Appeals has assessed facts on a case-by-case basis to determine whether compelling arbitration would violate public policy. In *Brady v. Williams Capital Group, L.P.,* 14 N.Y.3d 459, 467 (2010), the Court held that case-by-case analysis was required to determine whether arbitration costs preclude plaintiffs from effective vindication of their statutory rights. Thus, even as New York courts have generally approved of the waiver of a judicial forum, they have affirmatively found that these waivers will be restricted

when they prevent meaningful access to any forum. *Id*.

Here, in light of intervening changes to the standard for employee status under the New York Labor Law, wherein the New York Court of Appeals found workers for app-based employers such as the plaintiffs to be employees under the NYLL, Appellants sought leave to amend the complaint to, *inter alia*, plead their breach-of-contract claims as NYLL violations. J.A. 603-606. Here, enforcement of the arbitration provision and its class waiver does not merely foreclose judicial resolution of Appellants' complaints or raise questions of arbitration's cost-effectiveness for Appellants, but would make it impossible to for Appellants and the 90,000+ putative class members to have their claims adjudicated at all. When the underlying motion was briefed for the District Court, JAMS' website showed 70 arbitrators serving the New York area. *See* Dkt. 35, at 38. Although Appellants' claims involve no individualized facts, but proceed from Uber's universal policy of deducting amounts labeled as sales tax compelling arbitration to Uber's terms, including the class waiver in this case would require 90,000+ individual arbitrations to be held on an identical issue for all 90,000+ individual claims. Even assuming that JAMS could complete one arbitration arising from these claims every single business day, on top of their current caseload, it would take approximately 357 years to hear 90,000 cases. In these circumstances, enforcement of the arbitration clause does not provide the same remedy as a judicial forum, but serves, beyond any

rational doubt, to foreclose the possibility of a remedy for all members of the putative class Plaintiffs seek to represent. Thus, Defendant's arbitration agreement which, as applied in this case, mandates individual arbitration of 90,000+ identical claims, is void under New York law as contrary to public policy.

While it is true that, if it were to apply, New York law states a general policy in favor of arbitrability, this policy is not unlimited. *Brady*, *supra*, at 467 (recognizing that competing policy interests limit the policy favoring arbitration). New York courts will not enforce an arbitration agreement if it is contrary to the state's public policy, as expressed statutes or decisional law. *Susquehanna Valley Cent. Sch. Dist. v. Susquehanna Valley Teachers' Assoc.*, 37 N.Y.2d 614, 616-17 (1975).

New York law does not evince a blanket commitment to arbitration in all circumstances. Notably, when not preempted by the FAA, the legislature has decided to exempt certain types of arbitration agreements from enforcement altogether. In a clear expression of public policy, the legislature has, for decades, limited mandatory arbitration in situations of significantly unequal bargaining power: in 1984, the legislature enacted N.Y. Gen. Bus. Law § 399-c, prohibiting mandatory arbitration in contracts for consumer goods. This law was passed in response to the widespread abuse of mandatory arbitration clauses. *Ragucci v. Prof'l Constr. Servs.*, 803 N.Y.S.2d 139, 143-44 (2d Dept.) (summarizing legislative history). Customers often

did not understand the clauses, and it led to customers being forced into inconvenient forums with "one-sided" arbitrators who favored merchants and, ultimately, resulted in consumers forfeiting claims. *Id.* More recently, the legislature has expanded this prohibition of mandatory arbitration into employment contracts; in recent legislation intended to "increase[...] protections to employees," the legislature banned mandatory arbitration clauses covering discrimination and sexual harassment claims. 2019 Legis. Bill Hist. NY A.B. 8421, amending CPLR § 7515. These laws plainly indicate that there are situations in which the state views contracts requiring arbitration as against public policy where unequal bargaining power or the moral harm of the underlying claims renders arbitration an inappropriate forum. Here, given both the similarities between Uber drivers and consumers as non-sophisticated, unrepresented parties, and the fact that requiring mandatory individual arbitration of 90,000+ identical claims would leave New York City Uber drivers without any remedy, ordering arbitration for the putative class members' claims would violate New York's public policy.

