# 22-98

## United States Court of Appeals
### for the Second Circuit

LEVON ALEKSANIAN, INDIVIDUALLY, ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED, AND AS CLASS REPRESENTATIVES, SONAM LAMA,
INDIVIDUALLY, ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, AND
AS CLASS REPRESENTATIVES, HARJIT KHATRA, INDIVIDUALLY, ON
BEHALF OF ALL OTHERS SIMILARLY SITUATED, AND AS CLASS
REPRESENTATIVES,

*Plaintiffs-Appellants,*

– v. –

UBER TECHNOLOGIES INC., JOINTLY AND SEVERALLY, UBER LOGISTIK,
LLC, JOINTLY AND SEVERALLY, UBER USA LLC,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## RESPONSE BRIEF OF DEFENDANTS-APPELLEES UBER
TECHNOLOGIES, ET AL.

Jeremy Creelan
JENNER & BLOCK LLP
919 Third Avenue
New York, NY 10022-3908
(212) 891-1600

Adam G. Unikowsky
JENNER & BLOCK LLP
1099 New York Ave. NW, Suite 900
Washington, DC 20001
(202) 639-6000

## CORPORATE DISCLOSURE STATEMENT

Uber Technologies, Inc. is a publicly held corporation and not a subsidiary of any entity. Based solely on SEC filings regarding beneficial ownership of the stock of Uber, Uber is unaware of any shareholder who beneficially owns more than 10% of Uber's outstanding stock.

USA, LLC is a wholly-owned subsidiary of Uber Technologies, Inc.

Uber Logistik, LLC has been dissolved since 2015.

# TABLE OF CONTENTS

**Pages**

INTRODUCTION ................................................................1

JURISDICTIONAL STATEMENT ........................................2

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................2

STATEMENT OF THE CASE .............................................3

SUMMARY OF ARGUMENT .............................................7

ARGUMENT ..................................................................11

    I.    Plaintiffs Must Arbitrate Under the FAA...........................11

        A.    Plaintiffs fall within the class of "rideshare drivers."...............12

        B.    Rideshare drivers are not a "class of workers engaged in foreign or interstate commerce," even though some drivers occasionally cross state lines. ........................14

            1.    Text .............................................................14

            2.    Structure......................................................20

            3.    History .........................................................24

            4.    Other statutes ...............................................28

        C.    Rideshare drivers are not a "class of workers engaged in foreign or interstate commerce" by virtue of their travel to transportation hubs................................35

        D.    Alternatively, Uber's arbitration agreement is not a "contract of employment."........................................40

    II.    If Plaintiffs Are Exempt from the FAA, the Court Should Compel Arbitration Under New York Law. ........................43

        A.    If the FAA does not apply, then state law applies. ..................44

B.    Under New York law, the arbitration agreement is enforceable. ................................................................... 53

CONCLUSION ........................................................................ 57

CERTIFICATE OF COMPLIANCE ....................................... 58

CERTIFICATE OF SERVICE ............................................... 59

# TABLE OF AUTHORITIES

**Cases**                                                         **Pages**

*Bd. of Educ. of Bloomfield Cent. Sch. Dist. v. Christa Constr., Inc.*,
  80 N.Y.2d 1031 (1992) ...........................................................................53

*Buck v. California*,
  343 U.S. 99 (1952)..................................................................................31

*Capriole v. Uber Techs.*,
  7 F.4th 854 (9th Cir. 2021) ........................ 2, 8, 12, 13, 17, 22, 35, 37, 38, 39, 40

*Circuit City Stores, Inc. v. Adams*,
  532 U.S. 105 (2001)................................... 2, 8, 12, 13, 17, 22, 35, 37, 38, 39, 40

*Citizens Bank v. Alafabco, Inc.*,
  539 U.S. 52 (2003)..................................................................................24

*Cunningham v. Lyft, Inc.*,
  17 F.4th 244 (1st Cir. 2021)................. 2, 8, 11, 12, 13, 18, 19, 22, 35, 37, 40, 50

*Daly v. Citigroup Inc.*,
  939 F.3d 415 (2d Cir. 2019)....................................................................53

*Davarci v. Uber Techs., Inc.*,
  2021 WL 3721374 (S.D.N.Y. Aug. 20, 2021)............................................ 18, 43

*Diaz v. Mich. Logistics Inc.*,
  167 F. Supp. 3d 375 (E.D.N.Y. 2016) ...................................................... 53, 54

*Douglas v. U.S. Dist. Ct. for Cent. Dist. of Cal.*,
  495 F.3d 1062 (9th Cir. 2007) ...............................................................56

*Employers Liability Cases*,
  207 U.S. 463 (1908)................................................................................34

*Green Tree Fin. Corp.-Alabama v. Randolph*,
  531 U.S. 79 (2000)...................................................................................2

*Haider v. Lyft, Inc.*,
  No. 20-cv-2997 (AJN), 2021 WL 1226442 (S.D.N.Y. Mar. 31, 2021) ..............20

iv

*Hamrick v. Partsfleet, LLC*,
    1 F.4th 1337 (11th Cir. 2021) ...................................................................... 31, 32

*Harper v. Amazon.com Services, Inc.*,
    12 F.4th 287 (3d Cir. 2021) .............................................................................44

*Harris v. Shearson Hayden Stone, Inc.*,
    56 N.Y.2d 627 (1982); .....................................................................................56

*Harris v. Shearson Hayden Stone, Inc.*,
    82 A.D.2d 87 (1st Dep't 1981) .........................................................................56

*Hayes v. Cty. Bank*,
    26 A.D.3d 465 (2d Dep't 2006) ........................................................................56

*Heller v. Rasier, LLC*,
    No. CV 17-8545 PSG, 2020 WL 413243 (C.D. Cal. Jan. 7, 2020)....................26

*Hoffman v. Citibank (South Dakota), N.A.*,
    546 F.3d 1078 (9th Cir. 2008) ..........................................................................57

*Howard v. Illinois Cent. R. Co.*,
    148 F. 997 (C.C.W.D. Tenn. 1907) ...................................................................34

*Int'l Bhd. of Teamsters Local Union No. 50 v. Kienstra Precast, LLC*,
    702 F.3d 954 (7th Cir. 2012). .................................................................... 18, 19

*Islam v. Lyft, Inc.*,
    524 F. Supp. 3d 338 (S.D.N.Y. 2021) ..................................................... 49, 52, 54

*John Wiley & Sons, Inc. v. DRK Photo*,
    882 F.3d 394 (2d Cir. 2018)..............................................................................47

*Lamps Plus, Inc. v. Varela*,
    139 S. Ct. 1407 (2019).......................................................................................54

*Maryland Cas. Co. v. Continental Cas. Co.*,
    332 F.3d 145 (2d Cir. 2003)..............................................................................46

*Mohamed v. Uber Techns.*,
    848 F.3d 1201 (9th Cir. 2016) ..........................................................................57

*Morris v. McComb*,
　　332 U.S. 422 (1947)..........................................................................30

*New Prime Inc. v. Oliveira*,
　　139 S. Ct. 532　(2019) ................................................... 25, 41, 42, 43

*Newton v. LVMH Moet Hennessy*,
　　192 A.D.3d 540 (1st Dep't 2021) ......................................................55

*Olson v. Major League Baseball*,
　　29 F.4th 59 (2d Cir. 2022) ...............................................................41

*Osvatics v. Lyft, Inc.*,
　　535 F. Supp. 3d 1 (D.D.C. 2021) ...................................... 13, 18, 20, 38

*Ranieri v. Bell Atl. Mobile*,
　　304 A.D.2d 353 (1st Dep't 2003) ......................................................55

*Rittmann v. Amazon.com, Inc.*,
　　971 F.3d 904 (9th Cir. 2020) ............................................... 40, 51, 52

*Rogers v. Lyft, Inc.*,
　　452 F. Supp. 3d 904 (N.D. Cal. 2020) ................................................6

*Shaw Grp. Inc. v. Triplefine Int'l Corp.*,
　　322 F.3d 115 (2d Cir. 2003)..............................................................46

*Singh v. Uber Technologies, Inc.*,
　　571 F. Supp. 3d 345 (D.N.J. 2021) ............................................. 43, 49

*Southwest Airlines Co. v. Saxon*,
　　142 S. Ct. 1783 (2022)................................. 8, 9, 14, 15, 20, 21, 27, 39

*Tsadilas v. Providian Nat'l Bank*,
　　13 A.D.3d 190 (1st Dep't 2004). ......................................................55

*Union Pac. RR. Co. v. Brotherhood of Locomotive Engineers & Trainmen*,
　　558 U.S. 67 (2009)............................................................................25

*United States v. Capital Transit Co.*,
　　338 U.S. 286 (1949)..........................................................................30

*United States v. Yellow Cab Co.*,
    332 U.S. 218 (1947) ............................................................ 6, 10, 35, 36, 37, 38

*Valdes v. Swift Transp. Co.*,
    292 F. Supp. 2d 524 (S.D.N.Y. 2003) ........................................................ 44, 53

*Waithaka v. Amazon.com, Inc.*,
    966 F.3d 10 (1st Cir. 2020) ........................................................ 40, 50, 51

*Wallace v. Grubhub Holdings, Inc.*,
    970 F.3d 798 (7th Cir. 2020) ................................................ 6, 12, 19

**Statutes**

Fair Labor Standards Act of 1938, Pub. L. No. 718, 52 Stat. 1060 ........................29

Federal Arbitration Act
    9 U.S.C. § 1 ...................................................................... 1, 3, 5, 11, 12, 14, 40
    9 U.S.C. § 2 ......................................................................11
    9 U.S.C. § 16(a)(3) ......................................................................2

ICC Termination Act of 1995, Pub. L. No. 104-88, § 103, 109 Stat. 803 .............26

Motor Carrier Act of 1935, Pub. L. No. 74-255, § 203(b), 49 Stat. 543 .......... 26, 29

N.Y. C.P.L.R.
    § 7515 ......................................................................54
    § 7515(a)(2) ...................................................................... 54, 55
    § 7515(a)(3) ......................................................................55
    § 7515(b)(i) ...................................................................... 54, 55
    § 7515(b)(iii) ...................................................................... 54, 55

Uniform Computer Information Transactions Act § 102(a)(41) ............................41

**Rules**

35 R.C.N.Y. § 59A-11 ......................................................................26

**Other Authorities**

Department of Commerce, U.S. Bureau of the Census,
   Water Transportation 1926 (1929),
   https://books.google.com/books?id=JUgnAQAAIAAJ&printsec=frontcover&so
   urce=gbs_ge_summary_r&cad=0#v=onepage&q&f=false..........................23, 24

Harold Barger, *The Transportation Industries, 1889-1946: A Study of Output,
   Employment and Productivity* 128 (1951)..........................................................21

Interstate Commerce Comm., Bureau of Statistics, *Thirty-Third Annual Report on
   the Statistics of Railways in the United States* 37 (1933) ...................................21

L.E. Peabody, *Forecasting Future Volume of Railway Traffic*, 66 RAILWAY AGE
   899 (Samuel O. Dunn, Roy V. Wright & H.F. Lane eds., 1924) .......................21

Raymond T. Nimmer, et al., 2 Information Law §§ 11:3, 11:14,
   Westlaw (database updated May 2022) ........................................................41, 42

William J. Cunningham, Committee on Recent Economic Changes of the
   President's Conference on Unemployment, *Recent Economic Changes in the
   United States* (1929),
   https://www.nber.org/system/files/chapters/c4957/c4957.pdf. ...........................23

## INTRODUCTION

Plaintiffs are drivers who use the Uber app. When they accepted Uber's license agreement, they agreed to individually arbitrate their claims against Uber. The license agreement offered them the opportunity to opt out of arbitration without any adverse consequences, but they declined to do so. They now seek to renege on the arbitration agreement by filing a class-action lawsuit. They may not do so.

