# 22-98

---

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

LEVON ALEKSANIAN, INDIVIDUALLY, ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED, AND AS CLASS REPRESENTATIVES, SONAM LAMA,
INDIVIDUALLY, ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, AND
AS CLASS REPRESENTATIVES, HARJIT KHATRA, INDIVIDUALLY, ON
BEHALF OF ALL OTHERS SIMILARLY SITUATED, AND AS CLASS
REPRESENTATIVES,

*Plaintiffs-Appellants,*

-against-

UBER TECHNOLOGIES INC., JOINTLY AND SEVERALLY, UBER LOGISTIK,
LLC, JOINTLY AND SEVERALLY, UBER USA LLC,

*Defendants-Appellees.*

---

*On appeal from Order and Judgment of the U.S.*
*District Court for the Southern District of New York*
*Case No 1:19-cv-10308*

---

## REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

---

**JULIEN & MIRER, PLLC**
1 Whitehall Street, 16th Floor
New York, New York 10004
(212) 231-2235
jmirer@julienmirer.com
*Attorneys for Plaintiffs-Appellants*

**ZUBIN SOLEIMANY, ESQ.**
NEW YORK TAXI WORKERS ALLIANCE
31-10 37th Avenue, Suite 300
Long Island City, New York 11101
(718) 706-9892
zsoleimany@nytwa.org
*Attorney for Plaintiffs-Appellants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................ iii

INTRODUCTION ................................................................................. 1

ARGUMENT ......................................................................................... 2

I.    UBER'S BRIEF DOES NOT ENGAGE IN THE INFORMED ANAL-
YSIS OF THE FAA'S TEXT REQUIRED BY THE SUPREME
COURT'S FAA CASE LAW ............................................................. 2

    A.    Section One's Plain Language Places No Modifiers On The Re-
quirement To Engage In Interstate Commerce ............................ 3

    B.    Meaningful Textual Analysis Of The FAA's Residual Exemp-
tion Must Be Informed By Contemporary Statutes ...................... 5

    C.    Cases Regarding The Motor Carrier Act Confirm That Congress
Understood Local Transportation, Including Taxicabs, To Not
Be Outside Of Engagement In Interstate Commerce ................... 8

    D.    Because Rideshare Drivers Are Transportation Workers, And
Engaged In Interstate Commerce, They Fall Within The FAA's
Residual Exemption .................................................................. 11

    E.    Legislative History Neither Determines the Scope of the Resid-
ual Exemption, Nor Aides Uber's Argument ............................. 18

II.    BEYOND PERFORMING INTERSTATE TRIPS, DRIVERS EN-
GAGE IN INTERSTATE COMMERCE BY ROUTINELY PROVID-
ING AIRPORT TRIPS PURSUANT TO UBER'S AGREEMENTS
FOR AIRPORT ACCESS .............................................................. 21

    A.    Uber's Brief Does Not Address Key Arguments Regarding Air-
port Trips ................................................................................. 21

    B.    The Supreme Court's Treatment Of Wharfage Agreements Pro-
vides More Context Confirming That Rideshare Drivers' Air-
port Trips Are Within The Flow Of Interstate Commerce ......... 22

i

III.   UBER'S DRIVER AGREEMENTS ARE CONTRACTS OF EM-
       PLOYMENT ......................................................................................23

IV.   UBER'S REPLY FAILS TO EXPLAIN HOW A CHOICE-OF-LAW
       ANALYSIS CAN BE PERFORMED TO SUPERCEDE AN EXTANT
       AND UNSEVERABLE CHOICE-OF-LAW PROVISION INVOK-
       ING THE FAA ...................................................................................24

       A.    There Is No Basis To Sever The Choice-Of-FAA Provision As
             It Is Not "Invalid" Or "Unenforceable" ......................................25

       B.    Uber's Alleged Severability Clauses Do Not Function To Sever
             The Choice-Of-FAA Clause .......................................................28

V.    NEW YORK LAW DOES NOT REQUIRE ARBITRATION IN THIS
       CASE ...............................................................................................30

       A.    Uber Misunderstands The Scope Of CPLR 7515's Application 30

       B.    Under New York Law, an Individualized Assessment of the Ar-
             bitration Provision Prohibits Its Enforcement As a Matter of
             Policy ........................................................................................30

CONCLUSION ...........................................................................................32

CERTIFICATE OF COMPLIANCE ...........................................................33

# TABLE OF AUTHORITIES

## CASES

*Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265 (1995)......................................29

*Baker v. Dorfman,* 239 F.3d 415 (2d Cir. 2000) ............................................................8

*Baltimore & Ohio Southwestern R. Co. v. Burtch*, 263 U.S. 540 (1924)......................5

*Blash v. BLS Placements, LLC*, 2020 U.S. Dist. LEXIS 95391 (S.D.N.Y May 31, 2020) ............................................................................................................................30

*BP P.L.C. v. Mayor of Baltimore*, 141 S. Ct. 1532 (2021) .........................................12

*Brady v. Williams Capital Group, L.P.*, 14 N.Y.3d 459 (2010) ..................................31

*Buck v. California*, 343 U.S. 99 (1952)..............................................................10, 11, 13

*Capriole v. Uber Techs.*, 7 F.4th 854 (9th Cir. 2021) ..............................................4, 15

*Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001) ..................................5, 11, 19

*Cunningham v. Lyft*, 17 F.4th 244 (1st Cir. 2021) ..............................................4, 14, 16

*Daly v. Citigroup*, 939 F.3d 415 (2d Cir. 2019)..........................................................29

*Diaz v. Mich. Logistics, Inc.*, 167 F. Supp. 3d 375 (E.D.N.Y. 2016) .........................25

*Dumitru v. Princess Cruise Lines*, 732 F. Supp.2d 328 (S.D.N.Y. 2010) ..................26

*The Employer Liability Cases,* 207 U.S. 463 (1908) .........................................6, 13, 15

*Haider v. Lyft*, 2021 U.S. Dist. LEXIS 62690, 2021 WL 1226442 (S.D.N.Y. Mar. 31, 2021) .....................................................................................................3, 13, 14, 16

*Harris v. Shearson Hayden Stone*, 82 A.D.2d 87 (1st Dep't 1981)............................31

*International Brotherhood of Teamsters Local Union No. 50 v. Kienstra Precast, LLC*, 702 F.3d 954 (7th Cir. 2012).........................................................................3, 13

iii

*Islam v. Lyft*, 524 F. Supp. 3d 338 (S.D.N.Y. 2021) ..........................................3, 24, 25