Further, with the FAA outside of the analysis, New York has never stated a public policy in favor of class waivers. Indeed, the very policy outcomes that led New York courts to first articulate a policy in favor of arbitration evaporate under the facts of this case, where adjudication of 90,000 claims within a century is impossible. *See Matter of Smith Barney Shearson Inc. v. Sacharow*, 91 NY2d 39

(1997) ("arbitration serves as a means of conserving the time and resources of the courts and the contracting parties"), *citing Matter of Nationwide Gen. Ins. Co. v Investors Ins. Co. of Am.*, 37 NY2d 91, 95 (1975). *See also Maross Constr. v Central N.Y. Regional Transp. Auth.*, 66 NY2d 341, 345(1985) (arbitration "is now well recognized as an effective and expeditious means of resolving disputes between willing parties desirous of avoiding the expense and delay frequently attendant to the judicial process").

Requiring 90,000+ individual arbitrations on identical contractual issues will conserve no one's time or resources, not those of the contracting parties, nor the courts called upon to confirm 90,000+ individual arbitration awards. Nothing about arbitrating these claims individually over three centuries would be expeditious or would avoid the "expense and delay frequently attendant to the judicial process." Rather, compelling individual arbitration will simply serve to vitiate any meaningful remedy drivers may have. Under *Brady*, the courts must consider the case-by-case impact that compelling arbitration would have, and whether this would conflict with the fundamental policy concern that rights, where violated, may be remedied.

**CONCLUSION**

For the above-stated reasons, Appellants respectfully request that this Court reverse the District Court and rule that there is no basis to compel Appellants to arbitration.

Dated:  May 3, 2022

Respectfully Submitted,

JULIEN & MIRER, PLLC

/s/ Jeanne Mirer

_____

By:  Jeanne Mirer
1 Whitehall Street, 16th Floor
New York, New York 10004
(212) 231-2235
jmirer@julienmirer.com

*and*

ZUBIN SOLEIMANY, ESQ.
NEW YORK TAXI WORKERS
ALLIANCE

/s/ Zubin Soleimany

_____

31-10 37th Avenue, Suite 300
Long Island City, New York 11101
(718) 706-9892
zsoleimany@nytwa.org

*Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of Rule 32(a)(7)(B).  As measured by Microsoft Word 2013, the word-processing system used to prepare it, this brief contains 16,995 words.

Dated: May 3, 2022

_____

Jeanne Mirer
*Attorney for Appellant*s

## CERTIFICATE OF SERVICE

I hereby certify that one ( 1) copy of the following:

APPELLANT'S BRIEF AND SPECIAL APPENDIX
& APPELLANTS' APPENDIX

was served upon Appellee's counsel via the Court's ECF System, as indicated, this
3rd day of May, 2022, upon the following:

Date: May 3rd, 2022

/s/ Jeanne Mirer

_____

Jeanne Mirer
*Attorney for Appellant*

# SPECIAL APPENDIX

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: 12/29/2021

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

LEVON ALEKSANIAN, *individually, on*
*behalf of all others similarly situated, and as*
*Class Representative*, ET AL.,

                                **Plaintiffs,**

                   -against-

UBER TECHNOLOGIES INC., ET AL.,

                            **Defendants.**

-------------------------------------------------------------x

        1:19-cv-10308 (ALC)

        **<u>OPINION & ORDER</u>**

**ANDREW L. CARTER, JR., United States District Judge:**

On March 8, 2021, the Court issued its opinion granting Defendants' motion to compel arbitration and Plaintiffs' motion for discovery. Plaintiffs filed this motion for reconsideration pursuant to Fed. R. Civ. P. 59(e).

The Court assumes familiarity with the facts of this cases, as set forth in its March 8, 2021 Opinion and Order. For the reasons that follow, Plaintiffs' motion is DENIED.

A court will grant such a motion for reconsideration only where the party seeking reconsideration "[1] identifies an intervening change of controlling law, [2] the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust*, 729 F.3d 99, 104 (2d Cir. 2013) (citation and quotation marks omitted). The standard for granting such a motion is strict, and the decision to grant or deny a motion for reconsideration is one committed to the discretion of the district court. *Salveson v. JP Morgan Chase & Co.*, 663 Fed. App'x. 71, 75 (2d Cir. 2016) (internal quotations omitted). "[B]ut, in exercising that discretion, the court "must be mindful that a motion for reconsideration is not favored and is properly granted only upon a showing of

exceptional circumstances." *Boyd v. J.E. Robert Co.*, No. 05-CV-2455, 2013 WL 5436969, at *2 (E.D.N.Y. Sept. 27, 2013) (quoting *Nakshin v. Holder*, 360 Fed. App'x. 192, 193 (2d Cir. 2010)) (quotation marks omitted), *aff'd*, 765 F.3d 123 (2d Cir. 2014).