It is undisputed that the Federal Arbitration Act ("FAA"), if applicable, requires enforcement of Uber's arbitration agreement. Plaintiffs, however, argue that they are exempt from the FAA because their license agreements are "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. That argument is wrong. As the district court correctly held, Plaintiffs do not fall within a "class of workers engaged in interstate commerce." Instead, they fall within a class of workers engaged in local transportation. In 2019, 97.64% of Uber trips were intrastate, and the average Uber trip was 6.3 miles. Ja.37-38, ¶¶ 4-5. Although some drivers who live near state lines occasionally cross state lines during a trip, drivers who use Uber are fundamentally different from seamen and railroad employees, whose *job it is* to facilitate foreign or interstate commerce. The First and Ninth Circuits have rejected Plaintiffs' argument on this precise issue, and this Court should follow those

1

decisions rather than creating a circuit split. *See Cunningham v. Lyft, Inc.*, 17 F.4th 244 (1st Cir. 2021); *Capriole v. Uber Techs.*, 7 F.4th 854 (9th Cir. 2021).

Even if Plaintiffs are exempt from the FAA, the parties' arbitration agreement is enforceable under New York law. The arbitration agreement specifies that it will be governed by the FAA, but it also includes a severability clause stating that if any provision of the arbitration agreement is unenforceable, the rest will be enforceable. Hence, if the choice-of-FAA clause is unenforceable, it must be severed. If it is severed, then standard choice-of-law principles require applying New York law to the rest of the otherwise valid and binding arbitration agreement. And New York cases are unanimous that individualized arbitration agreements must be enforced. Plaintiffs' contrary view—that if Plaintiffs are exempt from the FAA, then the entire arbitration agreement must be discarded—is contrary to the plain text of the agreement and common sense.

## JURISDICTIONAL STATEMENT

Because the district court issued a final order compelling arbitration and dismissed this case, this Court has jurisdiction under Section 16(a)(3) of the FAA. *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 86-87, 89 (2000).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

**I.**    Is Plaintiffs' arbitration agreement with Uber exempt from the FAA on the ground that it is a "contract[] of employment of seamen, railroad employees, or

2

any other class of workers engaged in foreign or interstate commerce"? *See* 9 U.S.C. § 1.

**II.**     If the FAA does not apply, is the arbitration agreement enforceable under New York law, or must it be invalidated in its entirety, opening the door to class action litigation?

## STATEMENT OF THE CASE

Uber is a technology company.  It develops software to create digital marketplaces that are operated through app-based platforms.  The company's first and most widely known marketplace, the Rides marketplace, connects independent drivers with people seeking transportation.

If a person wants to use Uber to find a ride, the person must download the Uber app.  Likewise, if a driver wants to use Uber to find passengers, the driver must download the driver version of the Uber app.  Declaration of Brad Rosenthal, Dkt. #20-1, ¶ 8.

To use the driver version of the Uber app, a driver must first accept Uber's license agreement, which includes an arbitration agreement.  *Id.* ¶ 9.  All three plaintiffs accepted Uber's license agreement.  Ja.5-6.[1]

---

[1] Because the plaintiffs accepted their license agreements at different times, the license agreements they entered into vary slightly.  Plaintiff Aleksanian accepted Uber's June 21, 2014, Software License Agreement and June 21, 2014, Driver Addenda, while Plaintiffs Lama and Khatra last accepted Uber's December 11, 2015,

3

On the first page of the license agreement, the following message appears:

**IMPORTANT: PLEASE NOTE THAT TO USE THE UBER SERVICES AND THE ASSOCIATED SOFTWARE, YOU MUST AGREE TO THE TERMS AND CONDITIONS SET FORTH BELOW. PLEASE REVIEW THE ARBITRATION PROVISION SET FORTH BELOW IN SECTION 15.3 CAREFULLY, AS IT WILL REQUIRE YOU TO RESOLVE DISPUTES WITH UBER ON AN INDIVIDUAL BASIS, EXCEPT AS PROVIDED IN SECTION 15.3, THROUGH FINAL AND BINDING ARBITRATION UNLESS YOU CHOOSE TO OPT OUT OF THE ARBITRATION PROVISION. BY VIRTUE OF YOUR ELECTRONIC EXECUTION OF THIS AGREEMENT, YOU WILL BE ACKNOWLEDGING THAT YOU HAVE READ AND UNDERSTOOD ALL OF THE TERMS OF THIS AGREEMENT (INCLUDING SECTION 15.3) AND HAVE TAKEN TIME TO CONSIDER THE CONSEQUENCES OF THIS IMPORTANT BUSINESS DECISION. IF YOU DO NOT WISH TO BE SUBJECT TO ARBITRATION, YOU MAY OPT OUT OF THE ARBITRATION PROVISION BY FOLLOWING THE INSTRUCTIONS PROVIDED IN SECTION 15.3 BELOW.**

Ja.71.  Drivers are twice prompted to click "YES, I AGREE" before they are able to access the Rides marketplace.  *See* Dkt. #20-1, ¶¶ 9-15 (explaining process for drivers signing up to access the Rides marketplace).

---

UBER USA Technology Services Agreement ("TSA") and December 11, 2015, UBER USA Driver Addendum.  Declaration of Allison Gordon, Dkt. #20-2, ¶¶ 5, 8. The version of the arbitration agreement cited in Plaintiffs' appellate brief (at pages 51 and 64) is the version accepted by Lama and Khatra.  Ja.71-93.  Aleksanian's version of the agreement is in the district court record.  Dkt. #20-3.

As the district court noted, "the agreements are substantially similar in regard to the relevant provisions."  Ja.736 n.4.  Plaintiffs do not contend there are any relevant differences between the agreements.  For simplicity, and consistent with Plaintiffs' convention, Uber will collectively refer to these agreements as "the agreement" and cite the version accepted by Lama and Khatra.

The arbitration agreement recites that, with exceptions not applicable here, the parties will arbitrate "any disputes, actions, claims or causes of action arising out of or in connection with this Agreement or the Uber Services." Ja.86 (TSA § 15.2). The agreement also includes a section explaining "Your Right To Opt Out of Arbitration." Ja.92. (TSA § 15.3(viii)). It states: "Arbitration is not a mandatory condition of your contractual relationship with Uber," and permits drivers to opt out by notifying Uber in writing within 30 days of executing the agreement. *Id.*

Plaintiffs executed the arbitration agreement, and did not opt out. Ja.5-6. Nonetheless, Plaintiffs brought this putative class action against Uber. Uber moved to compel arbitration, arguing that the Federal Arbitration Act ("FAA") required the arbitration agreement to be enforced, and also preserving the argument that the agreement was enforceable under state law. Dkt. #20.

Plaintiffs opposed Uber's motion to compel arbitration and separately moved for discovery. Dkt. #35, 45. Plaintiffs contended that the agreement was exempt from the FAA because it was a "contract[] of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1.

The district court granted Uber's motion to compel arbitration and denied Plaintiffs' motion for discovery. Ja.734-751. The district court ruled that the FAA was applicable and rejected Plaintiffs' contention that they were exempt under

Section 1.  Canvassing case law from multiple circuits, the court concluded that for a worker to fall within the exemption, interstate commerce must be a "*central* part of the job description of the class of workers to which they belong."  Ja.745 (quoting *Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798, 803 (7th Cir. 2020)).  Applying that standard, the court held that Uber "is in the general business of giving people rides, not the particular business of offering interstate transportation to passengers." Ja.746 (quoting *Rogers v. Lyft, Inc.*, 452 F. Supp. 3d 904, 916 (N.D. Cal. 2020)). "Interstate trips that occur by happenstance of geography do not alter the intrastate [transportation] function performed by the class of workers."  *Id.*

The court rejected Plaintiffs' argument that the "class of workers" should be confined to New York City drivers (rather than drivers who use Uber as a whole), finding "no basis for defining the class so narrowly."  Ja.746.  It further rejected Plaintiffs' arguments that *Plaintiffs themselves* frequently crossed state lines, explaining that the "central inquiry is whether the *class* of workers engaged in interstate commerce."  Ja.747.

Plaintiffs also contended that they fell within Section 1 because they sometimes drove passengers to transportation hubs (such as airports).  The district court disagreed, relying on *United States v. Yellow Cab Co.*, 332 U.S. 218 (1947), which held that a conspiracy among taxicab companies did not involve the stream of commerce and therefore did not implicate the Sherman Act, even though some

taxi drivers occasionally took people to railroad stations. Ja.748-49. The court acknowledged evidence that Uber advertised flat rates between Manhattan and Newark International Airport and that Uber imposed a $20 surcharge to trips between New York City and New Jersey. Ja.749. In the court's view, however, this evidence was insufficient to establish that Section 1 applied: "just because Uber is set up to handle the occasional trip does not mean that interstate movement of goods is a central part of the job description of the class of workers to which Plaintiffs belong." Ja.749 (quotation marks and brackets omitted). Finally, the court rejected Plaintiffs' effort to analogize themselves to Greyhound bus drivers, finding that "Greyhound drivers are much more akin to seamen and railroad employees than Uber drivers." Ja.749.

Because Plaintiffs were subject to the FAA, the court enforced the arbitration agreement. Ja.750. The court denied Plaintiffs' motion for discovery, concluding that "this issue can be decided on the face of the complaint." Ja.742.

Noting that the parties had not sought a stay pending arbitration, the court dismissed Plaintiffs' suit with prejudice. Ja.751. Plaintiffs subsequently filed a motion for reconsideration, which the court denied. Ja.754-56.

## SUMMARY OF ARGUMENT

The district court correctly held that Plaintiffs must arbitrate under the FAA. Plaintiffs claim that their arbitration agreements fall within the exemption in Section

1, which covers "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. The First and Ninth Circuits have rejected that argument, *see Cunningham v. Lyft, Inc.*, 17 F.4th 244 (1st Cir. 2021); *Capriole v. Uber Techs.*, 7 F.4th 854 (9th Cir. 2021), as have most district courts. The Court should follow those authorities.

In determining whether Plaintiffs fall within a "class of workers engaged in foreign or interstate commerce," the Court must first determine what "class of workers" is at issue. The Court should hold that Plaintiffs fall within the class of "rideshare drivers"—not rideshare drivers *within New York City*, as Plaintiffs erroneously advocated in the district court. Neither the class of seamen nor the class of railroad employees is geographically restricted, so a class within the residual clause should not be geographically restricted either.

In assessing whether a class of workers engages in interstate commerce, the Court should consider what work "the members of the class, as a whole, typically carry out." *Southwest Airlines Co. v. Saxon*, 142 S. Ct. 1783, 1788 (2022). The class of rideshare drivers, as a whole, typically engages in local transportation, not interstate commerce. Indeed, in 2019, 97.64% of Uber trips were intrastate, and the average Uber trip was 6.3 miles. Ja.37-38, ¶¶ 4-5. Although drivers who live near state lines may occasionally transport passengers across state lines, most of their trips are intrastate. And many drivers who live far from state lines will never

8

transport a passenger across state lines in their lives. As such, the class of rideshare drivers is not exempt from the FAA.