*MBNA Am. Bank N.A. v. Hill*, 436 F.3d 104 (2d Cir. 2006) .......................................30

*Morris v. McComb*, 332 U.S. 422 (1947) ...................................................................11

*New Prime, Inc. v. Oliveira*, 139 S. Ct. 532 (2019) ....................................5, 19, 20, 29

*Rittmann v. Amazon.com, Inc.*, 971 F.3d 904 (9th Cir. 2020)..........................27, 28, 29

*Singh v. Uber Technologies*, 571 F.Supp.3d 345 (D.N.J., 2021)................................24

*Southwest Airlines Co. v. Saxon*, 142 S. Ct. 1783 (2022)...................2, 4, 5, 14, 20, 29

*Terwiliger v. Terwiliger,* 206 F.3d 240 (2d Cir.2000) ................................................26

*United States v. Hubbard*, 266 U.S. 474 (1925) .......................................7, 8, 9, 13, 15

*United States v. Yellow Cab*, 332 U.S. 218 (1947) .....................................................21

*Valdes v. Swift Transp. Co.*, 292 F. Supp.2d 524 (S.D.N.Y. 2003) ................24, 25, 29

**STATUTES**

CPLR § 7515.................................................................................................................30

Federal Arbitration Act, 9 U.S.C. § 1 ..................................................................*passim*

The Motor Carrier Act of 1935, 49 Stat. 543 .........................................................9, 10

**OTHER AUTHORITIES**

39TH ANNUAL REPORT OF THE INTERSTATE COMMERCE COMMISSION (1925), AT 115, AVAILABLE AT HTTPS://BOOKS.GOOGLE.COM/BOOKS?ID=EWFVAAAAMAAJ&PRINTSEC=FRONTCOVER&SOURCE=GBS_GE_SUMMARY_R&CAD=0#V=ONEPAGE&Q&F=FALSE.................17

4 WILLISTON ON CONTRACTS, *Sec XI*, *Partially Invalid Contracts,* § 19:70...............26

Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 COLUM. L. REV. 527, 537 (1947) ...............................................................................................................5

Scalia and Garner, READING LAW (2012)........................................................................6

RECENT ECONOMIC CHANGES IN THE UNITED STATES (1929), at 269, available at https://www.nber.org/system/files/chapters/c4957/c4957.pdf....................................17

WATER TRANSPORTATION 1926 (1929), at 41. Available at https://books.google.com/books?id=JUgnAQAAI-AAJ&printsec=frontcover&source=gbs_ge_summary_r&cad=0#v=onep-age&q&f=false..........................................................................................................18

## INTRODUCTION

Uber's brief calls for an atextual reading of the Federal Arbitration Act's exemption of workers engaged in interstate commerce; a view that would exclude rideshare drivers, who routinely transport passengers across state lines, and to and from airports in the flow of interstate commerce.

The FAA's plain language, however, includes no modifiers or exemptions that would limit the understanding of engagement in interstate commerce to long-distance interstate commerce, or to classes of workers predominantly engaged in interstate commerce, as Uber proposes. While a circuit-split exists on this question, Uber's brief conclusorily cites to decisions from one side of the split, without explaining why such decisions are more persuasive.

Uber similarly ignores Appellants' textual analysis rooted in the treatment of the identical phrase "engaged in interstate commerce" in other statutes contemporary to the FAA. The Supreme Court has long been guided by contemporary statutes in interpreting the FAA; these authorities make clear that Section 1's use of the term "engaged in commerce" is a term of art which, when used without modifiers or exceptions, applies broadly to include local interstate commerce, and that an entity is engaged in interstate commerce without regard to a threshold of interstate work performed. Uber's brief does not meaningfully engage these authorities. Instead, Uber continues to invoke the supposed mandate to give the residual exemption a

narrow construction, despite the fact that the Supreme Court has now held that statutory exemptions are not to be afforded a narrow construction.

In addition to state-line crossings, Uber drivers' airport trips constitute engagement in the flow of interstate commerce, consistent with appellate authority on similar facts, based on the non-incidental nature and quantity of such trips. This analysis is confirmed, specifically in the FAA context, by the Supreme Court's recent decision in *Southwest Airlines Co. v. Saxon*, 142 S. Ct. 1783 (2022), which noted the inclusion of agreements for "mere access" to wharfs as commerce under the FAA. *Saxon* informs an understanding that rideshare drivers' airport trips, performed pursuant to analogous agreements for airport access between Uber and airports across the U.S., constitute engagement in interstate commerce.

Absent application of the FAA to rideshare drivers, there is no basis for arbitration pursuant to any state law as Uber's contract calls exclusively and repeatedly for arbitration pursuant only to the FAA. This choice-of-law cannot be disregarded, and there is no basis for its severance as "invalid" merely because Uber now regrets the outcome it would require.

## ARGUMENT

### I. UBER'S BRIEF DOES NOT ENGAGE IN THE INFORMED ANALYSIS OF THE FAA'S TEXT REQUIRED BY THE SUPREME COURT'S FAA CASE LAW

## A. Section One's Plain Language Places No Modifiers On The Requirement To Engage In Interstate Commerce

The text of Section 1's residual exemption confirms that rideshare drivers are part of a class of workers engaged in interstate commerce, by virtue both of their routine crossing of state lines, and their even more common transportation of passengers to and from airports.

The FAA's plain language does not allow for the amendment-by-interpretation of the residual exemption, to modify the requirement for engagement in interstate commerce to require engagement in *long-distance* interstate commerce, or engagement *predominantly* in interstate commerce, a position supported by the Seventh Circuit in *International Brotherhood of Teamsters Local Union No. 50 v. Kienstra Precast, LLC*, 702 F.3d 954 (7th Cir. 2012) and, within this Circuit, by *Haider v. Lyft*, 2021 U.S. Dist. LEXIS 62690, 2021 WL 1226442 (S.D.N.Y. Mar. 31, 2021) and *Islam v. Lyft*, 524 F. Supp. 3d 338 (S.D.N.Y. 2021). Uber's brief largely does not engage with those decisions of numerous courts that emphasized that the statute's plain language forecloses the implication of numerical or geographical modifiers. Nor does Uber engage with the bright-line meaning of "interstate," in Section 1, which is clearer than any undefined notion of sufficiently long-distance transport that Uber proposes.