Plaintiffs contend that the Court committed egregious error by applying a motion to dismiss standard when determining the motion to compel arbitration. Plaintiffs' sought discovery on interstate trips "which Plaintiffs assert is relevant to deciding the issue of whether Plaintiffs belong to a class workers 'engaged in interstate commerce.'" *See* Opinion & Order at 9. The Court determined that discovery was unnecessary to resolve this issue. They argue that their factual submissions in reply to Defendants' motion to compel arbitration placed facts in dispute that barred resolution of the issue. But Plaintiffs' arguments are without merit. The opinion recognized that even though courts usually utilize something close to a summary judgment standard to decide motions to compel arbitration—allowing discovery where appropriate—when deciding whether a category of workers is exempted from the FAA under the residual clause of 9 U.S.C. § 1, the motion to dismiss standard applies if the complaint and incorporated documents provide a sufficient basis to decide the issue. Since the Court found that the Complaint and incorporated documents provided sufficient information, the Court ruled based on these documents.

The gravamen of Plaintiff's motion is their disagreement with the Court's conclusion. But mere disagreement with the Court's factual analysis is not sufficient grounds to baldly proclaim fallacy in the Court's reasoning. *See Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*, No. 16-cv-1318, 2019 WL 3738623, at *3 (S.D.N.Y. June 13, 2019) ("The fact that movants are unhappy with the Court's decision, while understandable, affords no basis for the relief they seek." (citations and quotation marks omitted)); *USA Certified Merchants, LLC v.*

*Koebel*, 273 F. Supp. 2d 501, 504 (S.D.N.Y. 2003) ("[A] motion for reconsideration is not designed to accord an opportunity for the moving party, unhappy with the results, to take issue with the Court's resolution of matters considered in connection with the original motion."). The Court finds no reason to alter the judgment in this case.

For the foregoing reasons, Plaintiffs' motion for reconsideration is **DENIED**. The Clerk of the Court is respectfully directed to terminate ECF No. 62.

**SO ORDERED.**

Dated: **December 29, 2021**
       **New York, New York**

_____
    **ANDREW L. CARTER, JR.**
    **United States District Judge**

### CPLR 7515. MANDATORY ARBITRATION CLAUSES;  PROHIBITED
(Current as of January 01, 2021)

(a)  Definitions.   As used in this section:

1.   The term "employer" shall have the same meaning as provided in subdivision five of section two hundred ninety-two of the executive law .

2.   The term "prohibited clause" shall mean any clause or provision in any contract which requires as a condition of the enforcement of the contract or obtaining remedies under the contract that the parties submit to mandatory arbitration to resolve any allegation or claim of an unlawful discriminatory practice of sexual harassment.

3.   The term "mandatory arbitration clause" shall mean a term or provision contained in a written contract which requires the parties to such contract to submit any matter thereafter arising under such contract to arbitration prior to the commencement of any legal action to enforce the provisions of such contract and which also further provides language to the effect that the facts found or determination made by the arbitrator or panel of arbitrators in its application to a party alleging an unlawful discriminatory practice based on sexual harassment shall be final and not subject to independent court review.

4.   The term "arbitration" shall mean the use of a decision making forum conducted by an arbitrator or panel of arbitrators within the meaning and subject to the provisions of article seventy-five of the civil practice law and rules.

(b)(i)  Prohibition.   Except where inconsistent with federal law, no written contract, entered into on or after the effective date of this section shall contain a prohibited clause as defined in paragraph two of subdivision (a) of this section.

(ii)  Exceptions.   Nothing contained in this section shall be construed to impair or prohibit an employer from incorporating a non-prohibited clause or other mandatory arbitration provision within such contract, that the parties agree upon.

(iii)  Mandatory arbitration clause null and void.   Except where inconsistent with federal law, the provisions of such prohibited clause as defined in paragraph two of subdivision (a) of this section shall be null and void.   The inclusion of such clause in a written contract shall not serve to impair the enforceability of any other provision of such contract.

(c)  Where there is a conflict between any collective bargaining agreement and this section, such agreement shall be controlling.

SpA.4