The structure of the FAA confirms that Plaintiffs are not exempt. As the Supreme Court held in *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001), and more recently in *Southwest*, courts applying Section 1 should assess whether the workers at issue are similar to the enumerated classes of workers—seamen and railroad workers. Rideshare drivers are nothing like seamen and railroad workers. Seamen and railroad workers work in the very channels of foreign and interstate commerce. By contrast, rideshare drivers' job is to facilitate local transportation, with trips crossing state lines occurring merely by happenstance of geography.

Plaintiffs' position also undermines the FAA's purpose. "Seamen" and "railroad employees" were exempted from the FAA because they were subject to other federal dispute resolution schemes. Both at the time of the FAA's enactment in 1925 and today, however, drivers who engage in local transportation were not subject to other federal dispute resolution schemes. Plaintiffs give no explanation of why Congress would have wanted to exempt such workers from the FAA in 1925, or why it makes sense to exempt them from the FAA today.

Plaintiffs contend, in the alternative, that they fall within Section 1 because they occasionally transport passengers to transportation hubs such as airports. As both the First and Ninth Circuits have held, that argument conflicts with *United*

9

*States v. Yellow Cab Co.*, 332 U.S. 218 (1947), which held that a conspiracy involving taxicabs did not implicate interstate commerce for Sherman Act purposes. The Court reasoned that the taxicabs' "relationship to interstate transit is only casual and incidental . . . [W]hen local taxicabs merely convey interstate train passengers between their homes and the railroad station in the normal course of their independent local service, that service is not an integral part of interstate transportation." *Id.* at 231, 233. Similarly, drivers who use Uber have a merely casual and incidental relation to interstate commerce and therefore do not fall within the Section 1 exception.

Alternatively, although the district court did not reach this question, the Section 1 exception does not apply because Uber's license agreement is not a "contract of employment." A contract of employment is a contract in which a worker promises to work for a client, in exchange for compensation. In Uber's license agreement, however, drivers are not required to do any work, and Uber does not pay drivers any money. Instead, Uber offers drivers access Uber's platform to find passengers, who then pay the drivers, with the payment facilitated by Uber's platform.

If the FAA does not apply, then Uber's arbitration agreement is enforceable under state law. The agreement provides that the FAA will govern the arbitration agreement. But it also states that if any provision of the arbitration agreement is

unenforceable, it must be severed and the rest of the arbitration agreement will be enforceable. Hence, if the choice-of-FAA clause is unenforceable, it must be severed. Because the contract does not recite what state's law applies if the choice-of-FAA clause is unenforceable, the Court should apply standard choice-of-law principles, which point toward New York law. Under an unbroken line of New York cases, arbitration agreements with class action waivers are enforceable.

## ARGUMENT

### I.   Plaintiffs Must Arbitrate Under the FAA.

The FAA provides that written arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Plaintiffs and Uber entered into a written arbitration agreement that covers Plaintiffs' claims. It is undisputed that, if the FAA applies to the arbitration agreement, it must be enforced.

Plaintiffs contend, however, that the FAA does not apply because Uber's agreement is a "contract[] of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce," and thus exempt from the FAA. 9 U.S.C. § 1.

The district court correctly held that Plaintiffs do not fall within that exemption. Its decision aligns with decisions of the First and Ninth Circuits on the identical issue. *See Cunningham v. Lyft, Inc.*, 17 F.4th 244 (1st Cir. 2021); *Capriole*

11

*v. Uber Techs.*, 7 F.4th 854 (9th Cir. 2021).  The Court should follow the First and Ninth Circuit's well-reasoned decisions.

### A. Plaintiffs fall within the class of "rideshare drivers."

The FAA does not apply to "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce."  9 U.S.C. § 1.   "[I]n determining whether the exemption applies, the question is 'not whether the *individual worker* actually engaged in interstate commerce, but whether *the class of workers to which the complaining worker belonged* engaged in interstate commerce.'"  Ja.744 (quoting *Wallace*, 970 F.3d at 800).  To analyze that issue, the Court must first answer a threshold question: what is the "class of workers to which the complaining worker belonged"?

In the district court, Plaintiffs argued that the "class" should be narrowly defined as "New York City Uber drivers."   Ja.746.  The district court rejected that argument, finding that "[t]here is no basis for defining the class so narrowly." Ja.746. The district court's decision not to narrowly define the class as drivers *in New York City* accords with the Ninth Circuit's decision in *Capriole*, which held that the relevant "category of workers must similarly be assessed at a nationwide level, rather than any narrow, geographic region."  7 F.4th at 862.[2]

---

[2] The First Circuit declined to resolve this issue in *Cunningham*, finding that it would not affect the result.  17 F.4th at 253 n.5.

Plaintiffs do not appear to contest the district court's conclusion on this issue, and it is correct. In *Circuit City Stores, Inc. v. Adams*, the Supreme Court held that "[t]he wording of § 1 calls for the application of the maxim *ejusdem generis*, the statutory canon that where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." 532 U.S. 105, 114-15 (2001) (internal quotation marks and citation omitted). "Under this rule of construction the residual clause [of Section 1] should be read to give effect to the terms 'seamen' and 'railroad employees,' and should itself be controlled and defined by reference to the enumerated categories of workers which are recited just before it." *Id.* at 115. As the Ninth Circuit explained: "As those terms contain no geographic limitations, the most natural inference is that Congress intended those terms to encompass *all* seamen and railroad employees nationwide." *Capriole*, 7 F.4th at 862 (internal quotation marks and citation omitted). "Giving the same construction to the 'other class of workers' referenced in Section 1, this category of workers must similarly be assessed at a nationwide level, rather than any narrow, geographic region." *Id.*; *accord Osvatics v. Lyft, Inc.*, 535 F. Supp. 3d 1, 14–16 (D.D.C. 2021) (similarly holding that courts must consider drivers nationwide rather than in one region).

13

Therefore, the Court should hold that the relevant class of workers is nationwide "rideshare drivers."

**B. Rideshare drivers are not a "class of workers engaged in foreign or interstate commerce," even though some drivers occasionally cross state lines.**

The text, structure, and purpose of Section 1 establish that rideshare drivers are not "seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." Contrary to Plaintiffs' contention, the fact that some drivers occasionally drive passengers across state lines is not enough to show that the class of drivers engages in interstate commerce.[3]

1. Text

Section 1 requires an analysis of whether the *class* of workers is engaged in interstate commerce. As the Supreme Court has recently held, this requires a showing that engaging in interstate commerce is work that "the members of the class, as a whole, typically carry out." *Southwest Airlines Co. v. Saxon*, 142 S. Ct. 1783, 1788 (2022). Hence, courts must analyze what the class "*as a whole*" does (rather than what a subset of members do), and they must look at what members "*typically*" do (as opposed to what they sporadically do). *Id.* (emphasis added).

---

[3] Plaintiffs also offer the alternative argument that drivers are "engaged in interstate commerce" because they sometimes drive passengers to transportation hubs. Uber addresses that argument in Part I.C below.

14

*Southwest*'s legal standard reflects a straightforward interpretation of the statutory text. Analyzing whether a "class" of workers "engages" in an activity requires analyzing whether workers across the class characteristically engage in that activity, rather than whether a subset of workers within the class sporadically do so. For instance, one would not say that the "class" of rideshare drivers, as a whole, is "engaged in" driving to state capitols. To be sure, a *subset* of such providers (those who happen to reside in state capitals) will *sporadically* drive to the local state capitol if it happens to be the passenger's destination. But most providers who reside outside state capitals will never drive to a state capitol in their lives, and even providers who reside within state capitals will drive there only occasionally. Hence, one would not say the class of drivers engages in that activity, even though some drivers occasionally do it.

The same reasoning establishes that the class of rideshare drivers is not "engaged in interstate commerce." Rideshare drivers engage in local transportation, not long-distance travel. In 2019, the average Uber trip in the U.S. was 6.3 miles. Ja.37-38, ¶ 5. Not surprisingly, in light of the short distances, the overwhelming majority of Uber trips are intrastate. In 2019, 97.64% of Uber trips nationally were intrastate. Ja.37, ¶ 4. In New York, that percentage was 98.33%.[4] Ja.38, ¶ 8. In

---

[4] For trips taken during the putative class period—i.e., 2013 to 2017—the data is similar. During this period, the average Uber ride nationwide covered a distance

states where major cities are not near the state line, the percentages are even higher. In California and Massachusetts, the 2019 percentages of intrastate rides were 99.99% and 99.63%, respectively.  Ja.39, ¶ 12.

True, drivers who live near state lines will occasionally cross state lines while making a trip.  But the vast majority of trips will not cross state lines.  Moreover, drivers who do not live near state lines—such as drivers in Los Angeles or Miami— will typically never drive passengers across state lines in their lives.  The *class* of drivers therefore does not "engage in" interstate commerce.  Contrary to Plaintiffs' contention, this approach does not "add[] modifiers that do not exist in the statute." Pl.Br.16.  Instead, it reflects a common-sense interpretation of the statutory text: a *class* of individuals does not "engage in" an activity if only a subset of those individuals does that activity occasionally by happenstance of geography.

Quoting a district court decision, Plaintiffs contend that "any federal district judge would answer in the affirmative if asked whether or not she was 'engaged in' conducting criminal trials."  Pl.Br.17.  But that analogy is unsound because all federal district judges regularly preside over criminal cases.  A more apt analogy would be to ask whether the "class" of federal district judges is "engaged in" sitting

---

of 6 miles and lasted for 16.6 minutes, while the average Uber ride in New York covered a distance of 5 miles and lasted 20.5 minutes.  Ja.37-39, ¶¶ 5, 9.  97.28% of all trips taken in this period, and 96.91% of all trips that began in New York, were intrastate.  *Id.* ¶¶ 4, 8.

on the Second Circuit by designation.  A judge would likely answer in the negative.  Some district judges occasionally sit on the Second Circuit by designation, but most never do, and it is not a characteristic of the class of district judges as a whole.  Here, likewise, some drivers occasionally will cross state lines, but many never do, so the "class" of drivers is not "engaged in" interstate commerce.

In *Capriole*, the Ninth Circuit relied on this reasoning in concluding that drivers who use Uber are not exempt from the FAA.  The Ninth Circuit explained: "Uber drivers, as a class, are not engaged in interstate commerce because their work predominantly entails intrastate trips, even though some Uber drivers undoubtedly cross state lines in the course of their work."  7 F.4th at 864 (quotation marks omitted).  Plaintiffs' assertion that *Capriole* improperly "limited the residual exemption only to long-distance interstate transportation workers," Pl.Br.31, is incorrect.  Instead, *Capriole* rightly recognized that most Uber trips—regardless of distance—do not cross state lines, and "interstate trips that occur by happenstance of geography do not alter the intrastate transportation function performed by the class of workers."  7 F.4th at 864 (quotation marks omitted).

In *Cunningham*, the First Circuit reached the same conclusion with regard to drivers who use Lyft.  It stated that courts must examine "the nature of a business for which a class of workers perform their activities" and it found that "Lyft is clearly primarily in the business of facilitating local, intrastate trips" even though some

17

drivers "infrequently find themselves crossing state lines." 17 F.4th at 253. This Court should reach the same conclusion here.