Instead Uber argues that, despite regularly crossing state lines and transporting passengers to and from airports, Uber drivers cannot be considered

3

engaged in interstate commerce because of the length of their trips and the proportion of trips within one state. In *Cunningham v. Lyft*, 17 F.4th 244, 252 (1st Cir. 2021), the First Circuit identified a circuit split between the Seventh and Ninth Circuits regarding whether the FAA requires any distance or threshold of interstate work for the exemption to apply. While the Seventh Circuit found that the text imposes no such requirements, the First and Ninth Circuits have largely based their decisions concerning rideshare drivers on what they view as the essentially local nature of Uber's business. Uber asserts that this Court should follow *Capriole v. Uber Techs.*, 7 F.4th 854 (9th Cir. 2021) and *Cunningham*, but does not explain why, in the face of this Circuit split and decisions within this Circuit following *Kienstra*, such decisions provide the more correct reading of the FAA.

Uber's argument rests largely on *Capriole* and several district court decisions' view that Section 1's requirement of engagement in interstate commerce requires long-distance transportation or a predominance of interstate work, following *Cunningham*'s language that "Lyft is clearly primarily in the business of facilitating local, intrastate trips." 17 F.4th, at 253. This approach has no basis in the text. In *Saxon*, the Court rejected arguments based on the general nature of a business, rather than the workers' activities, noting that the residual exemption must be understood in terms of workers' actions, and not the general nature of the business, finding

"Saxon is…a member of a 'class of workers' based on what she does at Southwest, not what Southwest does generally." 142 S. Ct., at 1788.[1]

### B. Meaningful Textual Analysis Of The FAA's Residual Exemption Must Be Informed By Contemporary Statutes

Uber's brief frames Appellants' discussion of statutes contemporary to the FAA as something extraneous, wholly outside its discussion of the FAA's text. However, because this case presents an issue of first impression in this Circuit regarding the scope of the residual exemption, it is essential to consult statutes contemporary to the FAA to inform an understanding of the text's contemporary meaning.

The Supreme Court is clear that it looks to contemporary statutes and cases to inform its understanding of the residual exemption. *See New Prime, Inc. v. Oliveira*, 139 S. Ct. 532, 535 (2019) (looking to "[c]ontemporaneous legal authority" to inform interpretation of the residual exemption); *Saxon*, at 1789 (*citing* a FELA case, *Baltimore & Ohio Southwestern R. Co. v. Burtch*, 263 U.S. 540 (1924) in determining the scope of the residual exemption). In *Circuit City Stores, Inc. v. Adams*, the Court described the term "engaged in commerce" as a "term of art" that should not be subject to variable meanings. 532 U.S. 105, 118 (2001). "[I]f a word is obviously transplanted from another legal source… it brings the old soil with it."

---

[1] Uber's brief makes much of *Saxon*'s reference to what a class of workers "typically" does. Appellants will address *Saxon* in more detail *infra*.

Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 COLUM. L. REV. 527, 537 (1947). *See also*, Scalia and Garner, READING LAW (2012), at 325 regarding the prior-construction canon ("The bar is unquestionably justified in relying on a decision (even a single decision) of the jurisdiction's highest court regarding the meaning of a certain word or phrase that is repeated in a later statute"). Cases contemporary to the FAA plainly confirm that, at the time of the FAA's passage in 1925, Congress and the courts understood "engaged in interstate commerce" to apply without regard to distance or thresholds of the proportion of interstate work a party was engaged in.

Uber argues that Appellants cited no Supreme Court case regarding the broad scope of the term "engaged in interstate commerce." Appellees' Br. 34. This is incorrect. Appellants' brief analyzes *The Employer Liability Cases*, 207 U.S. 463 (1908), which directly addressed whether a railroad was engaged in interstate commerce, and required to provide compensation for a worker's injury, even if the injury occurred while not engaged in interstate commerce. In deciding that *any* injury incurred while working for a railroad "engaged in interstate commerce" would be covered under the FELA, the Court noted that the statute's "all-embracing words" required the Court to view the statute as being addressed to corporations "who are engaged in interstate commerce" and was "not confined solely to regulating the interstate commerce business which such persons do." *Id*. at 497.

6

This decision directly addresses whether predominance of interstate work or any threshold must be met when a statute uses the broad jurisdictional term "engaged in interstate commerce." The Court understood "engaged in interstate commerce" to apply to a railroad, even if neither the railroad nor its employees would always be engaged in interstate commerce. On this point, the Court was explicit, providing examples of companies that would fall within the FELA's scope as "engaged in interstate commerce": "a railroad engaged in interstate commerce, having a purely local branch operated wholly within a State…a trolley line moving wholly within a State as to a large part of its business and yet as to the remainder crossing the state line." *Id*. at 498-99. The Court considered these to be engaged in interstate commerce, regardless of their locality ("trolleys") or proportion of interstate work. Uber's brief does not address this decision.

The Court's early-twentieth century view of the unqualified scope of the term "engaged in interstate commerce" is confirmed by its decision in *United States v. Hubbard*, 266 U.S. 474 (1925) (Brandeis, J.), decided a month before the FAA's enactment. In *Hubbard*, faced with the "question whether interurban electric railroads *engaged in interstate commerce* are subject generally to regulation by the Interstate Commerce Commission," and looking at interurban electric railroads that operated "lines within and between Ohio municipalities, and also between these and

7

a city in an adjoining State," the Court held that such essentially local railroads were subject to ICC regulation. *Id*. at 476 (emphasis added).

Further, *Hubbard* sets a definitive understanding of what "railroad," without any modifiers or exceptions, would have been understood to encompass in 1925. Accordingly, *Hubbard* necessarily informs an *ejusdem generis* analysis of Section 1 in defining a reference point for what "other classes" of workers resemble railroad workers. *See infra*.

### C. Cases Regarding The Motor Carrier Act Confirm That Congress Understood Local Transportation, Including Taxicabs, To Not Be Outside Of Engagement In Interstate Commerce

Cases concerning the requirement for engagement in interstate commerce under the Motor Carrier Act ("MCA") likewise inform how the residual exemption applies to rideshare drivers. While Uber argues that Appellants waived this argument, these cases present no new "issue," but merely further discuss whether thresholds of interstate work are required to show engagement in interstate commerce. Appellants raised such cases in their reply brief to the district court, and discussion of the MCA concerns purely legal questions. *See Baker v. Dorfman*, 239 F.3d 415, 420-21 (2d Cir. 2000).

Uber's view that MCA cases cannot inform an understanding of the FAA lacks merit. While such decisions were issued after the FAA's passage, they nonetheless inform a contemporary understanding of the term. Just as "engaged in

8

commerce" is a term of art that, as used in the FELA, would have informed Congress' understanding of the term's inclusion in the FAA, that understanding would have similarly carried over as a term of art into the MCA.