Most federal district courts have taken the same view. *See Davarci v. Uber Techs., Inc.*, 2021 WL 3721374, at *8 (S.D.N.Y. Aug. 20, 2021) (noting that the "majority of courts" have held that rideshare drivers are not exempt from the FAA, and collecting numerous cases). In one such case, then-Judge Ketanji Brown Jackson concluded, following an extensive analysis, that drivers who use Lyft were not exempt from the FAA, reasoning that "the relevant 'class of workers' must be defined at a *nationwide* level," and that "Lyft drivers offer services that are primarily local and intrastate in nature." *Osvatics*, 535 F. Supp. 3d at 15, 21 (emphasis in original).

Plaintiffs identify only one appellate decision purportedly supporting their position—*International Brotherhood of Teamsters Local Union No. 50 v. Kienstra Precast, LLC*, 702 F.3d 954 (7th Cir. 2012). However, *Kienstra* is readily distinguishable. *Kienstra* did not address rideshare drivers, but instead addressed whether a collective bargaining agreement signed by truckers who transported goods across state lines was covered by the FAA. *Id.* at 958. "[E]ach trucker who testified" testified that he made a "few dozen" interstate trips per year between Illinois and Missouri. *Id.* Without analyzing the issue expressly, the court apparently concluded that the relevant "class of workers" was the truckers who were subject to the CBA,

18

and concluded that *all* of them were "interstate transportation workers." *Id.* at 956-57. Because *all* workers were interstate workers, the court found that this "class" engaged in interstate commerce. *Id.* Those facts differ from this case, where the class includes thousands who do not live near state lines and do not drive passengers across them. *See Cunningham*, 17 F.4th at 252-53 (noting that "not all Lyft drivers engage in any interstate transportation" so "the 'class of workers' as a whole is not engaged in interstate commerce at all"). Notably, in a subsequent case, the Seventh Circuit, in a decision by then-Judge Amy Coney Barrett, stated that the applicability of Section 1 turned on whether interstate commerce was "a central part of the job description of the class of workers to which they belong"—a legal standard under which Uber would prevail. *Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798, 803 (7th Cir. 2020).

Plaintiffs cite statistics showing that the number of interstate Uber trips is high in absolute terms, allegedly exceeding the number of Greyhound and Amtrak trips, Pl.Br.18-20, 28. But those statistics merely reflect the fact that Uber facilitates many more rides than Greyhound or Amtrak: according to Plaintiffs' statistics, there were 1.5 billion Uber trips in 2019 in the United States, as compared to 16 million Greyhound trips and 32.5 million Amtrak trips. Pl.Br. 19 n.4, 28. As then-Judge Jackson explained in *Osvatics*, "the applicability of the section 1 residual clause does not depend on the aggregate number or frequency of interstate trips taken by a class

of workers." 535 F. Supp. 3d at 21. The dispositive fact is that Greyhound and Amtrak workers characteristically engage in interstate commerce, whereas for drivers who use Uber, "interstate rides, no matter how numerous, are merely 'incidental' to their local transportation function." *Id.*[5]

    2. <u>Structure</u>

*Circuit City* held that Section 1's residual clause must "be controlled and defined by reference to the enumerated categories of workers which are recited just before it," *i.e.*, seamen and railroad employees. 532 U.S. at 115. Applying that principle, *Southwest* held that airline employees who load cargo on and off airplanes fall within Section 1 based on their similarity to seamen and railroad employees. The Court pointed to *Circuit City*'s reasoning that railroad employees and seamen

---

[5] The Court should not follow *Haider v. Lyft, Inc.*, No. 20-cv-2997 (AJN), 2021 WL 1226442 (S.D.N.Y. Mar. 31, 2021), on which Plaintiffs rely. In *Haider*, the court concluded that drivers who use Lyft were exempt from the FAA, emphasizing "the sheer number of interstate trips rideshare drivers make." *Id.* at *3. The court acknowledged that many drivers, such those in San Francisco, will cross state lines on "vanishingly rare" occasions. *Id.* at *4. But the court estimated that, in the aggregate, drivers cross state lines "twice each week on average," and concluded that "[w]eekly interstate trips are enough" to establish that the exemption applies. *Id.* at *3. *Haider*'s analysis is in tension with the Supreme Court's subsequent opinion in *Southwest*. *Southwest* clarified that courts should consider what "the members of the class, as a whole, typically carry out." 142 S. Ct. at 1788. Further, *Southwest* relied heavily on the fact that the ramp supervisors at issue there "frequently" loaded and unloaded cargo—the word "frequent" or "frequently" appears seven separate times in the opinion. In view of that reasoning, the Court should not follow *Haider*'s holding that sporadic interstate trips by a subset of drivers are sufficient to place the entire class of drivers within Section 1.

"play a direct and 'necessary role in the free flow of goods' across borders." *Id.* at 1790 (quoting *Circuit City*, 532 U.S. at 121). The Court held that "[c]argo loaders exhibit this central feature of a transportation worker," because "one who loads cargo on a plane bound for interstate transit is intimately involved with the commerce (e.g., transportation) of that cargo." *Id.*

Here, by contrast, Section 1's references to "seamen" and "railway employees" confirm that rideshare drivers are not "engaged in interstate commerce." Seamen and railway employees work in the very channels of interstate and foreign commerce: railroad lines were built for nationwide transport, while the essence of maritime shipping is moving cargo internationally. The statistics bear that intuition out. Around the time of the FAA's enactment, one study reported that, in 1920, the average freight haul by railroad was 308 miles. *See* L.E. Peabody, *Forecasting Future Volume of Railway Traffic*, in 66 RAILWAY AGE 899, 900 (Samuel O. Dunn, Roy V. Wright & H.F. Lane eds., 1924); *see also* Interstate Commerce Comm., Bureau of Statistics, *Thirty-Third Annual Report on the Statistics of Railways in the United States* 37 (1933) (reporting that, in 1919, the average freight haul of a Class I railroad traveled 178.29 miles and the average passenger trip covered 39.36 miles). The average ship freight haul, shortly after the FAA's enactment, was 660 miles. Harold Barger, *The Transportation Industries, 1889-1946: A Study of Output, Employment and Productivity* 128 (1951). Airline cargo loaders did not exist in 1927,

but the vast majority of flights involve interstate and foreign commerce, so it is no surprise the Court classified airline cargo loaders as analogous to seamen and railroad employees.

By contrast, rideshare drivers transport people to local destinations—nearly always within the same state. Unlike seamen and railroad employees, whose jobs inherently involve interstate and foreign commerce, drivers who use Uber will only occasionally do so by happenstance of geography. The First and Ninth Circuits both rightly relied on this distinction in finding that drivers who use Uber and Lyft were subject to the FAA. *Cunningham*, 17 F.4th at 253 ("In section 1, those enumerated objects are 'seamen' and 'railroad employees,' two classes of transportation workers primarily devoted to the movement of goods and people beyond state boundaries. The same cannot even arguably be said of Lyft drivers."); *Capriole*, 7 F.4th at 865 (whereas Uber trips "only infrequently involve either crossing state lines or a trip to a transportation hub," "for the other enumerated categories of workers in Section 1, seamen and railroad workers, the interstate movement of goods and passengers over long distances and across national or state lines is an indelible and central part of the job description" (quotation marks omitted)).

Plaintiffs proffer statistics purporting to show that maritime and railroad transportation was frequently intrastate in 1925. But Plaintiffs' statistics are misleading. Plaintiffs claim that a government report states that in 1925, "49% percent of trips

22

of Class I railroads … were taken on commuter railroads." Pl.Br.35; *see* William J. Cunningham, Committee on Recent Economic Changes of the President's Conference on Unemployment, Recent Economic Changes in the United States (1929), at 278, available at https://www.nber.org/system/files/chapters/c4957/c4957.pdf. But the cited government report does not say that. Instead, it says that 49% *of passengers* were commuter passengers, and 18% *of passenger-miles* were commuter passenger-miles. *Id.* But these statistics regarding the percentage of passengers that were commuter passengers are a red herring, because passenger service made up only a small fraction of railway service. The same report reveals that in 1925, 74.2% of revenue came from freight service, and only 17.3% came from passenger service (the rest was "other"). *Id.* at 293. And, freight service was almost always interstate: the average haul per ton in 1925 was 179.59 miles. *Id.* at 278. In other words, interstate freight travel dominated the railroad industry, so the typical railroad employee would have engaged in interstate commerce.

Plaintiffs also rely on a government report reciting that 93.1% of "passengers were reported as having been carried in ferryboats." Pl.Br.36; *see* Department of Commerce, U.S. Bureau of the Census, Water Transportation 1926 (1929), at 124, available at https://books.google.com/books?id=JUgnAQAAI-AAJ&printsec=frontcover&source=gbs_ge_summary_r&cad=0#v=onepage&q&f=false. Again, a closer look at the report shows that it does not support Plaintiffs'

case. The report explains that there were a miniscule number of ferryboat workers as compared to other seamen. In 1926, there were 12,422 freight and passenger vessel workers, compared to a mere 456 ferryboat workers. *Id.* at 40; *see id.* at 35, 72-73 (noting tiny number of ferryboats compared to other types of vessels). Thus, regardless of the percentage of passengers that used ferryboats as opposed to other types of boats, the typical "seaman" would *not* have been a ferryboat worker.[6]

Of course, seamen and railroad employees may *occasionally* engage in intrastate commerce. But because seamen and railroad employees *typically* engage in interstate and foreign commerce, it is natural to say that those classes of workers engage in interstate and foreign commerce. By contrast, rideshare drivers are primarily engaged in local transportation.

### 3. History

Uber's contention aligns with the statutory history of Section 1.

On its face, Section 1's exclusion from the FAA seems arbitrary. Aside from Section 1, the FAA governs all contracts falling within Congress's Commerce Clause authority. *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52 (2003). Why would

---

[6] Moreover, Plaintiffs' premise—that ferryboat rides typically would have been intrastate—finds no support in the government's report. The report recites that 68.6% of ferry passengers were "Atlantic coast and Gulf of Mexico" while 23.6% were "Pacific coast (including Alaska)," both of which could involve interstate travel. *Water Transportation*, *supra*, at 125.

Congress insist that all arbitration agreements be enforced except contracts of employment with seamen, railway employees, and other workers engaged in interstate commerce?

*Circuit City* answers that question: The FAA carved out seamen and railroad employees from its regulatory purview to accommodate other "federal legislation providing for the arbitration of disputes" involving these types of workers. *Circuit City*, 532 U.S. at 120-21. Specifically, Congress had already enacted such legislation for the arbitration of disputes between seamen and their employers." *Id.* at 121. And "[w]hen the FAA was adopted, moreover, grievance procedures existed for railroad employees under federal law, and the passage of a more comprehensive statute providing for the mediation and arbitration of railroad labor disputes was imminent." *Id.* "It is reasonable to assume that Congress excluded 'seamen' and 'railroad employees' from the FAA for the simple reason that it did not wish to unsettle established or developing statutory dispute resolution schemes covering specific workers." *Id.*; *see also New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 537 (2019) ("Why this very particular qualification? By the time it adopted the Arbitration Act in 1925, Congress had already prescribed alternative employment dispute resolution regimes for many transportation workers.").[7]

---

[7] Today, the Railway Labor Act continues to regulate arbitration between railways and their employees. *See generally Union Pac. RR. Co. v. Brotherhood of Locomotive Engineers & Trainmen*, 558 U.S. 67, 73-76 (2009).