The MCA's partial exemption of taxicabs from certain requirements plainly indicates that taxicabs were otherwise covered and could be considered engaged in interstate commerce. *See* 49 Stat. 543, 545. This context furthers an understanding of how, although early-twentieth-century taxicab services were far more local and fragmented than Uber's global operations, rideshare drivers fit into the early-twentieth-century understanding of engagement in interstate commerce.

Uber argues that the MCA's explicit exemption of taxicabs "ratifies the prevailing understanding that local transportation service is not interstate commerce, even when drivers occasionally cross state lines." Appellees' Br. 31. This is incorrect, and Uber simply ignores the fact that the MCA did apply, in part, to taxicabs. Appellants' brief discussed the MCA's taxicab exemption to note that the textual choice to include the exemption signifies that, absent the exemption, the statute could apply to taxicabs. The Supreme Court said as much in *Hubbard*, noting that the partial exemption of interurban railroads from interstate commerce legislation indicated that "Congress did not intend to deny to the Commission the power to regulate interurban railways in other respects." 266 U.S., at 480.

In opposition, Uber misstates the content of the MCA's taxicab exemption, claiming that it exempted taxicabs broadly, "even those who crossed state lines." Appellee's Br. 29. This is false. The Motor Carrier Act of 1935, 49 Stat. 543, 545, *partially* exempted taxicab drivers from its coverage, stating, "Nothing in this part, except the provisions of section 204 relative to qualifications and maximum hours of service of employees and safety of operation or standards of equipment shall be construed to include… taxicabs." That the Act exempted taxicabs from some regulatory requirements, but not others, indicates that the non-exempted sections could apply to taxicabs. Such provisions could only apply if taxicabs could be considered engaged in interstate commerce.

The Supreme Court confirmed this in *Buck v. California*, 343 U.S. 99 (1952), which concerned whether local taxicab regulations were in conflict with, and thus preempted by ICC regulations under the MCA. Uber cites *Buck* for its description of taxicabs as a "local business," but fails to notice that *Buck* makes abundantly clear that the Supreme Court understood that taxicabs could be "engaged in interstate commerce." *Buck* explicitly notes that the MCA only *partially* exempted taxicabs from its coverage, and that "[t]he Interstate Commerce Commission, acting under authorization of Congress, has promulgated regulations establishing minimum qualifications for drivers of motor vehicles for carriers, including taxicabs, engaged in interstate and foreign commerce." *Id*. at 101. Uber's misreadings of the MCA and

10

*Buck* notwithstanding, the MCA's structure accords with the Court's earlier FELA precedents that, absent the inclusion of modifiers or exemptions in a statute, the broad phrase "engaged in interstate commerce" would apply to short-haul transportation that crosses state lines.

Uber's attempt to distinguish the Supreme Court's decision in *Morris v. McComb*, 332 U.S. 422 (1947) similarly misunderstands the structure of the statute. Uber points to other factors required to satisfy the motor carrier exemption, but such factors don't alter the fact that the statute still required a showing of a connection to "transportation in interstate commerce." *Id*. at 435. Indeed, that is *why* the Court needed to analyze the amount of work done in interstate commerce to reach its decision.

### D. Because Rideshare Drivers Are Transportation Workers, And Engaged In Interstate Commerce, They Fall Within The FAA's Residual Exemption

In *Circuit City*, applying the *ejusdem generis* canon of interpretation, the Supreme Court held that "Section 1 exempts from the FAA only contracts of employment of transportation workers," engaged in interstate commerce. 532 U.S., at 119. Uber now proposes further shrinking the exemption on the basis that *Circuit City* counseled that the residual exemption must be afforded a narrow construction. Essentially, Uber's view is that the residual exemption should not cover transportation workers unless they are both predominantly engaged in interstate

work, and their work entails long-distance transportation. This argument ignores both directly relevant Supreme Court case law treating local transportation as interstate commerce when it is interstate, and the Supreme Court's recent holding that statutory exemptions generally, are to be given a fair, not a narrow construction. *BP p.l.c. v. Mayor of Baltimore*, 141 S. Ct. 1532, 1539 (2021); Appellants' Br. 23.

Uber's rationale for this narrowing-upon-narrowing of the exemption boils down to this: only those transportation workers who resemble a statistically average railroad or maritime worker from 1925 should fall within the exemption. *See* Appellees' Br. 21-24. Neither the FAA's text, contemporary statutes, nor the history of these industries support this limited reading.

Uber drivers are undoubtedly transportation workers; in determining whether they fall within the residual exemption, the only question is whether they are engaged in interstate commerce. Determining whether they are, with reference to the text of the residual exemption, can be informed by reference to how early-twentieth-century courts determined whether, *e.g.*, a railroad worker or railroad was engaged in interstate commerce.

The terms "railroad employees" and "seamen" encompass a diversity of work arrangements, all of which fall within the residual exemption. Accordingly, the text of Section 1 and the canon of *ejusdem generis* could only demand, at most, that a

class of workers perform work similar to work performed by a railroad or maritime worker who was engaged in interstate commerce.

As noted above, the Supreme Court considered transportation workers performing "essentially local" interstate work on interurban railroads and others performing similarly local work to be "engaged in interstate commerce." Such cases establish what it means for a class of workers within the residual exemption to be engaged in interstate commerce in a manner similar to railroad workers and seamen. *See*, *Employer Liability Cases*, *supra*; *Hubbard*, *supra*; *Buck*, *supra*. *See also*, Garner and Scalia, *supra*, at 325. Uber presents no authority explaining *why* drivers must perform work in line with what Uber posits was an average railroad worker in 1925, as opposed to following the Supreme Court's plain language guidance considering short-haul interstate workers' engagement in interstate commerce.

Uber makes much of the fact that some drivers in some markets may never cross state lines, yet Uber never presents a number of drivers nationwide who do or do not perform trips across state lines; the record shows that, nationwide, roughly 1 in 30 trips crosses state lines and roughly every tenth trip involves an airport, trips that are undoubtedly performed by workers in every geographic market. J.A. 37-38. Considering only state-line crossings, this aggregate data aligns with the percentage of work performed in, *e.g.*, *Kienstra* at 958. *See also Haider*, at *10, considering nationwide aggregate data, and noting "weekly interstate trips are enough" to find

engagement in interstate commerce. And, undoubtedly all Uber drivers routinely perform airport trips in the flow of interstate commerce.