At the time of the FAA, however, no such scheme existed for drivers who engaged in local transportation. Federal statutes that covered motor carriers excluded drivers who engaged in the local transportation of passengers from regulation. *See*, *e.g.*, Motor Carrier Act of 1935, Pub. L. No. 74-255, § 203(b), 49 Stat. 543, 545 ("Nothing in this part. . . shall be construed to include. . . taxicabs, or other motor vehicles performing a bona fide taxicab service having a capacity of not more than six passengers and not operated on a regular route or between fixed termini.").[8]

The historic purpose of Section 1—deferring to remedial schemes in other federal statutes—would not be served by holding that drivers who engage in local transportation fall within Section 1. *See Heller v. Rasier, LLC*, No. CV 17-8545 PSG, 2020 WL 413243, at *8 (C.D. Cal. Jan. 7, 2020) ("Plaintiff is not in an employment relationship which was already regulated by Congress before the advent of the FAA, like railroad workers and seamen. . . . There was no such pre-existing or developing regime for local car drivers.").

---

[8] Today, likewise, federal statutes do not generally regulate drivers engaged in local passenger transport. *See, e.g.*, ICC Termination Act of 1995, Pub. L. No. 104-88, § 103, 109 Stat. 803, 861 (exempting "a motor vehicle providing taxicab service"). Instead, such providers are locally regulated. *See* N.Y.C., For-Hire Vehicle Owners: Taxi & Limousine Rules 35 RCNY § 59A-11, www1.nyc.gov/assets/tlc/downloads/pdf/rule_book_current_chapter_59.pdf (allowing only drivers licensed with the New York Taxi and Limousine Commission to pick up passengers within New York City).

This history shows something else too. Local transportation existed at the time of the FAA's enactment. Congress was well aware of it. If Congress wanted such workers to be exempt from the FAA, it could have expressly identified them in Section 1. It is unlikely that Congress would have exempted such workers from the FAA via the oblique method of a residual clause referring to workers "engaged in … interstate commerce." Indeed, it is hard to imagine a more misleading way for Congress to achieve that goal. This case therefore stands in stark contrast to *Southwest*. Airline employees did not exist at the time of the FAA, so it makes sense they would not be expressly identified in the statute and that the Supreme Court would have to analyze the scope of the residual clause. Local transportation providers did exist, and if Congress wanted to exempt them from the FAA, it would have said so.

It follows that Congress would not have understood local transportation providers who occasionally cross state lines as workers "engaging in interstate commerce" for purposes of the residual clause. Rideshare drivers therefore do not engage in interstate commerce for purposes of Section 1.

Plaintiffs' position is particularly implausible in view of the FAA's breadth. The FAA covers all contracts subject to the federal government's Commerce Clause authority, subject to the exemption in Section 1. Under Plaintiffs' position, Congress would inexplicably have created an exemption to the FAA that encompasses not only workers subject to other federal arbitration regimes, but also rideshare drivers,

27

who are not covered by *any* federal regime. Plaintiffs cannot explain why Congress would have arbitrarily decided to exclude one narrow class of arbitration agreements—those appearing in contracts involving rideshare drivers—from an otherwise seamless web of federal coverage.

Moreover, the Supreme Court has emphasized that the Section 1 of the FAA must "be afforded a narrow construction" because it "is contained in a statute that 'seeks broadly to overcome judicial hostility to arbitration agreements.'" *Circuit City*, 532 U.S. at 118 (citation omitted). Here, that narrow-construction principle should be given effect. The Court should not hold that the FAA contains an inexplicable gap, untethered from the FAA's purpose, that would confine arbitration agreements involving rideshare drivers to the vagaries of state law.

### 4. Other statutes

Rather than address the text and purpose of the FAA, Plaintiffs argue that they would be classified in particular ways under other, unrelated statutes, and ask the Court to import those classifications into the FAA. These arguments fail.

***Fair Labor Standards Act / Motor Carrier Act.*** Plaintiffs argue that the Court should apply the same test as used in the Fair Labor Standards Act (FLSA)'s motor carrier exception. Plaintiffs claim that this exemption applies when "the employee could reasonably have been expected to drive in interstate commerce," or when a sufficiently high "percentage of a company's revenue … is derived from interstate

28

work." Pl.Br.21, 25. Plaintiffs then contend that, under that test, drivers who use Uber would be exempt from the FLSA, which means that, according to Plaintiffs, they should also be exempt from the FAA. *Id.*

Plaintiffs waived this argument by failing to present it in their opposition to Uber's motion to compel arbitration.[9] In any event, it fails on its merits.

Plaintiffs do not identify any reason that the FLSA's motor carrier exception should be considered coextensive with Section 1. When enacted 13 years after the FAA's enactment, the FLSA included an exception for "any employee with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service pursuant to the provisions of section 204 of the Motor Carrier Act." Fair Labor Standards Act of 1938, Pub. L. No. 718, 52 Stat. 1060, 1068. At that time, Section 204 of the Motor Carrier Act applied to "motor carriers engaged in interstate or foreign commerce," but clarified that it shall not be "construed to include … taxicabs." 49 Stat. 543, 545. In other words, taxicab drivers— even those who crossed state lines—were *not* subject to the Motor Carrier Act, which means they were *not* subject to the FLSA's motor carrier exemption. Drivers who use Uber are not taxicab drivers, but they, too, typically engage in local transportation while occasionally crossing state lines—activity that Congress did not anticipate

---

[9] Plaintiffs did not mention this argument until their reply brief in support of their motion to compel discovery.

29

falling within the FLSA's motor carrier exception. The FLSA's motor carrier exception is therefore not instructive as to the scope of Section 1.

Plaintiffs rely heavily on *Morris v. McComb*, 332 U.S. 422 (1947), Pl.Br.21, 22, 23, 25, but *Morris* is irrelevant. In *Morris*, the Supreme Court held that the Interstate Commerce Commission's jurisdiction should be construed expansively based on its analysis of the specific terms of the Motor Carrier Act, which among other things is made "expressly applicable to motor vehicle pickup and delivery service within terminal areas to transportation in interstate commerce wholly within a metropolitan area." *Id.* at 435-36 & nn.14-16. This reasoning is irrelevant to the scope of Section 1, which does not include those specific provisions of the Motor Carrier Act. Likewise, *United States v. Capital Transit Co.*, 338 U.S. 286 (1949), which Plaintiffs cite repeatedly (Pl.Br. 33-34, 37, 48), is a Motor Carrier Act case sheds no light on Section 1.

Later in their brief, Plaintiffs contend that the Motor Carrier Act actually helps their case. Because the Motor Carrier Act contains a carveout excluding taxicabs, Plaintiffs draw the negative inference that the phrase "engaged in interstate . . . commerce," *without* this carveout, *does* include taxicabs (and, by extension, drivers who use Uber). Pl.Br.42-43. According to Plaintiffs, this implies that drivers who use Uber *also* are "engaged in interstate … commerce" for purposes of the FAA. *Id.* The opposite inference is more likely. The exemption of taxicabs from the Motor

30

Carrier Act likely ratifies the prevailing understanding that local transportation service is not interstate commerce, even when drivers occasionally cross state lines. This prevailing understanding is confirmed by a Supreme Court case addressing the Motor Carrier Act's taxicab exception. *See Buck v. California*, 343 U.S. 99, 102 (1952) ("The operation of taxicabs is a local business. For that reason, Congress has left the field largely to the states. Operation of taxicabs across state lines or international boundaries is so closely related to the local situation that the regulation of all taxicabs operating in the community only indirectly affects those in commerce . . . ."). Hence, the Congress that enacted the FAA would have understood that local transportation drivers are fundamentally different from the enumerated categories of "railroad employees" and "seamen."

Moreover, as the Eleventh Circuit has held in rejecting a similar argument, "the purpose of the Federal Arbitration Act" is "completely different from the Fair Labor Standards Act and the Motor Carrier Act." *Hamrick v. Partsfleet, LLC*, 1 F.4th 1337, 1349 (11th Cir. 2021). The FLSA and Motor Carrier Act are remedial statutes designed to protect workers and public safety, respectively, while the FAA is designed to promote the enforceability of arbitration agreements. *Id.* There is no reason these statutes, enacted at different times and for different purposes, would have the same coverage. As the Eleventh Circuit put it: "[R]eading statutes is not like playing with Lincoln Logs. Absent textual evidence that Congress borrowed

31

language from one statute to graft onto a second statute, you can't take a piece from one structure and put it on top of another and automatically expect it to fit." *Id.* at 1347 (citations omitted).

Plaintiffs cite language in *Circuit City* reciting that courts must interpret the term "engaged in commerce" in an "objective and consistent" manner. Pl.Br. 22 (quoting *Circuit City*, 532 U.S. at 117). In context, however, the Court was rejecting the argument that courts should "take into account the scope of the Commerce Clause, as then elaborated by the Court, at the date of the FAA's enactment in order to interpret what the statute means now." *Circuit City*, 532 U.S. at 116. As the Court underscored, it was *not* suggesting that "engaged in commerce" means the same thing in every statute. *Id.* at 118 ("[W]e do not mean to suggest that statutory jurisdictional formulations necessarily have a uniform meaning whenever used by Congress. . . . We must, of course, construe the 'engaged in commerce' language in the FAA with reference to the statutory context in which it is found and in a manner consistent with the FAA's purpose." (citations and quotation marks omitted)).

Indeed, Plaintiffs' position turns the purpose of the FLSA's motor carrier exemption on its head. The point of the motor carrier exemption is to ensure that drivers who are already subject to wage-and-hour requirements prescribed by the Interstate Commerce Commission (now the Department of Transportation) are not

subject to a separate set of wage-and-hour requirements under the Fair Labor Standards Act. In other words, drivers should be subject to one regulatory regime, not two. However, Plaintiffs contend that they are *neither* subject to the FAA *nor* any other regulatory regime governing arbitration. The FLSA's exemption for drivers who were already subject to other provisions of federal law does not justify exempting Plaintiffs from *all* federal law.[10]

*FELA.* Plaintiffs' discussion of FELA (Pl.Br.37-41) and the allegedly "similar" "Safety Appliance Acts" (Pl.Br.41-42), is not germane to this case. Nothing in FELA's text, or caselaw construing it, indicates that rideshare drivers engage in interstate commerce for purposes of the FAA.

Plaintiffs' argument goes like this: FELA applied to employers "engaged in" interstate commerce; pre-FAA case law suggested that anyone who crossed state lines was subject to FELA; therefore, anyone who crosses state lines must fall within Section 1 of the FAA. But FELA is textually different from Section 1. The FAA requires classification of a *class* of workers, while FELA is applied on an individual

---

[10] In addition to being irrelevant, Plaintiffs' discussion regarding the share of revenue attributable to interstate travel (Pl.Br.25-27) contains questionable numbers. For instance, Plaintiffs assert that it is "reasonable to project" that interstate trips typically yield revenue that is "roughly three times the amount of an average trip." Pl.Br.26. Plaintiffs do not explain why this is "reasonable" or where this number comes from. Plaintiffs' discussion of the personal finances of a hypothetical driver (Pl.Br.26-27) similarly lacks record support.

basis—as the case law quoted by Plaintiffs confirms. *See Employers Liability Cases*, 207 U.S. 463, 497 (1908) ("[T]he act extends to every individual or corporation who may engage in interstate commerce as a common carrier"). Moreover, FELA addresses railroad workers and therefore sheds no light on the appropriate classification of local transportation providers.