Uber implies that *Saxon*'s reference to what workers "typically" do likewise requires some larger– and undefined– proportion of workers in a class be engaged in interstate commerce in order for the exemption to apply. Appellees' Br. 8. Such questions, though, were not at issue in *Saxon*, and Uber's argument here is inconsistent with its position in *Singh v. Uber Technologies*, 21-3234 (3d Cir.), where, the same day it filed its brief in this case, Uber filed a letter seeking to refute the appellant's contention that *Saxon* had "any 'impact … on the instant appeal'" and reiterating Uber's position that, in *Saxon*, "the only question was whether cargo loaders were sufficiently close to the airline's interstate work to fall within the Section 1 exemption." *Id*. at Dkt. 45 (internal citations omitted).

Notwithstanding the fact that *all drivers* perform airport trips, and Uber presents no data on drivers who do not cross state lines, the FAA certainly does not require that *all* members of a class of workers be engaged in interstate commerce. Many courts have understood that the exemption does not function as Uber now proposes. In *Haider*, Judge Nathan noted that "not every rideshare driver takes passengers across state lines. But that's true too for workers expressly covered by the exemption like railroad employees." *Haider*, at *9. Similarly, in *Cunningham*, the First Circuit noted that "we also expect that some workers on passenger railroads

may handle only within-state trips," so the Court could not "rely on this fact alone" to determine whether rideshare drivers fall within the exemption. 17 F.4th, at 253.

In *The Employer Liability Cases* and *Hubbard*, companies were found engaged in interstate commerce, where some but not all of their operations were interstate. The same would, by reason, follow regarding these companies' employees' engagement in their operations, and thus the class of railroad workers generally. Accordingly, rideshare drivers as a class perform work analogous to railroad workers' and seamen.

Uber attempts to support its ultra-narrowing of the exemption by critiquing Appellants' presentation of data showing how transportation workers did not always cross state lines, and often performed short-haul work within a local area, providing historical support for the fact that, even in a narrower *ejusdem generis* analysis, rideshare drivers perform work similar to that performed by *many* railroad workers and seamen. While *Hubbard* and *The Employer Liability Cases* control this question, historical data supports Appellants' argument that *Capriole*'s insistence on long-distance and predominantly interstate transport is not only atextual, but unsupported by historical data. Uber's attempts to undermine this historical context fail.

15

Uber takes issue with Appellants' citation that 49% of all railroad passenger-trips were commuter trips, thus "local" trips.[2] Appellees' Br. 22-23. As *Cunningham* and *Haider* noted, many railroad workers would not cross state lines; this data proves that. Uber's analysis of historical transportation data oscillates between data points (revenue, distance, trips) when it believes one number serves its purpose, without explaining how the data it invokes reflects on the activities *of the class of workers*, as opposed to the nature of the business. Despite Uber's objections, the number of passenger-trips sheds more light on worker engagement than revenue or miles traveled; more passengers require more cars which require more conductors and agents. Uber presents no data to indicate that railroad workers working in commuter service were so few, or out-of-line with the number of passenger-trips. Further, intrastate passenger-trips would not be limited to commuter passenger-trips[3] but would include trips through much-trafficked corridors such as New York-Buffalo, Philadelphia-Pittsburgh, Los Angeles-Oakland. Uber's critique of this data doesn't suggest otherwise, and records confirm this, noting the average length, *of all passenger trips*, in 1924 was 38.7 miles, a trip that would often remain intrastate. William J. Cunningham,

---

[2] Appellants' use of trips refers to "passenger-trips," a well-known usage, distinct from Uber's suggestion that Appellants misrepresented data to imply the number of voyages-per-train.

[3] Certainly, some commuter trips would be interstate as well.

Committee on Recent Economic Changes of the President's Conference on
Unemployment, RECENT ECONOMIC CHANGES IN THE UNITED STATES (1929), at
269, available at https://www.nber.org/system/files/chapters/c4957/c4957.pdf.

Uber argues that any comparison to passenger-transportation data alone is
irrelevant to understanding the residual exemption, and that all trains, including
freight, must be considered. Appellees' Br. 23. Although Uber abandoned its
argument that the residual exemption applies only to workers who transport goods,
Uber argues that because goods "dominated" railroads (in terms of revenue),
rideshare drivers are not similar. But corporate revenue says nothing about the
activities of a class of workers, and, in 1924, total train-miles on passenger and
freight service were roughly equivalent. *See*, 39TH ANNUAL REPORT OF THE
INTERSTATE COMMERCE COMMISSION (1925), at 115, available at
https://books.google.com/books?id=ewfVAAAAMAAJ&printsec=frontcover&sou
rce=gbs_ge_summary_r&cad=0#v=onepage&q&f=false (reporting, in 1924,
553,253,000 "passenger train-miles" and 600,576,000 "freight train miles.")
While a railroad may generate more *revenue* from a freight train pulling 100 coal-
cars than a 10-car passenger train, it doesn't stand to reason that the coal train would
have *engaged more workers* than the passenger train; indeed, given the need for
conductors and porters on passenger cars, the opposite seems likely.

Similarly, Uber argues that, although 93% of passenger-trips on boats were local ferryboat trips, this is insignificant because ferries were a small percentage of total boats. Appellees' Br. 23-24. But ferryboat workers were not the only seamen engaged on short-distance, local boats. Uber points to the larger number of other categories of active vessels in Appellants' sources, apparently without realizing that many of the types of craft listed were essentially local vessels. The report shows for example, that 21.2% of craft were scows, and 6.7% were lighters.[4] *See* Department of Commerce, U.S. Bureau of the Census, WATER TRANSPORTATION 1926 (1929), at 41. Available at https://books.google.com/books?id=JUgnAQAAIAAJ&printsec=frontcover&source=gbs_ge_summary_r&cad=0#v=onepage&q&f=false. This report notes that "scows are used mainly for port work and short hauls." *Id*. at 40, n. 4. And while barges represent the majority of vessels, at 62.8%, the report notes that "[b]arges and scows are both used as lighters." *Id*. at 41; 40, n.4. Accordingly, seamen largely worked on locally operating vessels.

### E. Legislative History Neither Determines the Scope of the Residual Exemption, Nor Aides Uber's Argument

Uber attempts to argue that the residual exemption should only apply to transportation workers who were covered by alternative dispute resolution

---

[4] The same report notes that "lighters…[are] operated within harbors" *Id*.

legislation at the time of the FAA's passage, or who would be in the future. This argument finds no favor in the Supreme Court's treatment of legislative history in FAA cases, nor in the Supreme Court's decision finding truckers within the exemption, despite lacking any such outside of a legislative dispute resolution scheme. *See New Prime*, *supra*.