Additionally, FELA's purposes differ from the FAA's purposes. The purpose of FELA's "engaged in" language is to define the scope of workers that are subject to FELA's protections. This is completely different from the purpose of Section 1, which is to exempt certain arbitration agreements from the FAA.

Finally, even accepting that the FAA should be construed in light of FELA precedents, Plaintiffs fail to identify any Supreme Court or appellate decision construing FELA that supports their position. Instead, Plaintiffs' primary authority seems to be a dictum from a 1907 district court opinion stating that FELA's coverage does not turn on the "***length*** of railroads," so long as the railroad crosses state lines. Pl.Br.40 (emphasis in original) (quoting *Howard v. Illinois Cent. R. Co.*, 148 F. 997, 1003 (C.C.W.D. Tenn. 1907). But Uber's argument does not turn on the length of roads or trips. Instead, it turns on the fact that the class of drivers, as a whole, typically does not cross state lines.

*     *     *

Plaintiffs' occasional drives across state lines are insufficient to establish that they fall within the Section 1 exemption. The Court should follow *Capriole* and *Cunningham* and hold that Plaintiffs are subject to the FAA.

### C. Rideshare drivers are not a "class of workers engaged in foreign or interstate commerce" by virtue of their travel to transportation hubs.

Plaintiffs offer the alternative argument that the Section 1 exemption applies because rideshare drivers drive passengers to airports and railway stations, who then cross state lines on the next leg of their journeys. Pl.Br.33-39. The district court correctly rejected that contention based on *United States v. Yellow Cab Co.*, 332 U.S. 218 (1947), as have the First and Ninth Circuits. This Court should take the same path.

In *Yellow Cab*, the Supreme Court addressed whether two conspiracies involving the taxicab industry had a sufficient connection to the interstate commerce to be covered by the Sherman Act. The first conspiracy involved two taxicab companies refusing to compete "for contracts with railroads or railroad terminal associations to transport passengers and their luggage between railroad stations in Chicago." *Id.* at 228. The Court pointed out that a "great majority of the persons making interstate railroad trips which carry them through Chicago must disembark from a train at one railroad station, travel from that station to another some two blocks to two miles distant, and board another train at the latter station." *Id.* Indeed,

passengers often paid for this inter-station service as part of their railway fare. *Id.* The Court found that the "transportation of such passengers and their luggage between stations in Chicago is clearly a part of the stream of interstate commerce." *Id.* Although that transportation itself did not cross state lines, it was an "integral step in the interstate movement." *Id.* at 229.

By contrast, a conspiracy to limit the number of taxicab companies in Chicago was "too unrelated to interstate commerce to constitute a part thereof within the meaning of the Sherman Act." *Id.* at 230. The Court reasoned that the taxicabs' "relationship to interstate commerce is only casual and incidental . . . [W]hen local taxicabs merely convey interstate train passengers between their homes and the railroad station in the normal course of their independent local service, that service is not an integral part of interstate transportation." *Id.* at 231, 233. Rather, the interstate trip begins when the passenger "boards the train at the station and ends when he disembarks at the station in the city of destination." *Id.* at 231. The Court emphasized that the taxicab fares were not "paid or collected as part of the railroad fares"—to the contrary, "[t]o the taxicab driver, it is just another local fare." *Id.* 231-32.

The district court correctly concluded that the latter portion of *Yellow Cab*'s reasoning "is just as applicable here— the 'relationship to interstate transit [of the class of workers to which Plaintiffs belong] is only casual and incidental.'" Ja.748

36

(quoting *Yellow Cab*, 332 U.S. at 231). That conclusion aligns with the First and Ninth Circuit's analysis of *Yellow Cab*. In *Cunningham*, the First Circuit explained that drivers who use Lyft to and from an airport fall within "the second *Yellow Cab* scenario*."* 17 F.4th at 250. "The Lyft driver contracts with the passenger as part of the driver's normal local service to take the passenger to the start (or from the finish) of the passenger's interstate journey." *Id.* In view of that similarity, the First Circuit held that *Yellow Cab* foreclosed the drivers' argument. *Id.* The First Circuit was "confident that a scenario not affecting 'interstate commerce' under the Sherman Act would also not qualify as a scenario in which taxicabs would be 'engaged in . . . interstate commerce' under section 1 of the FAA." *Id.* at 251. It noted that the Sherman Act "is broadly construed," "whereas the FAA exception at issue here is narrowly construed." *Id.* "Hence, conduct that does not affect interstate commerce under the Sherman Act (e.g., local cab rides to the station) would seem *a fortiori* not to be conduct 'engaged in interstate commerce' under the FAA's section 1 exception." *Id.* The Ninth Circuit took the same view in *Capriole*, finding that *Yellow Cab* foreclosed the drivers' position. 7 F.4th at 863-64. The court held that "Uber drivers, as a class, are not engaged in interstate commerce because their work predominantly entails intrastate trips, even though some Uber drivers undoubtedly cross state lines in the course of their work and rideshare companies do contract with airports to allow Uber drivers to pick up arriving passengers." *Id.* at 864 (quotation

37

marks and ellipses omitted). Then-Judge Jackson took the same view in *Osvatics*. 535 F. Supp. 3d at 19 ("[T]he fact that Lyft drivers occasionally and incidentally transport passengers to and from airports and railroad stations does not mean that such drivers are engaged in interstate commerce for purposes of section 1 of the FAA."); *id.* at 19 & n.10 (explaining that *Yellow Cab* is dispositive because FAA Section 1's scope is narrower than Sherman Act's scope).

Plaintiffs attempt to distinguish *Yellow Cab* on the ground that Uber has entered into agreements with airports, such as agreements allowing passengers to use Uber's app within airport boundaries. Pl.Br.48-49. But those contracts do not transform the flight and local ride into a single integrated trip. Unlike in *Yellow Cab*'s first conspiracy, riders do not pay a single fare to the airline for a single journey that includes the Uber trip. Instead, like in *Yellow Cab*'s second conspiracy, passengers engage in a separate transaction with Uber in order to obtain local transportation.

Plaintiffs also point to statistics showing that 10.1% of Uber's trips, and 15% of its bookings, come from airport trips. Pl.Br.49. These arguments are insufficient to establish that "the trips form part of a single, unbroken stream of interstate commerce that renders interstate travel a 'central part' of a rideshare driver's job description." *Capriole*, 7 F.4th at 866. As *Capriole* explained, "there is no evidence that Uber exclusively contracted with airlines such that its drivers would 'serve[] only [airport] passengers' or otherwise participate in a single, unbroken stream of

interstate commerce." *Id.* at 865 (quoting *Yellow Cab*, 332 U.S. at 231). Although Uber may have entered into contracts with airports, they have no "affiliation with the airlines," *id.* at 865, that would warrant treating the Uber trip and the airline flight as a single journey. Therefore, "Plaintiffs have not demonstrated the 'practical, economic continuity' required to establish that they are engaged in interstate commerce." *Id.*

This analysis is consistent with the Supreme Court's recent decision in *Southwest*. The Supreme Court held that employees whose *job it was* to load and unload cargo at the airport fell within Section 1. For those workers, the first *Yellow Cab* scenario is on point: just as contracts to transport passengers from one railroad station to another as part of a single interstate journey involves interstate commerce, the loading and unloading of cargo from airplanes involves interstate commerce, even if neither scenario involves workers crossing state lines. By contrast, rideshare drivers engage in local transportation, just like the drivers in *Yellow Cab*'s second scenario.

Finally, Uber notes that this case does not present the question whether "last-mile" delivery drivers, who transport goods that previously traveled in interstate commerce, fall within the Section 1 exemption. The Supreme Court expressly declined to resolve this issue in *Southwest*, 142 S. Ct. at 1789 n.2.

Regardless of whether drivers who transport goods on the last leg of an interstate journey fall within Section 1, drivers who use Uber do not. Indeed, both the First and Ninth Circuits have held that last-mile delivery drivers *do* fall within Section 1, but rideshare drivers who use Uber or Lyft *do not*. In *Rittmann v. Amazon.com, Inc.*, 971 F.3d 904, 917 (9th Cir. 2020), the Ninth Circuit found that last-mile Amazon drivers fall within Section 1. But in *Capriole*, the Ninth Circuit distinguished *Rittmann*, finding that Amazon drivers complete trips "as the last leg of a single, unbroken stream of interstate commerce coordinated by Amazon from origin to destination," while "Uber drivers are unaffiliated, independent participants in the passenger's overall trip." *Id.* at 866-67. Likewise, in *Waithaka v. Amazon.com, Inc.*, 966 F.3d 10, 26 (1st Cir. 2020), the First Circuit found that last-mile Amazon drivers fall within Section 1. But in *Cunningham*, the First Circuit distinguished *Waithaka* on similar grounds. 17 F.4th at 251, 253.

Hence, the Court need not decide the question reserved by the Supreme Court in *Southwest*, because whatever the right answer to that question, the drivers in this case do not fall within the Section 1.

### D. Alternatively, Uber's arbitration agreement is not a "contract of employment."

The FAA's Section 1 exemption applies to "***contracts of employment*** of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1 (emphasis added). Even if the Court holds that

40

Plaintiffs fall within a "class of workers engaged in … interstate commerce," it should still affirm on the alternative ground that Plaintiffs did not enter into "contracts of employment."  The district court did not address this argument, but Uber preserved it, Dkt. #20 at 4-6, and the court "may affirm on any ground supported by the record."  *Olson v. Major League Baseball*, 29 F.4th 59, 84 (2d Cir. 2022).

Section 1 exempts "contract[s] for the performance of *work* by *workers*" from the FAA's coverage.  *New Prime*, 139 S. Ct. at 541 (2019) (emphasis in original). In *New Prime*, the Supreme Court held that the scope of Section 1 does not turn on the classification of the worker; a "contract of employment" can be with either an employee or an independent contractor.  *Id.*  But not all contracts with independent contractors are "contracts of employment."  To fall within that category, contracts must "require independent contractors to perform work."  *Id.* at 539.

License agreements differ from contracts of employment.  A license agreement is a "contract that authorizes access to . . . information or informational rights, but expressly limits the access or uses authorized or expressly grants fewer than all rights in the information."  Uniform Computer Information Transactions Act § 102(a)(41); *see* Raymond T. Nimmer, et al., 2 Information Law § 11:3, Westlaw (database updated May 2022) (license is "a conditional or limited grant of rights or privileges").  In an "online license," an "information provider gives licensed access

41

to information contained in its online system," comprising "access to the information and to the system itself." *Id*. § 11:14. While the licensee may *use* the online system to facilitate work, the license is not *itself* an "agreement[] to perform work." *New Prime*, 139 S. Ct. at 543-44.

Uber's Agreement is a license agreement, not a contract of employment. It "grants" drivers "a non-exclusive, non-transferable" license to use the Uber Services. Ja.80 (TSA § 5.1). That license gives drivers access to Uber's "on-demand lead generation" services and related Uber App, websites, software, and payment and support services, subject to certain restrictions. Ja.73, 80 (TSA §§ 1.17, 5.1). It reserves to drivers "the sole right" to determine when, where, and for how long they will use the Uber App or the Uber Services, as well as "the option" to accept, decline, ignore a rider's request for transportation services, or cancel an accepted request, through the Uber App. Ja.74 (TSA § 2.4). Unlike employees or independent contractors, who must work according to the terms of their contracts of employment, licensees of Uber's app can use the app to find passengers as much or as little as they want.