In *Circuit City*, the Supreme Court was explicit that legislative history did not inform its decision regarding the scope of the residual exemption: "As the conclusion we reach today is directed by the text of §1, we need not assess the legislative history of the exclusion provision…We do note, however, that the legislative record on the §1 exemption is quite sparse." 532 U.S., at 119. The Court explained that the sparse legislative history around the residual exemption provided a "permissible inference" as to *why* the exemption was shaped as it was, but such inference did not inform its decision. *Id.* at 120.

Despite the Court's explicit disclaimer that legislative history would not determine the exemption's scope, Uber argues that the exemption should cover only workers who had or would be included in federal dispute resolution legislation. Appellees' Br. 24-26. Such an exemption would cover seamen, railroad workers, and airline workers whose place within the residual exemption, if not anticipated by 1925, would later be confirmed by their inclusion in the Railway Labor Act. This argument is fatally undermined by the Court's inclusion of automobile-based

19

transportation workers within the exemption. *New Prime*. Trucking and bus service were well-established by 1925. *See*, RECENT ECONOMIC CHANGES, *supra*, at 272 (discussing trucking and noting that "[t]he number of employees in the automotive industry and highway transportation is more than those engaged in railway service.") If the existence of federal dispute resolution legislation determined the scope of the residual exemption, the Court could not have decided *New Prime* as it did since no federal legislation specifically governs employment disputes involving truckers.[5]

Uber closes its argument on legislative history by claiming that the FAA's policy of overcoming judicial hostility to arbitration should guide its interpretation and the exemption should be given narrow scope. Appellees' Br. 28. The Supreme Court has explicitly rejected this policy argument twice in recent years: "[W]e are not 'free to pave over bumpy statutory texts in the name of more expeditiously advancing a policy goal.' … we have no warrant to elevate vague invocations of statutory purpose over the words Congress chose." *Saxon*, 142 S. Ct., at 1792-93, *quoting New Prime*, 139 S. Ct., at 535. Uber likewise ignores the Supreme Court's recent holding that statutory exemptions are not to be given a narrow reading, but merely a fair one. *Mayor of Baltimore*, *supra*.

---

[5] Uber's citation to the MCA in its legislative history argument misses the mark; the MCA regulates certain aspects of interstate commerce by vehicle, but establishes no dispute resolution framework.

II.   **BEYOND PERFORMING INTERSTATE TRIPS, DRIVERS ENGAGE IN INTERSTATE COMMERCE BY ROUTINELY PROVIDING AIRPORT TRIPS PURSUANT TO UBER'S AGREEMENTS FOR AIRPORT ACCESS**

### A. Uber's Brief Does Not Address Key Arguments Regarding Airport Trips

Appellants' brief describes why *United States v. Yellow Cab*, 332 U.S. 218 (1947) does not answer whether rideshare drivers' airport trips can be considered engagement in interstate commerce. While *Yellow Cab* held that through-ticketing arrangements between taxis and railroads would be sufficient to find engagement in interstate commerce, through-ticketing is not a necessary condition, and *Yellow Cab* explicitly noted that different facts could merit finding interstate commerce. *Id.* at 232-33.

Appellants' brief cited multiple cases that explicitly distinguished *Yellow Cab* and found engagement in interstate commerce without state-line crossing or through-ticketing. *See* Appellants' Br. 44-49. Uber ignores these authorities and merely insists that *Yellow Cab* controls this case, despite the vast differences between a local taxi company operating within city limits, and Uber's nationwide operation deriving 15% of its revenue from airport trips, pursuant to agreements to access "most major U.S. airports" for passenger pick-up and drop-offs. J.A. 373.  A more thoughtful analysis of *Yellow Cab*'s limitations, in line with the appellate decisions cited in

Appellants' opening brief, merits finding rideshare drivers' airport trips within the flow of interstate commerce.

### B. The Supreme Court's Treatment Of Wharfage Agreements Provides More Context Confirming That Rideshare Drivers' Airport Trips Are Within The Flow Of Interstate Commerce

In *Saxon*, the Supreme Court looked to Section 1's first sentence for further guidance on what activities would constitute commerce under the residual exemption. *Saxon*'s treatment of wharfage further indicates that rideshare drivers' airport trips constitute interstate commerce under the FAA's residual exemption. There, the Court wrote,

> the first sentence of §1 of the FAA defines exempted "maritime transactions" to include, among other things, "agreements relating to wharfage...or any *other* matters in foreign commerce." (Emphasis added.) The use of "other" in the catchall provision indicates that Congress considered the preceding items to be "matters in foreign commerce." And agreements related to the enumerated "matte[r] in foreign commerce" of "wharfage," to take one example, included agreements for mere access to a wharf—which is simply a cargo-loading facility.… It stands to reason, then, that if payments to access a cargo-loading facility relate to a "matte[r] in foreign commerce," then an individual who actually loads cargo on foreign-bound ships docked along a wharf is himself engaged in such commerce.

142 S. Ct., at 1790.

Analogous to wharfage agreements are Uber's "arrangements with most major airports" to allow Uber to access airports to pick up and drop off

passengers. J.A. 373.[6] Following the Court's reasoning that, if a wharfage agreement is commerce under the FAA, then the work of loading cargo pursuant to such agreements is commerce, it follows that if agreements for "mere access" to airports for drop-off and pick-up of passengers is similarly commerce, then the work of transporting passengers immediately departing or disembarking from cross-border flights, pursuant to Uber's agreements, is likewise engagement in foreign or interstate commerce.