The payment provisions in the Agreement also bear the hallmarks of license agreements. In "contracts of employment," workers are paid by the entities that hire them. In license agreements, the payments typically go the other way—the licensees pay the licensors for the privilege of using the license to generate income. The

42

Agreement falls into the latter rubric—drivers are paid by passengers via Uber's platform, and remit a service fee to Uber. Ja.79 (TSA § 4.4).

Although two district courts have rejected this argument, *see Singh v. Uber Technologies, Inc.*, 571 F. Supp. 3d 345, 351 (D.N.J. 2021); *Davarci v. Uber Techs., Inc.*, No. 20-CV-9224 (VEC), 2021 WL 3721374, at *9 (S.D.N.Y. Aug. 20, 2021), Uber respectfully disagrees with those decisions. In these cases, the courts stated with little analysis that because drivers use Uber to find work, the license agreement necessarily must be a "contract of employment." But under *New Prime*, a "contract of employment" is a contract that *requires* the worker to perform work. 139 S. Ct. at 539. That condition is not satisfied when a driver enters into a contract that merely gives them access to a platform that assists them in finding passengers.

Because Uber's agreement with Plaintiffs is a license, not a "contract of employment," it does not fall within Section 1 of the FAA.

## II. If Plaintiffs Are Exempt from the FAA, the Court Should Compel Arbitration Under New York Law.

If the Court finds that Plaintiffs are exempt from the FAA, it should affirm on the alternative ground that the arbitration agreement is enforceable under state law.

Plaintiffs make two arguments that the arbitration agreement is unenforceable. First, they contend that it is the FAA or nothing: if the FAA does not apply, then there is no arbitration agreement and the parties must litigate. Second, they contend that the agreement is unenforceable under New York law. Both arguments fail.

43

**A. If the FAA does not apply, then state law applies.**

Section 1 of the FAA does not *prohibit* any arbitration agreements. Instead, it merely states that the FAA does not apply to certain arbitration agreements. If the FAA does not apply, and no other federal statute governs the enforceability of the parties' arbitration agreement, then enforceability is governed by state law. *See Harper v. Amazon.com Services, Inc.*, 12 F.4th 287, 295 (3d Cir. 2021) ("Finding the § 1 exemption applies does not mean all state law about arbitration vanishes. Even if an arbitration agreement is outside the FAA, the agreement still may be enforced." (quotation marks omitted)); *Valdes v. Swift Transp. Co.*, 292 F. Supp. 2d 524, 528-29 (S.D.N.Y. 2003) (holding, in case involving transportation worker exempt from the FAA, that "any inapplicability of the FAA would not preclude enforcing the arbitration agreement under state law," and collecting cases).

Here, if Plaintiffs are exempt from the FAA, ordinary principles of contract law point toward New York law. The parties' contract includes the following relevant provisions:

- An agreement to arbitrate that includes a class action waiver. The Arbitration Provision applies "to all disputes between You and Uber," and further provides, "You and Uber agree to resolve any dispute that is in arbitration on an individual basis only, and not on a class or collective action basis." Ja.88, 91 (TSA §§ 15.3(i), (v)).

44

- A provision stating that the arbitration clause will be "governed by the Federal Arbitration Act." Ja.86, 88 (TSA §§ 15.1, 15.3).

- Two severability clauses. The parties' contract includes the following general provision: "If any provision of this Agreement is or becomes invalid or non-binding, the parties shall remain bound by all other provisions hereof. In that event, the parties shall replace the invalid or non-binding provision with provisions that are valid and binding and that have, to the greatest extent possible, a similar effect as the invalid or non-binding provision, given the contents and purpose of this Agreement." Ja.85 (TSA § 14.3). The arbitration agreement also includes its own severability clause: "Except as stated in subsection v, above, in the event any portion of this Arbitration Provision is deemed unenforceable, the remainder of this Arbitration Provision will be enforceable." Ja.93 (TSA § 15.3(ix)).

The analysis is therefore straightforward. If the clause stating that the arbitration agreement is "governed by the Federal Arbitration Act" is unenforceable, the contract requires that clause to be severed.[11]

---

[11] Contrary to Plaintiffs' suggestion (Pl.Br.56), Uber made this argument below. Uber's motion to compel arbitration urged the Court to compel arbitration under the FAA, while also arguing that the arbitration agreement was enforceable

If that provision is severed, then the arbitration agreement is silent on choice of law. Although the contract states generally that the "interpretation of this Agreement shall be governed by California law," Ja.86 (TSA § 15.1), it is silent on what law governs the *enforceability* of the arbitration agreement if the FAA does not apply. *Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 123 (2d Cir. 2003) (finding that choice-of-law provision that invoked state law "only to assist in construing the agreement and the parties' rights and obligations thereunder," did not provide for state law "to govern the 'enforcement'" of the contract's arbitration provision).[12]

So what happens next? If the contract is silent on choice of law, then the Court should apply standard choice-of-law principles that apply to contracts that are silent on choice of law. Because Plaintiffs filed suit in the Southern District of New York, the Court must apply New York's choice-of-law rules. *Maryland Cas. Co. v. Continental Cas. Co.*, 332 F.3d 145, 150-51 (2d Cir. 2003). In the absence of an

---

under state law. *See* Dkt. #20. After Plaintiffs' response brief introduced the argument that the choice-of-law provision was both invalid and inseverable, Dkt. #35 at 31-34, Uber's reply brief pointed to the severability clause. Dkt. #38 at 8-10.

[12] Moreover, in the version of the agreement accepted by Plaintiffs Lama and Khatra, the choice-of-law provision specifying the applicability of California law is made expressly inapplicable to the arbitration agreement: "The choice of law provisions contained in this Section 15.1 do not apply to the arbitration clause contained in Section 15.3." Ja.86 (TSA § 15.1).

46

express choice-of-law provision, New York courts apply "the law of the place which has the most significant contacts with the matter in dispute." *Id.* at 151 (quotation marks omitted).[13]

Here, the jurisdiction with "the most significant contacts with the matter in dispute" is New York. Plaintiffs are New York City drivers with Uber who seek damages arising from "Uber's payment practices in New York" that "occurred only on trips taken within New York State." Ja.1-2 (Compl. ¶¶ 1, 2, 8). Therefore, New York law governs the enforceability of the arbitration agreement.

Plaintiffs do not contend that any other state has more significant contacts to the matter in dispute. Instead, Plaintiffs argue that the Court should not apply *any* state's law and should instead discard the arbitration agreement altogether. Ja.50-62. Plaintiffs insist that applying New York law would "rewrite the contract." Pl.Br.54. But it is Plaintiffs, not Uber, that seek to rewrite the agreement. Plaintiffs argue that the unenforceability of the choice-of-FAA provision requires wiping out the entire arbitration agreement, even though the contract says the precise opposite: "[I]n the event any portion of this Arbitration Provision is deemed unenforceable, the remainder of this Arbitration Provision will be enforceable." Ja.93 (TSA § 15.3(ix)).

---

[13] Even if federal common law provides the applicable choice of law framework, the same "most significant relationship" test would apply. *John Wiley & Sons, Inc. v. DRK Photo*, 882 F.3d 394, 412 (2d Cir. 2018).

Moreover, Plaintiffs' repeated insistence that severing the choice-of-FAA provision would "rewrite" the agreement ignores the way the agreement is actually written. The choice-of-FAA clause is one sentence in a lengthy agreement that sets forth arbitration procedures in granular detail, addressing what disputes may be arbitrated, how arbitrations are initiated, where arbitrations occur, who pays for the arbitrations, and more. Ja.88-93. If the court severs the choice-of-FAA clause, all that granular detail will remain intact. The arbitration would proceed exactly as the parties agreed—it would simply be enforced pursuant to state law instead of the FAA. It is Plaintiffs, not Uber, who seek to rewrite the arbitration agreement via their implausible view that the entire arbitration agreement rises and falls with the enforceability of the choice-of-FAA clause.

The contract's general severability clause also supports Uber's position. It provides that if "any provision of this Agreement is or becomes invalid or non-binding, … the parties shall replace the invalid or non-binding provision with provisions that are valid and binding and that have, to the greatest extent possible, a similar effect as the invalid or non-binding provision, given the contents and purpose of this Agreement." Ja.85 (TSA § 14.3). Here, there can be no serious dispute that the "contents and purpose" of the agreement signals the parties' intent to arbitrate. It would be far more faithful to the parties' intentions to arbitrate under state law than to discard the arbitration agreement altogether.

48

The Southern District of New York adopted Uber's position in *Islam v. Lyft, Inc.*, 524 F. Supp. 3d 338 (S.D.N.Y. 2021). After concluding that drivers who use Lyft fell within Section 1 of the FAA (a conclusion with which Uber respectfully disagrees), the court concluded that the drivers' arbitration agreement was enforceable under New York law. The court explained that "the inapplicability of the FAA does not render an arbitration clause void when it is otherwise enforceable under state law." *Id.* at 359. "[T]he fact that the arbitration clause is 'governed by the FAA' does not compel a different result, because it does not plausibly suggest that the parties intended for the clause to be discarded in the event that the FAA was found inapplicable." *Id.* "[T]he effect of the FAA being found inapplicable is only that the arbitration clause contains no choice-of-law provision, and therefore that 'the law of the jurisdiction having the greatest interest in the litigation will be applied.'" *Id.* "Because Plaintiff is a New York City-based Lyft driver bringing suit on behalf of other such drivers, New York clearly has the greatest interest in the litigation, and therefore New York arbitration law applies." *Id.* (quotation marks omitted). The Court should apply that persuasive reasoning.

The District of New Jersey followed *Islam* in *Singh v. Uber Technologies, Inc.*, 571 F. Supp. 3d 345 (D.N.J. 2021). The court held that Uber's arbitration agreement was enforceable under the FAA, and then held, in the alternative, that it would also be enforceable under state law. It explained that because the arbitration

49

agreement was silent on which state's law applied to the enforceability of the arbitration agreement, New Jersey's choice-of-law principles applied. *Id.* at 366-67. Because the plaintiffs lived and worked in New Jersey, New Jersey law applied, and the arbitration agreement was enforceable under New Jersey law. *Id.* For the same reasons, Uber's arbitration agreement is enforceable under New York law.

Uber's analysis also accords with *Waithaka v. Amazon.com, Inc.*, 966 F.3d 10 (1st Cir. 2020). In that case, the plaintiff was a "last mile" delivery worker who had entered into a contract with Amazon containing an arbitration agreement. The contract specified that the arbitration agreement "is governed by the Federal Arbitration Act and applicable federal law," but also included an express severability provision. *Id.* at 15. The First Circuit held that the plaintiff fell within the exemption in Section 1 of the FAA. *Id.* at 26.[14] That holding teed up a dispute over whether the arbitration agreement should be analyzed under state law. Similar to Plaintiffs here, the *Waithaka* plaintiff argued that if the FAA does not apply, the arbitration agreement should be invalidated in its entirety, and the parties should litigate in court. In response, Amazon urged the court to apply the severability clause and retain the remainder of the arbitration agreement. The court agreed with Amazon. While acknowledging that "Amazon could have specified more clearly what law

---

[14] As noted above, the First Circuit distinguished *Waithaka* in *Cunningham*, finding that drivers who used Lyft were not analogous to last-mile delivery workers. 17 F.4th at 251.

applies to the dispute resolution section when the FAA is inapplicable," the court applied the severability clause and held that state law was applicable. *Id.* at 27.[15] The Court should adopt the same view here.