## III.   UBER'S DRIVER AGREEMENTS ARE CONTRACTS OF EMPLOYMENT

Uber's argument that its contracts to pay drivers for performing car service trips for Uber, a global car service, are not contracts of employment simply strains credulity. Uber argues that these are not contracts of employment (i.e., an agreement to work for pay) because Uber doesn't pay drivers. Uber cites no cases to support this view; to the contrary, New York courts have held that Uber's payments to

---

[6] *See also*, *e.g.*, *Syracuse Hancock International Airport* (website) https://syrairport.org/syr-announces-uber-begin-operating-airport/ (Date accessed: Aug. 15, 2022) (describing Uber's contractual agreement with Syracuse International Airport for a $60,000 one-year fee to allow Uber to begin airport pick-ups and drop-offs); Department of Airports, City of Los Angeles *Customer Facility Charge Revenue Bonds, 2022 Series A*, at 67, available at https://lawamediastorage.blob.core.windows.net/lawa-media-files/media-files/lawa-web/lawa-investor-relations/files/2022-series/lax-2022-cfc-bonds-os.pdf (Describing the Airport Department's agreements with rideshare companies ("Transportation Network Companies), to pay a fee of at least $25,000 per month to access "designated airport property" at Los Angeles International Airport) (Date accessed: Aug. 15, 2022).

drivers are "wages" earned in employment sufficient to establish eligibility for unemployment benefits. *See Matter of Lowry*, 189 A.D.3d 1863 (3d Dep't 2020), *leave to appeal dismissed Matter of Claim of Colin Lowry*, 37 N.Y.3d 1045 (2021). Additionally, Uber's argument that drivers are not required to work is plainly undermined by the contract; drivers must provide at least one trip a month or Uber may fire, or "deactivate" them. J.A. 73, §2.1.

IV.  **UBER'S REPLY FAILS TO EXPLAIN HOW A CHOICE-OF-LAW ANALYSIS CAN BE PERFORMED TO SUPERCEDE AN EXTANT AND UNSEVERABLE CHOICE-OF-LAW PROVISION INVOKING THE FAA**

Arbitration cannot be compelled pursuant to state law where the arbitration provision exclusively asserts that it is governed by the FAA, and such choice is unseverable. Nonetheless, Uber argues that, should the FAA not apply, the Court must compel arbitration pursuant to New York law, after performing a choice-of-law analysis. Had Uber wanted its arbitration provision to be governed by the FAA, or by state law in the event of the FAA's inapplicability, it could have written such a clause, as it did in 2020, or simply remained silent on choice-of-law. *See Valdes v. Swift Transp. Co.*, 292 F. Supp.2d 524 (S.D.N.Y. 2003).

Cases Uber cites in support of disregarding the choice-of-FAA provision without first analyzing severability are inapposite. Neither *Islam* nor *Singh v. Uber Technologies, Inc.*, 571 F. Supp. 3d 345 (D.N.J 2021), address the necessary step of

24

severing a choice-of-FAA provision before conducting a choice-of-law analysis. *Islam* based its decision on inapposite and erroneous district court decisions which Appellants addressed in their opening brief. Appellants' Br. 57-58 (discussing *Swift*, *supra*, and *Diaz v. Mich. Logistics, Inc.*, 167 F. Supp. 3d 375 (E.D.N.Y. 2016)).

Absent severance of the choice-of-FAA provision, a court cannot superimpose another choice-of-law over the contract's choice-of-law. *See* Appellants' Br. 52-53. Given this, Uber argues for the first time on appeal, how it believes the contract calls for severance of the choice-of-FAA provision.[7] Even if, *arguendo*, these arguments are not considered waived, they fail on the merits.

## A. There Is No Basis To Sever The Choice-Of-FAA Provision As It Is Not "Invalid" Or "Unenforceable"

Uber asserts severance of the choice-of-FAA provision pursuant to its contract, which states generally that "[i]f any provision of this Agreement is or becomes invalid or non-binding, the parties shall remain bound by all other provisions hereof[,]" J.A. 85, § 14.3. Uber also asserts that §15.3(ix) requires severance of an "unenforceable" provision.

Uber argues that if drivers are exempt from the FAA, then the choice-of-FAA provision must be severed, but never explains how a finding that the FAA is

---

[7] Uber's brief notes that Uber "pointed to" the severability clause in Uber's reply brief to the district court. Appellees' Br. 46. This characterization is accurate; Uber did not present any argument on how severability could function until appeal.

inapplicable to rideshare drivers renders *the choice-of-FAA provision* an "invalid" or "unenforceable" choice-of-law.

Even if a court may not compel arbitration pursuant to 9 U.S.C. 4, the choice-of-law provision is nonetheless valid. *Terwiliger v. Terwiliger,* 206 F.3d 240, 245 (2d Cir.2000) (finding that generally "choice of law provisions are valid and enforceable"). The analysis of the severability of a partially "invalid" contract centers on whether such provisions are illegal. *See*, *e.g.*, 4 WILLISTON ON CONTRACTS, *Sec XI*, *Partially Invalid Contracts,* § 19:70: Severability and Enforceability Generally, 682-83 (discussing, generally, severance of illegal terms). A choice-of-law provision would be invalid or unenforceable when, because of law or policy grounds, a court may not enforce it. *See*, *e.g.*, *Dumitru v. Princess Cruise Lines*, 732 F. Supp.2d 328, 340-42 (S.D.N.Y. 2010) (finding a choice-of-Bermuda-law provision unenforceable as against public policy). That is not the case here, and Uber does not argue otherwise.

Both Uber's updated 2020 arbitration agreement and the FAA's text confirm the distinction between the FAA being "inapplicable" and terms being "invalid." Section 1 speaks of "not apply[ing]" to contracts of transportation workers; in line with this terminology, Uber revised its choice-of-arbitral-law provision in 2020 to alternatively require arbitration under state law "if... the Federal Arbitration Act

*does not apply* to this Arbitration Provision" J.A. 586, § 14.1(a) (emphasis added), not in "in the event the choice of the FAA is invalid" or "unenforceable."

It is certainly valid to select a preemptive federal statute in a choice-of-law provision; Uber presents only a conclusory assertion to the contrary and no authority for why the choice-of-FAA provision cannot be enforced.

In *Rittmann v. Amazon.com Inc.*, the Ninth Circuit reached the same result when considering an agreement that, regarding severability, stated "If any provision of this Agreement is determined to be unenforceable, the parties intend that this Agreement be enforced as if the unenforceable provisions were not present…" 971 F.3d 904, 908 (9th Cir. 2020). The Ninth Circuit did not find the choice-of-FAA provision susceptible to a severability analysis, noting there was nothing "unconscionable" about the provision that could thus render it unenforceable. Instead of acknowledging this, Uber's brief misrepresents *Rittmann*'s analysis, arguing that the Court's refusal to compel arbitration depended *only upon* Washington law forbidding the enforcement of the arbitration agreement (Appellees' Br. 51-52); Uber fails to notice that the Court only entertained Amazon's argument, if "*arguendo*" it could sever the clause, which it could not. *Rittmann*, 971 F.3d, at 920.

27

The same result is required here. As in *Rittmann*, the choice-of-FAA provision is not "unconscionable" as against public policy or otherwise invalid or unenforceable.