Plaintiffs rely on *Rittmann v. Amazon.com Inc.*, 971 F.3d 904 (9th Cir. 2020), in which the Ninth Circuit found that the plaintiffs were transportation workers, and then proceeded to invalidate the arbitration agreement altogether rather than consider its enforceability under state law. Uber respectfully disagrees with *Rittmann*, which is in any event distinguishable from this case. In *Rittmann*, the contract stated that it was "'governed by the law of the state of Washington without regard to its conflict of laws principles, except for [the arbitration agreement].'" *Id.* at 920. It further stated that the arbitration agreement would be governed by the FAA. *Id.* Amazon urged the court to sever the choice-of-FAA clause and apply *Washington law*. *Id.* But, as the Ninth Circuit explained, severing the choice-of-FAA clause would *preserve* the provision saying that Washington law would *not* apply to the arbitration agreement. *Id.* "In that case, the plain language of the contract would prohibit applying Washington law to the arbitration provision." *Id.* In the court's view,

---

[15] The *Waithaka* court went on to hold that a contractual choice-of-law provision providing for the application of Washington law served as the "default choice of law," but that the law of Massachusetts (*i.e.*, the forum's law) ousted that contractual choice-of-law provision. 966 F.3d at 27, 35. Those portions of *Waithaka*, which turned on Massachusetts law and the particulars of the parties' contract, are not relevant to this case.

applying Washington law to the arbitration agreement, despite a provision explicitly saying Washington law should not be applied to the arbitration agreement, would impermissibly rewrite the contract: "Amazon cites no authority that would allow us to conclude that the presumption in favor of local law overcomes express contractual language that precludes its application." *Id.* at 920-21.

Here, that reasoning does not apply. Nowhere does the arbitration agreement say that New York law should not apply. The *Islam* court distinguished *Rittmann* on the same basis: "Here, by contrast, the contract specifically provided that *California* law should not apply to the arbitration agreement, but said nothing about the applicability of New York law in the event that the FAA was found not to apply. There is accordingly nothing improper about applying standard choice-of-law principles to reach the conclusion that New York law applies to the arbitration agreement in the absence of the FAA." 524 F. Supp. 3d at 359-60.

Plaintiffs contend that following Uber's analysis would "lead to inconsistent and absurd results and promote forum-shopping." Pl.Br.61. They insist that a "variable approach to interpreting a contract . . . would be anathema to the 'national policy' regarding arbitration embodied by the FAA." *Id.* These are good arguments for construing Section 1 of the FAA narrowly and holding that Plaintiffs are *not* exempt from the FAA. All of Plaintiffs' forum-shopping concerns would be resolved if the Court holds that the FAA applies.

52

But if the Court finds that the FAA does not apply, there is nothing absurd about applying state law, and finding that workers in different states are subject to different state laws. That is the typical way contract law works. There is certainly no basis for applying Plaintiffs' proposed *anti-arbitration* canon, under which the interest in uniformity supports a conclusion that *no drivers* should arbitrate. To the contrary, "[i]n accordance with the strong federal policy favoring arbitration as an alternative means of dispute resolution," the Court "resolve[s] any doubts concerning the scope of arbitrable issues in favor of arbitrability." *Daly v. Citigroup Inc.*, 939 F.3d 415, 421 (2d Cir. 2019) (quotation marks omitted). Here, if the Court has doubts as to whether Plaintiffs' claims are arbitrable, it should resolve those doubts in favor of arbitration.

## B. Under New York law, the arbitration agreement is enforceable.

Under New York law, the parties' arbitration agreement is enforceable. "New York law favors arbitration, 'interfering as little as possible with the freedom of consenting parties' to submit disputes to arbitration." *Diaz v. Mich. Logistics Inc.*, 167 F. Supp. 3d 375, 381 (E.D.N.Y. 2016) (quoting *Bd. of Educ. of Bloomfield Cent. Sch. Dist. v. Christa Constr., Inc.*, 80 N.Y.2d 1031, 1032 (1992)). New York law, moreover, "does not exempt transportation workers from arbitration." *Id.*; *see Valdes*, 292 F. Supp. 2d at 528, 529-30. Accordingly, "even assuming that" the Plaintiffs here "fall within the § 1 exemption (and the FAA does not apply), [their]

claims are subject to mandatory arbitration under New York arbitration law." *Diaz*, 167 F. Supp. 3d at 380-81; *see Islam*, 524 F. Supp. 3d at 357 (enforcing Lyft's arbitration agreement under New York law).

Plaintiffs contend that the arbitration agreement is unenforceable under N.Y. C.P.L.R. § 7515. Pl.Br.63-65. But that provision only prohibits contract provisions that require parties to arbitrate "to resolve any allegation or claim *of discrimination*." N.Y. C.P.L.R. §§ 7515(a)(2) (emphasis added), (b)(i). The statute expressly states that the inclusion of a prohibited clause in a contract "shall not serve to impair the enforceability of any other provision of such contract." *Id.* § 7515(b)(iii). Hence, N.Y. C.P.L.R. § 7515 does not wipe out the arbitration agreement as applied to Plaintiffs' claims, which have nothing to do with discrimination. *See Islam*, 524 F. Supp. 3d at 357 n.7 (rejecting identical argument and finding that Section 7515 does not "preclud[e] enforcement of an arbitration clause that could under different circumstances be used to compel arbitration of a discrimination claim").[16]

Moreover, N.Y. C.P.L.R. § 7515 does not apply for multiple other reasons. First, the statute was enacted in 2018, after Plaintiffs entered into their arbitration agreements. As Plaintiffs acknowledge, the Appellate Division has held that

---

[16] Contrary to Plaintiffs' assertion (Pl.Br.63), Justice Ginsburg's dissent in *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407 (2019) does not suggest that Section 7515 invalidates the agreement. Justice Ginsburg stated that Section 7515 "safeguard[s] employees' opportunities to bring sexual harassment suits in court," *id.* at 1422 (Ginsburg, J., dissenting), a concern not implicated here.

C.P.L.R. § 7515 does not apply retroactively. Pl.Br.63 n.10 (citing *Newton v. LVMH Moet Hennessy*, 192 A.D.3d 540 (1st Dep't 2021)). Plaintiffs offer no reason to disregard a state appellate court's interpretation of state law. Second, the statute prohibits arbitration clauses which "require[] as a condition of the enforcement of the contract or obtaining remedies under the contract that the parties submit to mandatory arbitration to resolve any allegation or claim of discrimination." N.Y. C.P.L.R. § 7515(a)(2), (b)(i); *see id.* § 7515(a)(3), (b)(iii) (barring "mandatory arbitration clauses"). Here, by contrast, arbitration is not a condition of the license agreement and is not mandatory. The agreement states: "Arbitration is not a mandatory condition of your contractual relationship with Uber," and permits drivers to opt out by notifying Uber in writing within 30 days of executing the agreement. *Id.* Hence, C.P.L.R. § 7515 does not apply.

Plaintiffs also claim that a New York court would bar enforcement of the arbitration agreement based on "public policy" concerns. Pl.Br.65-69. Plaintiffs' argument is incorrect. Under New York law, "given the strong public policy favoring arbitration and the absence of a commensurate policy favoring class actions," "a contractual proscription against class actions . . . is neither unconscionable nor violative of public policy." *Ranieri v. Bell Atl. Mobile*, 304 A.D.2d 353, 354 (1st Dep't 2003); *accord Tsadilas v. Providian Nat'l Bank*, 13 A.D.3d 190, 191 (1st Dep't 2004). In *Harris v. Shearson Hayden Stone, Inc.*, 82

A.D.2d 87 (1st Dep't 1981), the First Department compelled arbitration of a putative class action under New York's arbitration act, even though it assumed that doing so would preclude proceeding as a class action. 82 A.D.2d at 93. The Court explained that "it is clear . . . that the interests favoring arbitration should prevail over those favoring the class action, both in general and in the present instance." *Id.* at 94. The First Department acknowledged that "if no arbitration agreement existed plaintiffs might have a strong case for class action certification, since the institution of an individual lawsuit for the paltry sum at issue would be self-defeating." *Id.* at 95. But it stressed that "maintenance of a class action here by assertion of a claim for which a forum is provided elsewhere, would defeat the aim of arbitration." *Id.* The Court of Appeals affirmed "for reasons stated in" the First Department's opinion. *Harris v. Shearson Hayden Stone, Inc.*, 56 N.Y.2d 627, 628 (1982); *accord Hayes v. Cty. Bank*, 26 A.D.3d 465, 467 (2d Dep't 2006); *Douglas v. U.S. Dist. Ct. for Cent. Dist. of Cal.*, 495 F.3d 1062, 1068 (9th Cir. 2007) ("class action waiver[s] . . . aren't substantively unconscionable under New York law").

Plaintiffs' invocation of public policy is particularly unpersuasive given the agreement's express opt-out provision. Plaintiffs' argument that they have "unequal bargaining power" and must resort to "mandatory individual arbitration," Pl.Br.68, rings hollow given that the agreement gave them option to opt out, at no cost to them.

Plaintiffs failed to opt out. Now that they are suing Uber, they should be held to the terms of the arbitration agreement.[17]

## CONCLUSION

The judgment should be affirmed.

August 2, 2022

Respectfully submitted,

Jeremy Creelan
JENNER & BLOCK LLP
919 Third Avenue
New York, NY 10022-3908
(212) 891-1600

/s/ Adam G. Unikowsky
Adam G. Unikowsky
JENNER & BLOCK LLP
1099 New York Ave. NW, Suite 900
Washington, DC 20001
(202) 639-6000

---

[17] Plaintiffs do not contend that the Court should apply California law in determining whether the arbitration agreement is enforceable, and as explained above, New York law, not California law, should apply. But even if the Court did apply California law, the arbitration agreement and class action waiver would be enforceable in light of the opt-out option. *Mohamed v. Uber Techns.*, 848 F.3d 1201, 1210-11 (9th Cir. 2016) (finding that delegation provision in Uber's arbitration agreement with driver was not unconscionable under California law because driver had opportunity to opt out); *see also Hoffman v. Citibank (South Dakota), N.A.*, 546 F.3d 1078, 1085 (9th Cir. 2008) ("We have held that providing a 'meaningful opportunity to opt out' can preclude a finding of procedural unconscionability and render an arbitration provision enforceable.").

**CERTIFICATE OF COMPLIANCE**

This brief complies with the word limit of Second Circuit Local Rule 32.1(a)(4)(A) because it contains 13,920 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013, Times New Roman 14-point.

Dated:  August 2, 2022          By:  /s/ Adam G. Unikowsky
                                      Adam G. Unikowsky

## CERTIFICATE OF SERVICE

I hereby certify that on August 2, 2022, I electronically filed the foregoing document with the Clerk of Court for the United States Court of Appeals for the Second Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: August 2, 2022                    By: /s/ Adam G. Unikowsky
                                         Adam G. Unikowsky