**B. Uber's Alleged Severability Clauses Do Not Function To Sever The Choice-Of-FAA Clause.**

Assuming, *arguendo*, that Uber's severability provisions could relate to the choice-of-FAA clause, neither of these provisions actually call for severance of an offending term.

First, Section 15.3(ix) does not call for severance of any term, but is actually a savings clause, merely stating, that, "in the event any portion of this Arbitration Provision is deemed unenforceable, the remainder of this Arbitration Provision will be enforceable." J.A. 93.

Second, Section 14.3, although titled "Severability," likewise never calls for severance of an "invalid" or "non-binding" term; accordingly, it provides no basis for severance of the choice-of-FAA provision, assuming, *arguendo*, it would be found "invalid." This is distinct from *Rittmann*, where the contract contained a clear severability clause. *See Rittmann v. Amazon.com, Inc.*, C16-1554-JCC (W.D. Wash), Dkt. 37-1, §16. Instead, Section 14.3 calls for the parties to replace an invalid term. Absent application of the FAA to rideshare drivers, there is no contractual basis to find mutual assent for any other law governing the arbitration provision. A

court's role is limited to enforcing an arbitration agreement "accord[ing to] the terms of the parties' agreement." *New Prime*, 139 S. Ct., at 537. What Uber now proposes, asking the Court to replace the choice-of-FAA provision with an alternate choice to which the parties have not assented, would be a plainly impermissible re-writing.

The arbitration provision states explicitly that it is governed by the FAA *three times*. This leaves no doubt as to the drafters' intentions; all the more so considering that, absent drivers' falling within the residual exemption, the FAA would have already applied to the arbitration provision, as a contract involving commerce. *See Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265 (1995); *Swift*, *supra* (beginning analysis of agreement under the FAA where arbitration agreement contained no choice-of-law provision). The current litigation sets forth the parties' positions regarding whether any other law should apply if the FAA is inapplicable. At most, this presents ambiguity as to whether the parties ever intended for any other law to apply. Of course, any such ambiguity must be construed against the drafter. *See*, *Rittmann*, at 920 ("Because it is not clear that the parties intended to apply Washington law to the arbitration provision in the event the FAA did not apply, we construe ambiguity in the contract against Amazon to avoid that result.")[8]

---

[8] Uber's cite to *Daly v. Citigroup*, 939 F.3d 415 (2d Cir. 2019) which concerns resolving disputes regarding *the scope of arbitrable* issues in favor of arbitrability, is inapposite to determining threshold questions of arbitrability.

## V.  NEW YORK LAW DOES NOT REQUIRE ARBITRATION IN THIS CASE

### A. Uber Misunderstands The Scope Of CPLR 7515's Application

Uber incorrectly states that CPLR 7515 does not apply because the arbitration agreements contain opt-out provisions and thus are not "mandatory." Appellees' Br. 55. This argument relies on a misunderstanding of what constitutes mandatory arbitration: "mandatory" arbitration does not refer to the possibility of a party opting out, but whether parties must arbitrate their claims upon agreeing to the clause. This court has long viewed arbitration agreements as "mandatory" even where they contain opt-out provisions. *MBNA Am. Bank N.A. v. Hill*, 436 F.3d 104, 106-07 (2d Cir. 2006). *See, also  e.g., Blash v. BLS Placements, LLC*, 2020 U.S. Dist. LEXIS 95391 (S.D.N.Y May 31, 2020) at *14, n. 4 ("Mandatory" arbitration requires arbitration if either of the parties elects to pursue it; "permissive" arbitration requires arbitration only with the consent of both parties."). Because the arbitration agreement requires the arbitration of "any dispute," J.A. 86, §15.3(i), it is mandatory and subject to CPLR 7515.

### B. Under New York Law, an Individualized Assessment of the Arbitration Provision Prohibits Its Enforcement As a Matter of Policy

Uber ends its assessment of the arbitration agreement's enforceability under New York law by citing to the general proposition that New York law does not prohibit class action waivers and favors arbitration. Appellees' Br. 55. However,

30

Uber does not respond to Appellants' arguments: namely, the New York Court of Appeals requires assessment of the enforcement of arbitration agreements on a case-by-case basis, and the policy justifications offered for favoring arbitration militate against providing it here.

Due to the scale of the potential class, enforcement of the arbitration clause would make it impossible for Appellants and over 90,000 largely immigrant low-wage workers to have their claims heard at all should the arbitration agreement be enforced. As the Court of Appeals has acknowledged, the "strong state policy favoring arbitration" is not unlimited, and must be balanced against other policy interests. *Brady v. Williams Capital Group, L.P.*, 14 N.Y.3d 459, 467 (2010). Per *Brady*, these facts present starkly different policy considerations than any present in *Harris v. Shearson Hayden Stone*, 82 A.D.2d 87 (1st Dep't 1981), cited by Uber, which involved a sophisticated party seeking to bring a class action concerning the handling of his commodities account on behalf of a class of unknown size. Here, those policy interests – namely, effective vindication of Appellants' rights – would preclude the enforcement of the arbitration agreement in this case.

## CONCLUSION

The judgment should be reversed.

Dated:  August 22, 2022

<div style="margin-left:40%">

Respectfully Submitted,

JULIEN & MIRER, PLLC

/s/ Jeanne Mirer

_____

By:  Jeanne Mirer
1 Whitehall Street, 16th Floor
New York, New York 10004
(212) 231-2235
jmirer@julienmirer.com

*and*

ZUBIN SOLEIMANY, ESQ.
NEW YORK TAXI WORKERS
ALLIANCE

/s/ Zubin Soleimany

_____

31-10 37th Avenue, Suite 300
Long Island City, New York 11101
(718) 706-9892
zsoleimany@nytwa.org

*Attorneys for Plaintiffs-Appellants*

</div>

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of Rule 32(a)(7)(B).  As measured by Microsoft Word 2013, the word-processing system used to prepare it, this brief contains 6,955 words.

Dated: August 22, 2022

/ s / Jeanne Mirer
_____
Jeanne Mirer
*Attorney for Appellant*s

## **CERTIFICATE OF SERVICE**

I hereby certify that one ( 1) copy of the following:

APPELLANT'S REPLY BRIEF

was served upon Appellee's counsel via the Court's ECF System, as indicated, this
_22_ day of August, 2022, upon the following:

Date: August _22_, 2022

/s/ Jeanne Mirer

_____

Jeanne Mirer
*Attorney for Appellant*